RICHARD M. PACHULSKI (Cal. Bar No. 90073)
ROBERT B. ORGEL (Cal. Bar No. 101875)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:  rpachulski@pszjlaw.com
         rorgel@pszjlaw.com

Attorneys for Shlomo Rechnitz

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SANTA ANA DIVISION

In re:

Plaza Healthcare Center LLC,

　　　Debtor and Debtor-in-Possession.

☒ Affects All Debtors

☐ Affects Belmont Heights Healthcare Center LLC
☐ Affects Claremont Healthcare Center Inc.
☐ Affects Country Villa East LP
☐ Affects Country Villa Imperial LLC
☐ Affects Country Villa Nursing Center Inc.
☐ Affects Country Villa Southbay LLC
☐ Affects East Healthcare Center LLC
☐ Affects Los Feliz Healthcare Center LLC
☐ Affects Mountainside Operating Company LLC
☐ Affects North Healthcare Center LLC
☐ Affects North Point Health & Wellness Center LLC
☐ Affects Plaza Convalescent Center LP
☐ Affects Plaza Healthcare Center LLC
☐ Affects RRT Enterprises LP
☐ Affects Sheraton Healthcare Center LLC
☐ Affects South Healthcare Center LLC
☐ Affects Westwood Healthcare Center LLC
☐ Affects Westwood  Healthcare Center LP
☐ Affects Wilshire Healthcare Center LLC

　　　Debtors and Debtors-in-Possession.

Lead Case No.:  8:14-bk-11335-CB
(Jointly Administered)
Case No. 8:14-bk-11337-CB
Case No. 8:14-bk-11358-CB
Case No. 8:14-bk-11359-CB
Case No. 8:14-bk-11360-CB
Case No. 8:14-bk-11361-CB
Case No. 8:14-bk-11362-CB
Case No. 8:14-bk-11363-CB
Case No. 8:14-bk-11364-CB
Case No. 8:14-bk-11365-CB
Case No. 8:14-bk-11366-CB
Case No. 8:14-bk-11367-CB
Case No. 8:14-bk-11368-CB
Case No. 8:14-bk-11370-CB
Case No. 8:14-bk-11371-CB
Case No. 8:14-bk-11372-CB
Case No. 8:14-bk-11373-CB
Case No. 8:14-bk-11375-CB
Case No. 8:14-bk-11376-CB
Chapter 11 Cases

**RESPONSE OF SHLOMO RECHNITZ TO OBJECTION AND STATEMENT OF POSITION OF COVENANT CARE, LLC REGARDING OVERBIDDING AND PROPOSED ORDERS; DECLARATION OF RICHARD M. PACHULSKI**

Date: July 28, 2014
Time: 10:00 a.m.
Place: Courtroom 5D
　　　411 West Fourth Street
　　　Santa Ana, CA 92701
Judge: Hon. Catherine Bauer

DOCS_LA:280010.4 73538/001

**TO THE HONORABLE CATHERINE BAUER, UNITED STATES BANKRUPTCY JUDGE, AND TO ALL INTERESTED PARTIES:**

In response to the *Objection and Statement of Position of Covenant Care, LLC Regarding (A) Covenant Care's Overbid, Right to Overbid and Covenant Care's Right to Participate in Auction Sale; and (B) Proposed Order Approving, Without Overbidding, Stalking Horse Bid – Denying Estate at Least an Additional $8,000,00 in Cash as an Overbid; (C) Order: (1) Authorizing Debtor's Entry Into Binding Plan Term Sheet; (3) Establishing Auction Sale and Overbid Procedures; (3) Approving Interim Management Agreement for Winning Bidder at the Auction; (4) Approving Payment of a Break-Up Fee and Expense Reimbursement in the Event of a Successful Overbid; (5) Approving Releases; and (6) Granting Related Relief* [Dkt. No. 498] (the "Objection"), Shlomo Rechnitz (the "Plan Funder" or "Rechnitz") respectfully represents as follows:

**I.**

**INTRODUCTION**

Covenant Care accuses the Debtors, the Committee and the Plan Funder of engaging in a conspiracy to stymie bidding and depress the consideration to the estates from the disposition of the Debtors' assets. How else to explain the short shrift given to its manifestly superior overbid proposal? Lacking a shred of evidence for this unlikely proposition, Covenant Care slings mud. It reminds us that Rechnitz was criticized three months ago for a lease transaction that he entered into (without restructuring counsel) that the Court found would chill bidding for the purchase of the Belmont facility, a now irrelevant past deal, while disregarding that the lease transaction was unwound. It also utterly disregards what is most relevant - that, as to the current proposed sale transaction, the subsequent month of negotiations produced a stalking horse bid that was accepted by the Debtors and the Committee and approved by the Court (without any objection from Covenant Care). Covenant Care then falsely accuses the Plan Funder of failing to disclose that he intends to "flip" certain properties, based on double hearsay that is both inaccurate and irrelevant. It is false because the Plan Funder is not selling a single facility. He does contemplate subleasing up to three of them but will remain the master lessee of all 19 facilities and, most significantly for the Debtors

2

DOCS_LA:280010.4 73538/001

and their estates, the guarantor of all leases. And he did disclose that intention, not because it is required by the Term Sheet but to err on the side of disclosure. It is not required because it is irrelevant: it does not affect the identity of the Plan Funder, it has no bearing on the consideration to be received by the estates and carries no risk to any party in interest. The most interesting and telling aspect of the accusation, in fact, is that it is based upon (inaccurate) hearsay relayed in an email to Covenant Care from the Debtors' broker, sent <u>after</u> the Debtors had rejected Covenant Care's bid, in the broker's own apparent effort to undermine the sale that the Debtors had determined is in the best interests of the estates (but which would not generate a commission).

There is no factual basis for Covenant Care's harsh rhetoric and reckless accusations. As set forth in the *Debtors' Response to Objection and Statement of Covenant Care, LLC as Overbidder* [Dkt. No. 516] (the "<u>Debtors' Response</u>") and the Committee's Omnibus Response [Dkt. No. 517], the Debtors' conclusion that proceeding with the stalking horse bid is in the best interests of the estates and that the Covenant Care bid does not qualify for overbidding is more than amply justified, for reasons that Covenant Care knows but does not bother to address. On its face, the Covenant Care bid does not comply with the bidding requirements approved by the Court. As described herein, the terms of the stalking horse bid were arduously negotiated and contained numerous deal points, insisted upon by the Debtors and the Committee, that required the Plan Funder to assume a huge amount of risk. The requirement that an overbidder match these terms was not arbitrary, but was a matter of fundamental fairness to the stalking horse bidder and a contractual quid pro quo for a deal structure that is extraordinarily beneficial for the estates and their creditors. They are not jumping off points for negotiations, as Covenant Care wishes to treat them. Indeed, the Covenant Care bid appears to have been crafted to deprive the estates of significant benefits conferred upon the estates by the stalking horse bid, to the detriment of the estates and to the particular prejudice of the stalking horse bidder. The validity of the Debtors' exercise of their business judgment to reject Covenant Care's bid is beyond question.

3

**II.**

**THE PLAN FUNDER IS ACTING IN GOOD FAITH**

Covenant Care does not offer any evidence to support its unprofessional and offensive accusations of a conspiracy among the Plan Funder and the Debtors' equityholders, and/or among counsel for the Plan Funder, the Debtors and the Committee, to rig the bidding in favor of the Plan Funder.

Covenant Care warns that "[t]he stalking horse bidder and the same counsel that the Court strongly warned about chilling bids is the same stalking horse bidder and the same counsel pursuing and pushing the stalking horse bid as the winning bid for the Debtors' nineteen facilities." Objection at 3. For emphasis, it reproduces two pages of the April 25 transcript of the hearing on the proposed sale of the Belmont facility. A portion consists of the Court's criticism of Rechnitz' purchase of future lease rights as chilling bids. The admonition was heard. Rechnitz had not consulted with bankruptcy counsel regarding the transaction, and readily agreed to withdraw his purchase agreement when asked to do so. Declaration of Richard M. Pachulski, attached hereto, at ¶ 17. As noted by the Debtors, Belmont was a "troubled facility that the Debtors spent months trying to sell pre-bankruptcy without success" (Debtors' Response at 6) and Rechnitz had agreed to purchase it separately as an accommodation to the Debtors at their request. In any event, nothing about the Belmont sale has any probative value with respect to Covenant Care's allegations of a conspiracy involving the rejection of its bid.

A larger portion of the transcript excerpt reproduced by Covenant Care in its Objection consists of frustratingly choppy telephonic colloquy between the Court and counsel, the inclusion of which appears to serve no purpose other than to try to embarrass counsel for (unintentionally) interrupting the Court. The passage illustrates why CourtCall should not be used with speakerphones, and counsel apologizes for the interruptions. Pachulski Dec. at ¶ 16.

The only other "evidence" offered by Covenant Care attests at most to its own bad faith conduct, not to any bad faith by the Plan Funder. It consists of an email from the Debtors' court-approved broker to Covenant Care, sent after the Debtors rejected Covenant Care's bid, reflecting an

4

DOCS_LA:280010.4 73538/001

effort by the broker to work with Covenant Care to undermine the Plan Funder's bid (which if consummated would not earn him a commission). Specifically, in a July 23, 2014 email to Covenant Care's CFO, Shep Roylance names entities that he's "heard" may have been promised facilities by the Plan Funder, and suggests that this could change the makeup of the bid and raise disclosure issues. He also wonders "what happens to his [the Plan Funder's] guaranties?" (a potentially helpful issue for Covenant Care since it refuses to put up guaranties). Objection at 6.

Setting aside the evidentiary issue that the contents of Mr. Roylance's email are inadmissible as double-hearsay and the ethical issue that the email was clearly unauthorized and at cross-purposes with the Debtors' rejection of the Covenant Care bid, Mr. Roylance's information is simply wrong. The Plan Funder has fully apprised the Debtors of who comprises the "Plan Funder." The Plan Funder is Shlomo Rechnitz and limited liability companies that have been disclosed to the Debtors. Nonetheless, although he has no further disclosure obligation under the Term Sheet, he wants there to be no disclosure issue and no misinformation. The facts are that the Plan Funder has been approached by numerous parties (which in many cases were likely sent by the broker making the allegation), but the Plan Funder does not want any partner for this transaction and has advised the parties who contacted him of that position. There is one party to which the Plan Funder would like to sub-lease up to three of the facilities after the closing, but key is that the Plan Funder will remain as the master lessee of the facilities and will also stay on the personal guarantee of the specific leases. Thus, this is not a change in the composition of the Plan Funder nor does it affect the consideration to the estate or the risk carried by any interested party. Nor does it have any potential impact on bidding, particularly since the Plan Funder is not intending to share ownership with any entity that might otherwise be a competing bidder.

The bidding requirements that Covenant Care claims are arbitrary and indicative of bad faith (but to which it did not object when they were before the Court) were negotiated in good faith and are anything but arbitrary. In late April, 2014, the Debtor and the Plan Funder began preliminary discussions regarding the Plan Funder becoming the stalking horse bidder for the Debtors' nineteen facilities. During the initial negotiations between the Plan Funder and the Debtors, the Debtors

5

DOCS_LA:280010.4 73538/001

advised the Plan Funder that both the Debtors and the Committee would only accept a stalking horse bid that satisfied at least the following three criteria:

(1) A fair stalking horse price that the Debtors and the Committee believed after resolution of disputed claims was likely to pay creditors in full;

(2) A large deposit and similar liquidated damage amount that would be "painful" in the event a stalking horse did not go forward with the transaction. The explanation given by the Debtors, and by the Committee through the Debtors, was that the vast majority of the Debtor's value could be destroyed if there was a material adverse change during the time it would take to close the sale of the facilities; and

(3) There could be no contingencies or outs. There could not even be a provision permitting withdrawal in the event of a material adverse change in the Debtors' business, a customary provision in a transaction of this size. The Debtors advised the Plan Funder that they would not accept a stalking horse bid with such a provision; among other things, all parties were and are presently aware that the implementation of the Coordinated Care Initiative by the California Department of Health Care Services could dramatically reduce patient reimbursements to skilled nursing facilities.

The Plan Funder was willing to meet the foregoing extraordinary conditions only if he received in exchange the following essential protections:

(1) If the Plan Funder was to accept a large liquidated damages provision and assume the unusual risk of not having a material adverse change provision, for the benefit of the Debtors, then any overbid had to take the identical risks (Term Sheet ¶ 12(e)(iv));

(2) Because of the serious risk of a material adverse change in the Debtors' business (including the implementation of the Coordinated Care Initiative) until the closing of the transaction, the Debtors had to agree to enter into an interim management agreement with the Plan Funder in which the Plan Funder would take all the risk of any downturn of the business and receive any benefit from an upturn of the business (Term Sheet ¶ 13);

6

DOCS_LA:280010.4 73538/001

(3) At the request of the Debtors, the Plan Funder purchased the Debtors' indebtedness to Private Bank (its secured loan to the Debtors of approximately $7.5 million), and also agreed to extend a post-petition loan to the Debtors of up to $5 million (none of which post-petition loan has been utilized). If the Plan Funder were unsuccessful in the auction, the Plan Funder insisted that the Private Bank Debt be repaid from the deposit or be taken out immediately upon entry of the order approving the winning bidder, *i.e.*, that the winning bidder effectively step in immediately to substitute for the Plan Funder as the Debtors' lender to provide to the Debtors this financial accommodation going forward (Term Sheet ¶ 4(a)); and

(4) The Plan Funder's (below-market) expense reimbursement and breakup fee, as well as bid protections. Term Sheet ¶ 12(a),(b) and (d)(iv)(2).

The Plan Funder would never have agreed to proceed with negotiations and expend hundreds of thousands of dollars in due diligence and professional fees unless and until the Debtors and the Committee agreed to the items referenced above. Contrary to the impression given by Covenant Care, which had no involvement, the negotiations between the Debtors and the Plan Funder were both contentious and time-consuming. On at least two occasions during the just over thirty days of negotiations, the deal between the Plan Funder and the Debtors collapsed.

Ultimately, the parties executed the Term Sheet on or about May 30, 2014. On July 2, 2014, the Court granted the Debtors' motion authorizing it to enter into the Term Sheet and to schedule an auction to be held on July 28, 2014. The order granting the motion was entered on July 18, 2014 [Dkt. No. 487]. At no time until the filing of the Objection did Covenant Care or any other prospective bidder object to any provision of the Term Sheet or, more significantly, allege that there was any conspiracy between the Debtors and the Plan Funder, as there is none.

## III.

## IT WOULD BE FUNDAMENTALLY INEQUITABLE TO THE PLAN FUNDER TO PERMIT COVENANT CARE TO DISREGARD THE BID PROCEDURES

Covenant Care posits that its bid of $70,000,000 represents an additional $8 million of value to the estates and attacks various bidding requirements that stand in the way of acceptance of its

7

DOCS_LA:280010.4 73538/001

overbid.  In fact, the difference is less than $6 million taking into account the expense reimbursement, breakup fee and broker fees (even if it were a qualifying bid).  But on its face, it is not a qualifying bid.  The July 22, 2014 letter from the Debtors' counsel to Covenant Care (the "Bid Rejection") identifies nine defects in Covenant Care's bid.  As to each, Covenant Care argues that the requirement is unnecessary or arbitrary and/or that the Debtors should at least be willing to negotiate them.

The Debtors' Response and Committee Response address the substantial and valid bases for their rejection of the Covenant Care Bid and the remarkable level of disingenuousness and gamesmanship manifested in the Objection.  Without duplicating that analysis, the Plan Funder wishes to highlight how certain of the bidding terms that Covenant Care breezily states are malleable or even unnecessary are integral to the Plan Funder's bargain, and why qualifying the Covenant Care bid without requiring it to match those terms would be fundamentally unfair to the Plan Funder.

On Covenant Care's terms, it does not have to provide the Debtors with the financial backing of guarantees.  Covenant Care is utterly disingenuous in its assertion that its refusal to provide personal lease guaranties affects only the non-debtor lessors.  Under the Term Sheet, the Debtors have the obligation to assume and assign to the winning bidder whatever contracts and leases that it selects for assumption and assignment (Term Sheet ¶ 3(f))).  The Debtors thus are obligated, among other things, to demonstrate adequate assurance of future performance, when required.  Absent the financial backing afforded by guarantees of a demonstrably capable entity, the Debtors' risk of failing to meet their obligations and thus failing to close the transaction increase dramatically.  If Covenant Care can be the prevailing bidder without offering lease guarantees, and proceeds to play chicken with the lessors and ultimately walks away from the deal, the Debtors may be left unable to honor and close a transaction under the Term Sheet with the winning bidder and be left without time to realize any value through an alternative transaction on their leased facilities. That is an unfair result to which the Debtors and Committee unsurprisingly object.

Moreover, the guarantees included as part of the Plan Funder's bid were offered by Rechnitz at very substantial cost to him.  Further, they were a critical part of the negotiations that resulted in

8

DOCS_LA:280010.4 73538/001

the insiders providing as part of the Term Sheet that they would afford the winning bidder seven new leases extending 34 more years at below market rents. These non-debtor lessors have required the Plan Funder to enter into what is effectively over $150 million of personal guaranties to protect them against a default of what the Plan Funder believes are the most valuable assets owned by the non-debtors. Whereas the Belmont lease transaction was faulted as comprising a benefit that was unavailable to competing bidders, the Term Sheet makes fully available to any overbidder the valuable deal on the new seven leases, subject to one critical requirement - the overbidder must offer the same consideration being offered by the Plan Funder. Covenant Care has chosen to offer less. Qualifying such a bid for the Auction would be unfair to the Plan Funder (and is likely unacceptable to the subject lessors).

Additionally, as addressed at length in the Debtors' Response, Covenant Care's attempt to reduce the liquidated damages provision from $40 million to $3 million goes to the very core of the transaction. The Debtors' and Committee's insistence that the deal be effectively impossible to walk away from, even if there were a material adverse change in the condition of the business, created an extraordinary deal structure. The Plan Funder offered those assurances and has placed $40 million at risk. Covenant Care is trying to get what the Plan Funder did not, the ability to walk away from the transaction in any of numerous scenarios, including ones in which the business has collapsed prior to closing due to the effects of the Coordinated Care Initiative or anything else or because the apparently new Covenant Care / Kaiser partnership falls apart, for, at the most, only $3 million. Such a revision is grossly unfair not just as a matter of competitive bidding, but because it would render the Debtors unable to satisfy contractual obligations that the Plan Funder obtained for the very reason that he was making such a substantial iron-clad commitment.

One such obligation was the Plan Funder's right to be repaid the $7.5 million Private Bank debt immediately upon entry of an order awarding the sale to an overbidder. The Plan Funder purchased the Private Bank debt at the Debtors' request during the case. If he is not the prevailing bidder, he becomes a lender to an entity managed by the winning bidder under an interim

9

DOCS_LA:280010.4 73538/001

management agreement.  Understandably, the Plan Funder contracted to prevent being left with a borrower over which it has no control.

Second, as with the Plan Funder's right to loan repayment, reducing the winning bidder's exposure to $3 million compromises or eliminates the Debtors' ability to honor another central obligation to the Plan Funder: the Term Sheet's provisions under ¶ 12(a)-(b) for payment of expense reimbursement and a breakup fee totaling $1.5 million within three days of entry of an order awarding the sale to another bidder, to be paid from the deposits or funding of the winning overbidder.  The deal that was negotiated was not dependent upon a closing for the Plan Funder to receive these funds.

Third, permitting such a revision is repugnant to the principle of fair competition and the integrity of the bankruptcy sale process.  The Court entered an order that required any overbidder to provide a term sheet with identical terms, including the liquidated damage clause and the terms relating to the non-debtor leases.  Covenant Care never objected to the terms at the bid procedures hearing.  An order was entered and Covenant Care's bid violates the Term Sheet.  For Covenant Care's utterly nonconforming bid to qualify, it must seek to modify the order.  To do so would require it to satisfy the applicable standards for reconsideration of an order.  If a motion to alter or amend a judgment is filed within 14 days after entry, it is addressed under Bankruptcy Rule 9023 (Fed. R. Civ. P. 59(e)).  Otherwise, Bankruptcy Rule 9024 (Fed. R. Civ. P. 60(b)) applies.  As stated by the Ninth Circuit, reconsideration of a prior order under Rule 59(e) is:

> an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources.  Indeed, a motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law.  A Rule 59(e) motion may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation.

*Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (citations omitted).

There are no "highly unusual circumstances" here.  Covenant Care was actively involved in the case and simply did not object.  And relief under Rule 60(b) is even more unlikely: Covenant

10

DOCS_LA:280010.4 73538/001

Care cannot prove mistake, inadvertence, surprise, or excusable neglect under Rule 60(b)(1) or satisfy any of the other bases for relief thereunder.

At the eleventh hour, Covenant Care is throwing out a higher potential recovery paired with substantially greater estate risk (due in part to its meager liquidated damages provision and its failure to offer the Debtors the financial backing of lease guarantees), all in an effort to create havoc and ram through a completely flawed overbid that, as reflected in the responses of the Debtors and the Committee, is utterly non-responsive to the concerns that shaped their deal with the Plan Funder. To maintain the integrity of the bankruptcy process and, in particular, the sale process, this Court should overrule Covenant Care's objection to the proposed sale to the Plan Funder and should specifically approve the sale to the Plan Funder.

## IV.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, the Plan Funder respectfully requests that the Court overrule Covenant Care's objection and approve the sale to the Plan Funder.

Dated: July 25, 2014                PACHULSKI STANG ZIEHL & JONES LLP

By: */s/ Robert B. Orgel*
   Richard M. Pachulski
   Robert B. Orgel

   Counsel for Shlomo Rechnitz

11

DOCS_LA:280010.4 73538/001

## DECLARATION OF RICHARD M. PACHULSKI

I, Richard M. Pachulski, declare and state as follows:

1. I am a senior partner in the law firm of Pachulski Stang Ziehl & Jones LLP, and lead bankruptcy counsel to Schlomo Rechnitz ("Rechnitz" or the "Plan Funder"), the stalking horse bidder for the nineteen (19) Contry Villa Facilities. I am authorized to practice law in the State of California and before this Court. The matters stated herein are of my personal knowledge, and if called upon to testify as a witness, I could and would competently do so.

2. This Declaration is in response to the Objection and Statement of Position of Covenant Care, LLC, as over bidder ("Objection").

3. The primary basis of my Declaration is to refute the unsubstantiated allegations and irresponsible comments made by Covenant Care, LLC ("Covenant Care") in the Objection in an attempt to disparage the Plan Funder and me.

### Term Sheet Negotiations

4. In late April, 2014, the Debtor and the Plan Funder began preliminary discussions regarding the Plan Funder becoming the stalking horse for the Debtors' nineteen (19) facilities. During the initial negotiations between the Plan Funder and the Debtors, the Debtors advised the Plan Funder that both the Debtors and the Committee would only accept a stalking horse bid that satisfied at least the following criteria:

 (1) A fair stalking horse price that the Debtors and the Committee believed after resolution of disputed claims was likely to pay creditors in full;

 (2) A large deposit and similar liquidated damage amount that would be "painful" in the event a stalking horse did not go forward with the transaction. The explanation given by the Debtors, and by the Committee through the Debtors, was that the vast majority of the Debtor's value could be destroyed if there was a material adverse change during the time it would take to close the sale of the facilities; and

 (3) There could be no contingencies or outs. There could not even be a provision permitting withdrawal in the event of a material adverse change in the Debtors' business, a

12

DOCS_LA:280010.4 73538/001

customary provision in a transaction of this size. The Debtors stated that they would not accept a stalking horse bid with such a provision; among other things, all parties were and are presently aware that the implementation of the Coordinated Care Initiative by the California Department of Health Care Services could dramatically reduce patient reimbursements to skilled nursing facilities.

5. The Plan Funder was willing to meet the foregoing extraordinary conditions only if he received in exchange the following essential protections:

(1) If the Plan Funder was to accept a large liquidated damages provision and assume the unusual risk of not having a material adverse change provision, for the benefit of the Debtors, then any overbid had to take the identical risks;

(2) Because of the serious risk of a material adverse change in the Debtors' business (including the implementation of the Coordinated Care Initiative) until the closing of the transaction, the Debtors had to agree to enter into an interim management agreement with the Plan Funder in which the Plan Funder would take all the risk of any downturn of the business and receive any benefit from an upturn of the business;

(3) At the request of the Debtors, the Plan Funder purchased the Debtors' indebtedness to Private Bank (its secured loan to the Debtors of approximately $7.5 million), and also agreed to extend a post-petition loan to the Debtors of up to $5 million (none of which post-petition loan has been utilized). If the Plan Funder were unsuccessful in the auction, the Plan Funder insisted that the Private Bank Debt be repaid from the deposit or be taken out immediately upon entry of the order approving the winning bidder, i.e., that the winning bidder effectively step in immediately to substitute for the Plan Funder as the Debtors' lender to provide to the Debtors this financial accommodation going forward; and

(4) The Plan Funder's (below-market) expense reimbursement and breakup fee, as well as bid protections.

6. By the end of the first week of May, 2014, the Debtors, and the Committee through the Debtors, and the Plan Funder had agreed to negotiate a term sheet around the material items

13

DOCS_LA:280010.4 73538/001

referenced above. The Plan Funder would never have agreed to proceed with negotiations and expend hundreds of thousands of dollars in due diligence and professional fees unless and until the Debtors and the Committee agreed to the items referenced above. Contrary to the impression given by Covenant Care, which had no involvement, the negotiations between the Debtors and the Plan Funder were both contentious and time-consuming. On at least two occasions during the just over thirty days of negotiations, the deal between the Plan Funder and the Debtors collapsed.

7. Ultimately, the parties executed the Term Sheet on or about May 30, 2014. On July 2, 2014, the Court granted the Debtors' motion authorizing it to enter into the Term Sheet and to schedule an auction to be held on July 28, 2014. The order granting the motion was entered on July 18, 2014 [Dkt. No. 487]. At no time until the filing of the Objection did Covenant Care or any other prospective bidder object to any provision of the Term Sheet or, more significantly, allege that there was any conspiracy between the Debtors and the Plan Funder, as there is none.

**The Bid Chilling Allegations Against the Plan Funder and His Counsel**

8. I take particular offense that Covenant Care has alleged, without one shred of evidence, that the Plan Funder has conspired with the Debtors' equityholders to chill any bidding. The Debtors and the Committee, as recently as the day before yesterday, confirmed to me that the price is not as critical as avoiding any outs or contingencies with respect to the proposed sale transaction. This was the Debtors' and Committee's requirement to gain certainty of a sale close, not the Plan Funder's.

9. Covenant Care suggests that based on the hearing on April 25, 2014 related to the Belmont facility, this Court should infer that there is "bid chilling" going on with respect to the nineteen facilities. Again, not only is the bid-chilling allegation untrue, but there is not one piece of evidence to support the allegation.

10. I do wish to apologize to the Court because I apparently was speaking over the Court during the April 25 hearing without knowing that I was doing so. Apparently as I discovered after the hearing, since I was on a speaker phone I was unaware when other people were speaking. I do

14

not want to make any excuses for speaking over the Court, but simply wanted to both apologize and explain to the Court the reason for my error in speaking at times over the Court during the hearing.

11. As to the substance of what happened during the Belmont hearing, I was unaware that the Plan Funder had entered into a transaction with the Belmont facilities' landlord for the period after the expiration of the Belmont lease, as the Plan Funder had negotiated the transaction through real estate counsel, and not restructuring counsel. What Covenant Care does not state in their papers is that when the Court requested that the Plan Funder withdraw his agreement with the Belmont landlord, the Plan Funder agreed.

12. The Debtors and the Committee were well aware of the April 24 Belmont hearing, as they obviously appeared at the hearing, and still decided to move forward with a stalking horse transaction with the Plan Funder, who submitted an offer that provides a reasonable likelihood that creditors will be paid in full. The Debtors and the Committee insist on a definitive closing backed by the Plan Funder's liquidated damages, and not pie in the sky from Covenant Care.

13. The only other contention in the objection that is made against the Plan Funder is the unprofessional effort by the Debtors' court-approved broker to work with Covenant Care to try to come up with a basis to undermine the Plan Funder's bid. It suggests that the Plan Funder is promising facilities to other parties and may be violating disclosure requirements, and also asks "what happens to his [the Plan Funder's] guaranties?"

14. The Plan Funder has fully complied by advising the Debtors of who comprises the "Plan Funder." The Plan Funder is Schlomo Rechnitz and limited liability companies that have been disclosed to the Debtors. The Term Sheet does not require more, but the Plan Funder wants to ensure there is no disclosure issue. The facts are that the Plan Funder has been approached by numerous parties, likely sent by the very broker who makes the allegation against the Plan Funder. The broker tried to put groups of people together to bid on the nineteen facilities in order to obtain a fee. Some of those parties approached the Plan Funder. The Plan Funder does not want any partner for this transaction and advised various parties who contacted him of that position.

15

DOCS_LA:280010.4 73538/001

15. In one instance, relating to three facilities, the Plan Funder would like to enter into a sub-lease agreement with a party after closing of the proposed sale transaction, whereby the Plan Funder will close the transaction with the Debtors, will remain as the master lessee of the facilities, and when completed post-closing, will also stay on the personal guarantee of the specific leases. Again, nothing in the Term Sheet requires any such disclosure, and it has no bearing on the consideration to be received by the estates and creates no risk for any other party in interest.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Los Angeles, California on July 25, 2014.

*/s/ Richard M. Pachulski*
Richard M. Pachulski

16

DOCS_LA:280010.4 73538/001

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California  90067**

A true and correct copy of the foregoing document entitled (*specify*):  **RESPONSE OF SHLOMO RECHNITZ TO OBJECTION AND STATEMENT OF POSITION OF COVENANT CARE, LLC REGARDING OVERBIDDING AND PROPOSED ORDERS; DECLARATION OF RICHARD M. PACHULSKI** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **July 25, 2014**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **July 25, 2014**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

By Personal Delivery
Hon. Catherine E. Bauer
United States Bankruptcy Court
411 West Fourth Street
Santa Ana, CA  92701

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 25, 2014 | Myra Kulick | /s/ Myra Kulick |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                               **F 9013-3.1.PROOF.SERVICE**
DOCS_LA:280061.1 73538/001

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

Mailing Information for Case 8:14-bk-11335-CB

- *Michael A Abramson  maa@abramsonlawgroup.com*
- *Russell S Balisok    balisok@stopelderabuse.org*
- *Robert D Bass    rbass@greenbass.com*
- *Ron Bender    rb@lnbyb.com*
- *Richard S Berger    rberger@lgbfirm.com, marizaga@lgbfirm.com;ncereseto@lgbfirm.com;msutton@lgbfirm.com*
- *Manuel A Boigues    bankruptcycourtnotices@unioncounsel.net*
- *Matthew Borden    borden@braunhagey.com, fair@braunhagey.com*
- *Michael J Bujold    Michael.J.Bujold@usdoj.gov*
- *Steven Casselberry    scasselberry@mrllp.com, jjacobs@mrllp.com*
- *Cheryl S Chang    Chang@Blankrome.com, Lalocke@Blankrome.com;RMerten@Blankrome.com*
- *Jacquelyn H Choi    jchoi@swesq.com*
- *Baruch C Cohen    bcc4929@gmail.com, pjstarr@starrparalegals.com*
- *Marianne M Dickson    MDickson@seyfarth.com, shobrien@seyfarth.com*
- *Caroline Djang    cdjang@rutan.com*
- *Joseph A Eisenberg    jae@jmbm.com, vr@jmbm.com;tgeher@jmbm.com;bt@jmbm.com;jae@ecf.inforuptcy.com*
- *Fahim Farivar    lawyercpa@gmail.com*
- *William L Foreman    wforeman@oca-law.com, laiken@oca-law.com*
- *Eric J Fromme    ejf@jmbm.com, lo2@jmbm.com*
- *Jeffrey K Garfinkle    jgarfinkle@buchalter.com, docket@buchalter.com;dcyrankowski@buchalter.com*
- *Fredric Glass    fglass@fairharborcapital.com*
- *Christina Goebelsmann    cgoebelsmann@wargofrench.com*
- *Nancy S Goldenberg    nancy.goldenberg@usdoj.gov*
- *D Edward Hays    ehays@marshackhays.com, ecfmarshackhays@gmail.com*
- *Mark S Horoupian    mhoroupian@sulmeyerlaw.com, ppenn@sulmeyerlaw.com;mhoroupian@ecf.inforuptcy.com;ppenn@ecf.inforuptcy.com*
- *Ivan L Kallick    ikallick@manatt.com, ihernandez@manatt.com*
- *David I Katzen    katzen@ksfirm.com, schuricht@ksfirm.com*
- *Gerald P Kennedy    gerald.kennedy@procopio.com, kristina.terlaga@procopio.com;calendaring@procopio.com;efile-bank@procopio.com*
- *Monica Y Kim    myk@lnbrb.com*
- *K Kenneth Kotler    kotler@kenkotler.com, zoe@kenkotler.com*
- *Ian Landsberg    ilandsberg@landsberg-law.com, bgomelsky@landsberg-law.com;cdonoyan@landsberg-law.com;dzuniga@landsberg-law.com*
- *Mary D Lane    mal@msk.com, mec@msk.com*
- *Leib M Lerner    leib.lerner@alston.com*
- *Elan S Levey    elan.levey@usdoj.gov, louisa.lin@usdoj.gov*
- *Howard S Levine    howard@cypressllp.com, jennifer@cypressllp.com*
- *Elizabeth A Lossing    elizabeth.lossing@usdoj.gov*
- *Craig G Margulies    craig@marguliesfaithlaw.com, staci@marguliesfaithlaw.com;mhillel@marguliesfaithlaw.com;fahim@marguliesfaithlaw.com*
- *Ashley M McDow    amcdow@bakerlaw.com, mdelaney@bakerlaw.com;sgaeta@bakerlaw.com*
- *Krikor J Meshefejian    kjm@lnbrb.com*
- *Kenneth Miller    kmiller@ecjlaw.com*
- *Benjamin Nachimson    ben.nachimson@wgfllp.com*
- *Tara L Newman    tara.newman@doj.ca.gov*
- *Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com*
- *Christopher E Prince    cprince@lesnickprince.com*
- *Hanna B Raanan    hraanan@marlinsaltzman.com, jhawkes@marlinsaltzman.com;sshepard@marlinsaltzman.com;irvinefileclerk@marlinsaltzman.com*
- *Hamid R Rafatjoo    hrafatjoo@venable.com, kfox2@venable.com;bclark@venable.com*
- *Kurt Ramlo    kr@lnbyb.com*
- *Brett Ramsaur    bramsaur@swlaw.com, kcollins@swlaw.com*
- *Paul R Shankman    pshankman@jhindslaw.com*
- *Lindsey L Smith    lls@lnbyb.com*
- *Adam D Stein-Sapir    info@pfllc.com*
- *Alan Stomel    alan.stomel@gmail.com, astomel@yahoo.com*
- *Kelly Sweeney    ksweeney@spiwakandiezza.com*
- *United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov*
- *Jeanne C Wanlass    jwanlass@loeb.com, karnote@loeb.com;ladocket@loeb.com*
- *Joshua D Wayser    joshua.wayser@kattenlaw.com, jessica.mickelsen@kattenlaw.com;kim.johnson@kattenlaw.com,ecf.lax.docket@kattenlaw.com,adelle.shafer@kattenlaw.com*
- *Andrew F Whatnall    awhatnall@daca4.com*
- *Elisa B Wolfe-Donato    Elisa.Wolfe@doj.ca.gov*
- *Jennifer C Wong    bknotice@mccarthyholthus.com*
- *David Wood    dwood@marshackhays.com, ecfmarshackhays@gmail.com*
- *Benyahou Yeroushalmi    ben@yeroushalmilaw.com*
- *Kristin A Zilberstein    bknotice@mccarthyholthus.com, kzilberstein@mccarthyholthus.com*

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*    **F 9013-3.1.PROOF.SERVICE**
DOCS_LA:280061.1 73538/001