RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LINDSEY L. SMITH (SBN 265401)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email:  rb@lnbyb.com; myk@lnbyb.com; kjm@lnbyb.com; lls@lnbyb.com

Attorneys for Chapter 11 Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## (SANTA ANA DIVISION)

| | |
|---|---|
| In re:<br><br>Plaza Healthcare Center LLC,<br><br>Debtor and Debtor in Possession.<br>―――――――――――――――――――<br>☐ Affects All Debtors<br><br>☒ Affects Belmont Heights Healthcare Center LLC<br>☒ Affects Claremont Healthcare Center Inc.<br>☒ Affects Country Villa East LP<br>☒ Affects Country Villa Imperial LLC<br>☐ Affects Country Villa Nursing Center Inc.<br>☐ Affects Country Villa Southbay LLC<br>☐ Affects East Healthcare Center LLC<br>☒ Affects Los Feliz Healthcare Center LLC<br>☒ Affects Mountainside Operating Company LLC<br>☐ Affects North Healthcare Center LLC<br>☒ Affects North Point Health & Wellness Center LLC<br>☐ Affects Plaza Convalescent Center LP<br>☒ Affects Plaza Healthcare Center LLC<br>☐ Affects RRT Enterprises LP<br>☐ Affects Sheraton  Healthcare Center LLC<br>☒ Affects South Healthcare Center LLC<br>☐ Affects Westwood Healthcare Center LLC<br>☐ Affects Westwood Healthcare Center LP<br>☐ Affects Wilshire Healthcare Center LLC<br><br>Debtors and Debtors in Possession. | ) Lead Case No.: 8:14-bk-11335-CB<br>) Jointly administered with:<br>) Case No. 8:14-bk-11337-CB<br>) Case No. 8:14-bk-11358-CB<br>) Case No. 8:14-bk-11359-CB<br>) Case No. 8:14-bk-11360-CB<br>) Case No. 8:14-bk-11361-CB<br>) Case No. 8:14-bk-11362-CB<br>) Case No. 8:14-bk-11363-CB<br>) Case No. 8:14-bk-11364-CB<br>) Case No. 8:14-bk-11365-CB<br>) Case No. 8:14-bk-11366-CB<br>) Case No. 8:14-bk-11367-CB<br>) Case No. 8:14-bk-11368-CB<br>) Case No. 8:14-bk-11370-CB<br>) Case No. 8:14-bk-11371-CB<br>) Case No. 8:14-bk-11372-CB<br>) Case No. 8:14-bk-11373-CB<br>) Case No. 8:14-bk-11375-CB<br>) Case No. 8:14-bk-11376-CB<br>) Chapter 11 Cases<br>)<br>)<br>) **NOTICE OF MOTION AND MOTION FOR**<br>) **AN ORDER APPROVING DEBTORS'**<br>) **ASSUMPTION AND ASSIGNMENT OF**<br>) **UNEXPIRED REAL PROPERTY LEASES**<br>) **AND DETERMINING CURE AMOUNTS;**<br>) **MEMORANDUM OF POINTS AND**<br>) **AUTHORITIES; DECLARATION OF**<br>) **JERRY ROLES**<br>)<br>) Date:    September 3, 2014<br>) Time:    10:00 a.m.<br>) Place:    Courtroom "5D"<br>)            411 West Fourth Street<br>)            Santa Ana, CA 92701<br>) |

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................8

I.    FACTS ..........................................................................................................................8

      A.    Background ......................................................................................................8

      B.    The Binding Plan Term Sheet and the Winning Bidder ..............................10

      C.    Treatment of Facility Lease Agreements Under the Binding Plan

            Term Sheet ....................................................................................................12

      D.    The Existing Lease Agreements and the Proposed Cure Amounts .............14

II.   DISCUSSION.............................................................................................................24

      A.    The Bankruptcy Court Should Authorize the Affected Debtors to

            Assume and Assign to the Purchaser All of the Non-Insider Leases.............24

III.  CONCLUSION ..........................................................................................................26

i

# TABLE OF AUTHORITIES

**FEDERAL CASES**

In re AEG Acquisition Corp.
  127 B.R. 34 (Bankr. C.D. Cal. 1991), aff'd 161 B.R. 50 (9th Cir. B.A.P. 1993) .................. 25

In re Bowman
  194 B.R. 227 (Bankr. D. Ariz. 1995) ..................................................................... 25

In re Central Fla. Metal Fabrication, Inc.
  190 B.R. 119 (Bankr. N.D. Fla. 1995) ................................................................... 24

In re Continental Country Club, Inc.
  114 B.R. 763 (Bankr. M.D. Fla. 1990) ................................................................... 25

In re Embers 86th Street. Inc.
  184 B.R. 892 (Bankr. S.D.N.Y. 1995) ................................................................... 25

In re Gucci
  193 B.R. 411 (S.D.N.Y. 1996) ...................................................................... 24, 25

In re Klein Sleep Products, Inc.
  78 F.3d 18 (2d. Cir. 1996) ................................................................................. 24

In re Prime Motors Inns
  124 B.R. 378 (Bankr. S.D. Fla. 1991) ................................................................... 25

**FEDERAL STATUTES**

11 U.S.C. § 365 ....................................................................................... 4, 12

11 U.S.C. § 365(a) ......................................................................................... 24

11 U.S.C. § 365(b)(1) .................................................................................. 25, 26

11 U.S.C. § 365(f) .......................................................................................... 25

11 U.S.C. § 1107(a) ........................................................................................ 24

**FEDERAL RULES**

Fed.R.Bankr.P. 9013-1(f) ................................................................................... 6

**PLEASE TAKE NOTICE THAT** a hearing will be held on September 3, 2014, at 10:00 a.m., before the Honorable Catherine E. Bauer, United States Bankruptcy Judge for the Central District of California, in Courtroom 5D located at 411 West Fourth St., Santa Ana, CA, for the Court to consider approval of the motion ("Motion") filed by nine of the above-referenced nineteen debtors and debtors in possession in these jointly administered Chapter 11 cases (all nineteen debtors are collectively defined herein as the "Debtors", while the nine debtors directly affected by this Motion are defined herein as the "Affected Debtors") to assume their respective ten (10) unexpired leases of real property, as amended and supplemented, together with all rights thereunder, including, *e.g.*, any purchase or extension options (defined collectively as the "Non-Insider Leases") affecting the twelve skilled nursing facilities owned by the Affected Debtors (collectively, the "Affected Facilities")[1] and assign them to Shlomo Rechnitz ("SR") and/or his designees (collectively with SR, the "Purchaser") as the winning bidder under the Binding Plan Term Sheet (the "Term Sheet"), which has been approved by the Court. The nine Affected Debtors bringing this Motion are:

    (1)    Belmont Heights Healthcare Center, LLC (Case No. 8:14-bk-11358-CB),

    (2)    Claremont Healthcare Center Inc. (Case No. 8:14-bk-11375-CB),

    (3)    Country Villa East LP (Case No. 8:14-bk-11371-CB),

    (4)    Country Villa Imperial LLC (Case No. 8:14-bk-11370-CB),

    (5)    Los Feliz Healthcare Center LLC (Case No. 8:14-bk-11368-CB),

    (6)    Plaza Healthcare Center LLC (Case No. 8:14-bk-11335-CB),

    (7)    Mountainside Operating Company LLC (Case No. 8:14-bk-11367-CB),

    (8)    North Point Health & Wellness Center LLC (Case No. 8:14-bk-11365-CB), and

    (9)    South Healthcare Center LLC (Case No. 8:14-bk-11361-CB).

---

[1] One of the Affected Debtors is the lessee of 4 of the Facilities affected by this Motion under two leases, while each of the other eight Affected Debtors is the lessee of 1 of the Facilities affected by this Motion under one lease each, which is why there are a total of nine Affected Debtors, ten Non-Insider Leases and twelve Affected Facilities.

Each of the Non-Insider Leases affected by this Motion is described below in the annexed Memorandum of Points and Authorities.

On July 13, 2014, the Court entered an order approving the Term Sheet, which is attached as Exhibit 1 to the annexed Declaration of Jerry Roles ("Roles Declaration"). The Term Sheet sets forth the mechanism or process, as well as the primary economic terms, pursuant to which all of the Debtors will sell and transfer substantially all of their assets and related skilled nursing facilities to the Purchaser or to a successful overbidder. Pursuant to the auction and bidding procedures approved by the Court as part of the Term Sheet, qualifying overbids were required to be submitted to the Debtors by July 21, 2014, and the Court scheduled an auction hearing to take place in the Court on July 28, 2014. At the auction hearing on July 28, 2014, the Court determined that no qualifying overbids were timely submitted. The Court therefore deemed the Purchaser's bid set forth in the Term Sheet to be the winning bid and the Purchaser to be the winning bidder.

All of the Debtors, in the aggregate, own 18 skilled nursing facilities and 1 assisted living facility – for a total of 19 facilities. The 19 facilities are subject to 17 real property leases with 16 of the Debtors.[2] The 10 real property leases of the 9 Affected Debtors bringing this Motion (i.e., the Non-Insider Leases) are with landlords who have no affiliation with any of the Debtors and affect 12 facilities (i.e., the Affected Facilities).

The landlords of the remaining 7 leases covering the remaining 7 facilities are owned in substantial part and controlled by Stephen and Diane Reissman ("Reissmans"), who are founders, owners and officers of the Debtors, and, therefore, insiders of the Debtors (the "Insider Leases"). The Term Sheet provides for the landlords of the Insider Leases to enter into new written lease agreements with the Purchaser based on certain economic terms which are set forth in the Term Sheet.

Pursuant to the Order Extending Deadlines for Debtors to Assume or Reject Non-Residential Real Property Leases entered by the Court on June 30, 2014 [Dkt. No. 412], the

---

[2] One of the Affected Debtors, Country Villa East LP, has two real property leases, one lease affecting 3 of the Affected Facilities and one lease covering 1 of the Affected Facilities.

deadline by which Debtor Plaza Healthcare Center LLC must assume or reject its real property lease was extended through September 30, 2014, and the deadline by which the remaining Debtors must assume or reject their real property leases was extended through October 1, 2014.

The Debtors and the Purchaser have agreed that they will proceed to consummate their overall transaction by way of a traditional asset sale motion, and the Debtors expect that the Court hearing on that asset sale motion will take place on or after October 1, 2014, with a planned closing date (or "Sale Effective Date" as defined in the Term Sheet) of on or after October 31, 2014, but in no case later than December 31, 2014. Since the transaction will be occurring through an asset sale, the basic concept will be that the references in the Term Sheet to the "Plan Effective Date" and the timing of events for the "Plan Effective Date" would in effect be changed to the "Sale Effective Date."[3]

By this Motion and as contemplated by the Term Sheet, the Affected Debtors are seeking, pursuant to the provisions of Section 365 of the Bankruptcy Code, Court approval to assume now and to assign to the Purchaser effective as of the Sale Effective Date all 10 of the Non-Insider Leases. A complete description of each of the Non-Insider Leases, including the Affected Debtors' contentions as to the amounts of any defaults which would need to be cured in connection with the Affected Debtors' assumption and assignment to the Purchaser of the Non-Insider Leases, is set forth in the annexed Memorandum of Points and Authorities, and a summary schedule of the Affected Debtors' contentions as to the required cure amounts is attached as Exhibit 2 to the annexed Roles Declaration.

The cure amounts required to be paid as a condition to the Affected Debtors' assuming and assigning the Non-Insider Leases to the Purchaser will either be paid by the Debtors from their existing cash on hand prior to the Sale Effective Date, or will be paid from the "Cash Component" (of $62 million subject to certain limited adjustments) to be paid by the Purchaser to the Debtors on the Sale Effective Date. The Debtors believe that they will clearly have

---

[3] All capitalized terms used herein shall have the meanings given in the Term Sheet unless otherwise defined. In the event of any inconsistency between the terms of the Term Sheet and this Motion, the terms of the Term Sheet shall control.

sufficient cash without any of the Cash Component to pay for all required cure obligations under the Non-Insider Leases, but clearly will have sufficient cash once the Sale Effective Date occurs.

The Purchaser is required to fully cooperate with the Affected Debtors in the Affected Debtors' efforts to assume and assign the Non-Insider Leases to the Purchaser, including providing the Affected Debtors and the Court with the information necessary to demonstrate adequate assurance of future performance under the Non-Insider Leases, including a personal guarantee by SR of the obligations under the Non-Insider Leases if required to do so by the Court. The Affected Debtors are informed and believe that SR is negotiating directly with the lessors of the Affected Facilities to resolve any issues or concerns any such lessors have with regard to the Affected Debtors' assignment of the Non-Insider Leases to the Purchaser.

Working in cooperation with the Official Committee of Unsecured Creditors ("Committee"), the Debtors have concluded that entering into the transactions contemplated by the Term Sheet is clearly the best means of maximizing the recovery to creditors and exiting these cases, and the Court has already entered orders approving the Term Sheet and deeming the Purchaser as the winning bidder at the auction sale which occurred on July 28, 2014. The relief sought in this Motion furthers these goals and achieves a primary element of the Term Sheet of providing for the Affected Debtors' assumption and assignment to the Purchaser of the Non-Insider Leases.

Accordingly, for all of these reasons and the others set forth below in the annexed Memorandum of Points and Authorities and Roles Declaration, the Affected Debtors respectfully request that the Court grant this Motion without delay to allow for the Affected Debtors to assume the Non-Insider Leases now and to assign the Non-Insider Leases to the Purchaser effective as of the Sale Effective Date.

It should be noted that as contemplated by the Term Sheet, the Reissmans and the Purchaser have reached agreement on the form of new written lease agreements that they will enter into effective as of the Sale Effective Date. In order to avoid having the Insider Leases be deemed statutorily rejected prior to the Sale Effective Date, the seven Debtors who are the tenants under the Insider Leases and the Reissmans have entered into a stipulation extending the

deadline for the seven Debtors to assume or reject the Insider Leases to the earlier to occur of the Sale Effective Date (expected to be on or after October 31, 2014, but in no event later than December 31, 2014) and December 31, 2014. The Court hearing on the motion to approve such stipulation will be held concurrently with the hearing on this Motion.

Attached as Exhibit 3 to the annexed Roles Declaration is the Purchaser's list of intended Purchaser entities to be the assignees of the Non-Insider Leases and the Insider Leases, along with the Purchaser's list of the intended Purchaser entities to be the operating entities.

**PLEASE TAKE FURTHER NOTICE** that this Motion is based upon this Notice of Motion and Motion, the annexed Memorandum of Points and Authorities and Roles Declaration and all exhibits attached thereto, the facts and circumstances of these cases, and any and all arguments of counsel which may be presented at the hearing on this Motion.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(f), each interested party opposing or responding to this Motion must file and serve the response on the Office of the United States Trustee, and the Debtors and their counsel at the address indicated on the upper left corner of the first page of this Notice and Motion not later than 14 days before the date designated for the hearing on this Motion. The response must be a complete written statement of all reasons in opposition or response thereto, declarations and copies of all evidence on which the opposing or responding party intends to rely, and any other responding memorandum of points and authorities. The failure to file and serve a timely opposition or response to this Motion may be deemed by the Court to constitute the consent to the granting of the relief requested by the Affected Debtors in this Motion.

**WHEREFORE**, the Affected Debtors respectfully request that the Court enter an order:

1.      approving the Affected Debtors' immediate assumption of all of the Non-Insider Leases and approving the Affected Debtors' assignment of all of the Non-Insider Leases to the Purchaser effective as of the Sale Effective Date;

2.      finding and ordering that (i) the cure amounts which must be paid by the Affected Debtors to the lessors of the Affected Facilities in connection with the Affected Debtors' assumption and assignment to the Purchaser of the Non-Insider Leases are the amounts set forth

1    in Exhibit "2" to the Roles Declaration (the "Cure Amounts"), (ii) the Affected Debtors have the

2    right to pay all such Cure Amounts within ten days following the Sale Effective Date, (iii)

3    adequate assurance of future performance has been demonstrated by the Purchaser with respect to

4    the Non-Insider Leases, (iv) any party that fails to file a timely objection to this Motion shall be

5    deemed to have consented to the Motion, including, *e.g.*, the Affected Debtors' proposed Cure

6    Amounts, and be forever barred from challenging the assumption and assignment of the Non-

7    Insider Leases (including, e.g., any purchase or extension options therein) or the Affected

8    Debtors' proposed Cure Amounts, or from asserting any claim against the Affected Debtors or the

9    Purchaser (or any other party) on account of any cure costs related to the Non-Insider Leases, and

10   (v) any claims of any of the lessors of the Affected Facilities that were scheduled by any of the

11   Debtors in their bankruptcy schedules filed with the Court and/or asserted by the lessors in any

12   proofs of claim shall be automatically deemed reduced to $0 following the payment of the Cure

13   Amounts to the lessors without the need for the Debtors to file any amendments to their

14   bankruptcy schedules or any objections to the proofs of claim filed by the lessors; and

15          3.    granting such other and further relief as the Court deems just and proper.

16   Dated:  August 13, 2014    BELMONT HEIGHTS HEALTHCARE CENTER, LLC
17                     CLAREMONT HEALTHCARE CENTER INC.
                  COUNTRY VILLA EAST LP
18                     COUNTRY VILLA IMPERIAL LLC
                  LOS FELIZ HEALTHCARE CENTER LLC
19                     PLAZA HEALTHCARE CENTER LLC
                  MOUNTAINSIDE OPERATING COMPANY LLC
20                     NORTH POINT HEALTH & WELLNESS CENTER LLC
21                     SOUTH HEALTHCARE CENTER LLC

22                     By:   */s/ Ron Bender*
23                         Ron Bender
                      Monica Y. Kim
24                         Krikor J. Meshefejian
                      Lindsey L. Smith
25                         Levene, Neale, Bender, Yoo & Brill L.L.P.
                      Attorneys for Chapter 11 Debtors
26                         and Debtors in Possession

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### FACTS

**A.    Background**

1.    Plaza Healthcare Center LLC (Case No. 8:14-bk-11335-CB), along with all of the other eighteen jointly administered affiliated entities, filed voluntary petitions under chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on March 4 and March 5, 2014.  The other eighteen affiliated entities consist of Plaza Convalescent Center LP (Case No. 8:14-bk-11337-CB); Belmont Heights Healthcare Center LLC (Case No. 8:14-bk-11358-CB), Claremont Healthcare Center Inc. (Case No. 8:14-bk-11375-CB), Country Villa East LP (Case No. 8:14-bk-11371-CB), Country Villa Imperial LLC (Case No. 8:14-bk-11370-CB), Country Villa Nursing Center Inc. (Case No. 8:14-bk-11364-CB), Country Villa Southbay LLC (Case No. 8:14-bk-11360-CB), East Healthcare Center LLC (Case No. 8:14-bk-11372-CB), Los Feliz Healthcare Center LLC (Case No. 8:14-bk-11368-CB), Mountainside Operating Company LLC (Case No. 8:14-bk-11367-CB), North Healthcare Center LLC (Case No. 8:14-bk-11366-CB), North Point Health & Wellness Center LLC (Case No. 8:14-bk-11365-CB), RRT Enterprises LP (Case No. 8:14-bk-11363-CB), Sheraton Healthcare Center, LLC (Case No. 8:14-bk-11362-CB), South Healthcare Center LLC (Case No. 8:14-bk-11361-CB), Westwood Healthcare Center LLC (Case No. 8:14-bk-11359-CB), Westwood Healthcare Center LP (Case No. 8:14-bk-11376-CB), and Wilshire Healthcare Center LLC (Case No. 8:14-bk-11373-CB).  All nineteen debtors are collectively defined herein as the "Debtors".

2.    The Debtors are primarily engaged in the business of owning and operating skilled nursing facilities in Southern California.  Collectively, the Debtors own and operate 18 skilled nursing facilities which provide 24 hours per day, 7 days per week and 365 days per year care to patients who reside at these facilities, and one assisted living facility.  As of February 27, 2014, the Debtors' facilities had approximately 1,711 patients and were staffed by approximately 2,113 employees.  The Debtors' facilities currently have a total number of approximately 1,905 beds.

3.    All of the Debtors' facilities are duly licensed by the California Department of Public Health ("CDPH") and certified for participation in the Title XVIII ("Medicare") and Title

XIX ("Medi-Cal") programs.  All of the Debtors' facilities are managed by an affiliated entity, Country Villa Service Corp ("CVSC"), which was founded in 1969.  CVSC has been a recognized leader in the operations and management of skilled nursing facilities in the State of California and has concurrently managed 50 nursing facilities within the State.  While there are nineteen separate Chapter 11 Debtors, the Debtors essentially operate as one consolidated business entity.  CVSC manages and handles all of the administrative tasks for all of the Debtors, for which CVSC is paid a monthly management fee.  CVSC is not in bankruptcy at this time.

4.      In addition to having common ownership, the Debtors have common creditors. Many of the largest unsecured creditors in these cases are common creditors of many of the Debtors.  Additionally, all or most of the Debtors are borrowers under a common pre-petition credit arrangement that had been entered into pre-petition with secured creditor Private Bank and Trust ("Private Bank").

5.      The Debtors operated their business pre-petition in accordance with a pre-petition accounts receivable credit arrangement with Private Bank.  While Private Bank only included the accounts receivable of 16 of the 19 Debtors in its borrowing base computations, Private Bank's lien extends to the accounts receivable and other personal property of all of the Debtors with the exception of Country Villa Nursing Center Inc.

6.       As of the Petition Dates, the aggregate indebtedness of Private Bank was (i) approximately $6.3 million under the accounts receivable line of credit, and (ii) approximately $852,000 under a term note (plus a certain letter of credit that has since been extinguished).  The Debtors do not dispute the liens of Private Bank.  At the request of the Debtors, an individual by the name of Shlomo Rechnitz ("SR"), personally or through an affiliate, acquired the Private Bank indebtedness during the Debtors' bankruptcy cases.  The Debtors requested SR to acquire the Private Bank indebtedness because Private Bank was being unnecessarily restrictive on the Debtors' post-petition use of funds and was incurring an excessive and unjustifiable amount of professional fees monitoring the Debtors' bankruptcy cases and business operations when the Debtors believed that there was no question that Private Bank was adequately protected by an overwhelming equity cushion.

7.    As of the Petition Dates, the Debtors collectively had cash on hand of approximately $2,231,518, and the Debtors have been able to continue to maintain a sizeable cash balance through the duration of their bankruptcy cases.

8.    The Debtors' primary assets consist of their accounts receivable (owing primarily by Medi-Cal and Medicare) and the facilities themselves.  All of the Debtors' facilities are leased.  As of January 31, 2014, the Debtors had total accounts receivable of approximately $26,830,827, and this figure remains relatively constant.    The Debtors generate annual revenue of approximately $170 million.

**B.    The Binding Plan Term Sheet and the Winning Bidder**

9.    After careful consideration of all of their various options for exiting these bankruptcy cases, all of the Debtors, working in conjunction with the Official Committee of Unsecured Creditors ("Committee"), determined that a sale of substantially all of the Debtors' assets and their related skilled nursing/assisted living facilities was the best option for maximizing value and return to creditors.

10.    Given the numerous moving parts in these cases, the Debtors concluded that having an open auction with no stalking horse bidder and/or having an open auction where prospective bidders were free to bid on all aspects involving the Debtors, including individual facilities, would be completely chaotic and unmanageable.  Instead, the Debtors concluded that creating an overall and sensible deal structure with a viable stalking horse bidder on favorable terms if one could be found and then subjecting that deal structure to overbid at an auction sale was in the overwhelming best interests of these estates.  In that regard, the Debtors concluded that SR was the ideal person to serve the role of a stalking horse bidder in these cases if an agreement could be reached with him on favorable terms for the Debtors.  All of these reasons are described in detail in the motion that was filed by the Debtors on June 11, 2014 for approval of the Binding Plan Term Sheet [Dkt. No. 364], which was approved by the Court at a hearing held on July 2, 2014.

11.    On July 18, 2014, the Court entered its order [Dkt No. 487) (the "Term Sheet Order") approving the Binding Plan Term Sheet, which Term Sheet Order, among other things,

10

scheduled an overbid auction (the "Auction") to be held on July 28, 2014, at 10:00 a.m., and specifically authorized the Debtors to enter into an interim management agreement with the winning bidder at the Auction pending a plan or sale.  A copy of the Binding Plan Term Sheet, dated May 30, 2014, is attached as Exhibit 1 to the annexed Declaration of Jerry Roles ("Roles Declaration").

12.    The Binding Plan Term Sheet (the "Term Sheet") was the result of extensive negotiations and documentation between the Debtors and the Committee, on the one hand, and SR, on the other hand.  The Term Sheet essentially created a deal structure of a transaction for SR or his designees (defined herein as the "Purchaser") to acquire the Debtors or their assets (excluding the Debtors' cash) for the agreed upon cash purchase price of $62 million (subject to certain limited adjustments), with the transaction to be subject to overbid at the Auction to be held before the Court on July 28, 2014.[4]  In order for any overbidder to participate at the Auction, the overbidder was required to submit a qualifying overbid by July 21, 2014 in compliance with the specific terms set forth in the Term Sheet and the Term Sheet Order.

13.    At the Auction held on July 28, 2014, the Court ultimately determined that no qualifying overbid was timely submitted, and, therefore, deemed the Purchaser's bid as set forth in the Term Sheet to be the winning bid and the Purchaser to be the winning bidder.

14.    While the Term Sheet contemplates the ultimate transaction between the Debtors and the Purchaser occurring through a confirmed plan of reorganization or an asset sale, the Debtors and the Purchaser have agreed that they will proceed to consummate their ultimate transaction by way of an asset sale.  The Debtors expect that the Court hearing on their asset sale motion will take place on or after October 1, 2014, with a planned closing date (or "Sale Effective Date" as defined in the Term Sheet) of on or after October 31, 2014, but in no event later than December 31, 2014.  Since the transaction will be occurring through an asset sale, the basic concept will be that the references in the Term Sheet to the "Plan Effective Date" and the

---

[4] The Auction date was selected by the Court at a case status conference held on June 4, 2014.

timing of events for the "Plan Effective Date" would in effect be changed to the "Sale Effective Date."[5]

**C.    Treatment of Facility Lease Agreements Under the Binding Plan Term Sheet**

15.    As indicated above, the Debtors own a total of 19 facilities.  Each of the 19 facilities is subject to a real property lease where the respective Debtor is the lessee under the lease.  The ten real property leases pertaining to this Motion, as amended and supplemented, together with all rights thereunder, including, *e.g.*, any purchase or extension options (the "Non-Insider Leases") relate to 12 of the facilities (the "Affected Facilities")[6] and are with landlords who have no affiliation with any of the Debtors.  The landlords of the remaining 7 leases covering the remaining 7 facilities are owned in substantial part and controlled by Stephen and Diane Reissman ("Reissmans"), who are founders, owners and officers of the Debtors, and, therefore, insiders of the Debtors (the "Insider Leases").  The Term Sheet provides for the landlords of the Insider Leases to enter into new written lease agreements with the Purchaser, as the winning bidder, based on certain economic terms which are set forth in the Term Sheet.

16.    Pursuant to the Order Extending Deadlines for Debtors to Assume or Reject Non-Residential Real Property Leases entered by the Court on June 30, 2014 [Dkt. No. 412], the deadline by which Debtor Plaza Healthcare Center LLC must assume or reject its real property lease was extended through September 30, 2014, and the deadline by which the remaining Debtors must assume or reject their real property leases was extended through October 1, 2014.

17.    By this Motion and as contemplated by the Term Sheet, the Affected Debtors are seeking, pursuant to the provisions of Section 365 of the Bankruptcy Code, Court approval to assume now and to assign to the Purchaser effective as of the Sale Effective Date all 10 of the

---

[5]   All capitalized terms used herein shall have the meanings given in the Term Sheet unless otherwise defined.  In the event of any inconsistency between the terms of the Term Sheet and this Motion, the terms of the Term Sheet shall control.

[6] One of the Debtors is the lessee of 4 of the Facilities affected by this Motion under two leases while each of the other eight Affected Debtors is the lessee of 1 of the Facilities affected by this Motion, each under one lease, which is why only nine of the Debtors (defined herein as the "Affected Debtors") are parties to this Motion to assume and assign ten leases as to the twelve Affected Facilities.

Non-Insider Leases.  A complete description of the Non-Insider Leases, including the Affected Debtors' contentions as to the amounts of any defaults which would need to be cured in connection with the Affected Debtors' assumption and assignment to the Purchaser of the Non-Insider Leases, is set forth below.  A schedule of the Affected Debtors' contentions as to the required cure amounts is attached as Exhibit 2 to the annexed Roles Declaration.

18.    The cure amounts required to be paid as a condition to the Affected Debtors assuming and assigning the Non-Insider Leases to the Purchaser (the "Cure Amounts") will either be paid by the Debtors from the Debtors' existing cash on hand prior to the Sale Effective Date, or will be paid from the "Cash Component" (of $62 million subject to certain limited adjustments) to be paid by the Purchaser to the Debtors on the Sale Effective Date.  The Debtors believe that they will clearly have sufficient cash without any of the Cash Component to pay for all required Cure Amounts, but clearly will have sufficient cash once the Sale Effective Date occurs.

19.    The Purchaser is required to fully cooperate with the Affected Debtors in the Affected Debtors' efforts to assume and assign the Non-Insider Leases to the Purchaser, including providing the Affected Debtors and the Court with the information necessary to demonstrate adequate assurance of future performance under the Non-Insider Leases, including a personal guarantee by SR of the obligations under the Non-Insider Leases if required to do so by the Court.  The Affected Debtors are informed and believe that SR is negotiating directly with the lessors of the Affected Facilities to resolve any issues or concerns any such lessors have with regard to the Affected Debtors' assignment of the Non-Insider Leases to the Purchaser.

20.    The assumption and assignment of the Non-Insider Leases to the Purchaser is a key component of the Term Sheet and the assets to be purchased by the Purchaser.  Accordingly, for all of the reasons stated herein and in connection with the Term Sheet, the Affected Debtors respectfully request that the Court grant this Motion without delay to allow for the Affected Debtors to assume the Non-Insider Leases prior to the expiration of the deadlines by which the Affected Debtors must assume or reject the Non-Insider Leases and to assign the Non-Insider Leases to the Purchaser as of the Sale Effective Date.

21.     It should be noted that as contemplated by the Term Sheet, the Reissmans and the Purchaser have reached agreement on the form of new written lease agreements that they will enter into effective as of the Sale Effective Date (expected to be on or after October 31, 2014, but in no event later than December 31, 2014).   In order to avoid having the Insider Leases be deemed statutorily rejected prior to the Sale Effective Date, the seven Debtors and the Reissmans have entered into a stipulation extending the deadline for the seven Debtors to assume or reject the Insider Leases to the earlier to occur of the Sale Effective Date (expected to be on or after October 31, 2014, but in no event later than December 31, 2014) and December 31, 2014.  The Court hearing on the motion to approve such stipulation will be held concurrently with the hearing on this Motion.

22.     Attached as Exhibit 3 to the annexed Roles Declaration is the Purchaser's list of intended Purchaser entities to be the assignees of the Non-Insider Leases and the Insider Leases, along with the Purchaser's list of the intended Purchaser entities to be the operating entities.

**D**.     **The Existing Lease Agreements and the Proposed Cure Amounts**

23.     While there are a total of twelve Affected Facilities covered by the Non-Insider Leases, there are only a total of ten Non-Insider Leases because one of the Non-Insider Leases covers three of the Affected Facilities as more explained below.  As a result, a total of ten Non-Insider Leases are the subject of this Motion.  The following is a description of each of the ten Non-Insider Leases and related Cure Amounts:

24.     The One Lease of Belmont Heights Healthcare Center LLC ("Belmont").  Belmont filed its bankruptcy case on March 5, 2014.  Belmont owns and operates, pursuant to a lease agreement (including any amendments thereto) (the "Belmont Lease") with Emanuel Newman and Alisa Newman, Trustees of the Newman Family Trust, established August 9, 1994, and Uri Mandelbaum and Brenda Mandelbaum, Trustees of the Mandelbaum Trust dated November 1, 1988, as lessor (the "Belmont Landlord"), a 117-bed skilled nursing facility known as "Country Villa Belmont Heights Healthcare Center" located at 1730 Grand Avenue, Long Beach, California.  The current term of the Belmont Lease is September 1, 1998 through August 31, 2018.  Inclusive of all options to extend the term or renew the Belmont Lease, Belmont believes

that there is less than 5 years left on the Belmont Lease.

**Belmont Lease Cure**:  Based on Belmont's review of its books and records, Belmont believes that the default amount which would need to be cured in connection with Belmont's assumption and assignment of the Belmont Lease is **$10,275.85**.  This is comprised of the unpaid pre-petition rents due under the Belmont Lease for the first five days of March, 2014 ("March Stub Rent").  The Belmont Landlord has not filed any proof of claim asserting any different cure claim amount.  Belmont therefore assumes that there is no dispute with the Belmont Landlord over the amount of the Belmont cure claim.

25.    The One Lease of Claremont Healthcare Center Inc. ("Claremont").  Claremont filed its bankruptcy case on March 5, 2014.  Claremont owns and operates, pursuant to a lease agreement (including any amendments thereto) (the "Claremont Lease") with Health Care Property Partners, as lessor (the "Claremont Landlord"), a 99-bed skilled nursing facility known as "Country Villa Claremont Healthcare Center" located at 590 S. Indian Blvd., Claremont, California (the "Claremont Facility").  The current term of the Claremont Lease is September 1, 2002 through August 30, 2017.  Inclusive of all options to extend the term or renew the Claremont Lease, Claremont believes that there is less than 14 years left on the Claremont Lease.

**Claremont Lease Cure**:  Based on Claremont's review of its books and records, Claremont believes that the default amount which would need to be cured in connection with Claremont's assumption and assignment of the Claremont Lease is **$5,983.37**.  This is comprised of the March Stub Rent due under the Claremont Lease.  The Claremont Landlord has filed a proof of claim (as claim number 12 on the Claremont claims register) asserting a cure claim in the amount of $18,326.19.  Claremont, working in conjunction with the Purchaser as appropriate, will attempt to resolve this discrepancy with the Claremont Landlord in advance of the hearing on this Motion.[7]

---

[7] While not a cure issue, the Claremont Landlord has scheduled a hearing before this Court relating to the Claremont Lease for September 3, 2014, at 10:00 a.m., as to the interim

26.    <u>The Two Leases of Country Villa East LP ("East").</u>  East filed its bankruptcy case on March 5, 2014.

A.    <u>East Lease 1</u>.  East owns and operates three facilities under one master lease agreement (including any amendments thereto, collectively, "<u>East Lease 1</u>") with Flora Rosman, Trustee of the Rosman Trustee u/t/d February 19, 1980, as lessor (the "<u>East Landlord 1</u>").  The three facilities are (i) a 59-bed skilled nursing facility known as "Country Villa Pavilion Nursing Center" located at 5916 W. Pico Blvd., Los Angeles, California (the "<u>Pavilion Facility</u>"). (ii) a 49-bed skilled nursing facility known as "Country Villa Terrace Nursing Center" located at 6070 W. Pico Blvd., Los Angeles, California ("<u>Terrace Facility</u>"), and (iii) a 136-bed assisted living facility known as "Country Villa Terrace Assisted Living Facility" located at 6050 W. Pico Blvd., Los Angeles, CA ("<u>Terrace AL Facility</u>").  The current term of East Lease 1 is March 16, 1996 through March 31, 2016.  Inclusive of all options to extend the term or renew East Lease 1, there is less than 22 years left on East Lease 1.

**\*\*East Lease 1 Cure**:  Based on East's review of its books and records, East believes that the default amount which would need to be cured in connection with East's assumption and assignment of East Lease 1 is $134,510 total for the Terrace Facility and the Terrace AL Facility, and $33,080 for the Pavilion Facility, for a total cure amount of **$167,590**.  This is comprised of: (a) March Stub Rent of $8,180.59 and delinquent rents resulting from CPI increases going to back to 2005 which were never paid totaling $126,329.41 for the Terrace Facility and Terrace AL Facility, and (b) March Stub Rent of $3,932.24 and delinquent rents resulting from CPI increases going back to 2005 which were never paid totaling $29,147.76

---

management by the Purchaser, pending a Sale Effective Date, authorized for all other Facilities by this Court's July 18, 2014 order.  By stipulation previously approved by this Court, the Debtors agreed that, despite this Court's July 18, 2014 order, as to the Claremont Facility, the Claremont Landlord could object thereto until 10 days after the Auction. The Claremont Landlord has so objected and set hearing thereupon for September 3, 2014, at 10:00 a.m. Claremont, working in conjunction with the Purchaser, will attempt to resolve the Claremont Landlord's objection in a consensual manner.  If that is not possible, Claremont or the Purchaser may file pleadings pertinent to the scheduled September 3, 2014 hearing to address this issue.

for the Pavilion Facility. The East 1 Landlord has filed a proof of claim (as claim number 40 on the East claims register) asserting a cure claim in the amount of $266,922.38. East, working in conjunction with the Purchaser as appropriate, will attempt to resolve this discrepancy with the East 1 Landlord in advance of the hearing on this Motion.

B.    East Lease 2. In addition to the three (3) facilities identified above, East owns and operates, pursuant to a lease agreement (including any amendments thereto, collectively "East Lease 2") with Superior Convalescent LLC ("East Landlord 2"), a fourth facility consisting of a 138-bed skilled nursing facility known as "Country Villa Sheraton Nursing & Rehabilitation Center" located at 9655 Sepulveda Blvd., North Hills, CA ("Sheraton Facility"). The current term of East Lease 2 is January 1, 1997 through December 31, 2016. Inclusive of all options to extend the term or renew East Lease 2, there is less than 18 years left on East Lease 2.

**East 2 Cure**: Based on East's review of its books and records, East believes that the default amount which would need to be cured in connection with East's assumption and assignment of East Lease 2 is **$11,735.74**. This is comprised of the March Stub Rent due under East Lease 2. The East 2 Landlord has not filed any proof of claim asserting any different cure claim amount. East therefore assumes that there is no dispute with the East 2 Landlord over the amount of the East Lease 2 cure claim.

East believes that East Landlord 1 and/or East Landlord 2 may contend that certain extension options under East Lease 1 and/or East Lease 2 expired pre-petition due to pre-petition defaults by East. Based on East's ability to cure and reinstate under the Bankruptcy Code, the discussion of cure herein, and the facts set forth herein and in and as supported by the annexed Roles Declaration, the approval of this Motion will be a determination that the assumption by East of East Lease 1 and East Lease 2 and assignment of East Lease 1 and East Lease 2 to the Purchaser includes all rights of East under East Lease 1 and East Lease 2, including such extension options.

27.    <u>The One Lease of Country Villa Imperial LLC ("Imperial").</u>    Imperial filed its bankruptcy case on March 5, 2014.  Imperial owns and operates, pursuant to a lease agreement (including any amendments thereto) (the "<u>Imperial Lease</u>") with Sam Krieger and Certie Krieger, Trustees of the Kreiger Family Trust u/t/a dated January 7, 1985, as lessor (the "<u>Imperial Landlord</u>"), a 99-bed skilled nursing facility known as "Healthcare Center of Bella Vista" located at 933 E. Deodar St., Ontario, California.  The current term of the Imperial Lease is March 31, 1998 through March 31, 2018.  Inclusive of all options to extend the term or renew the Imperial Lease, there is less than 9 years left on the Imperial Lease.

**Imperial Cure**:  Based on Imperial's review of its books and records, Imperial believes that the default amount which would need to be cured in connection with its assumption and assignment of the Imperial Lease is **$3,756.77**.   This is comprised of the March Stub Rent due under the Imperial Lease.  The Imperial Landlord has filed a proof of claim (as claim number 2 on the Imperial claims register) asserting a cure claim in the same amount of $3,756.77.

28.    <u>The One Lease of Los Feliz Healthcare Center LLC ("Los Feliz").</u>  Los Feliz filed its bankruptcy case on March 5, 2014.  Los Feliz owns and operates, pursuant to a lease agreement (including any amendments thereto) (the "<u>Los Feliz Lease</u>") with L.F. Enterprises, as lessor (the "<u>Los Feliz Landlord</u>"), a 131-bed skilled nursing facility known as "Country Villa Los Feliz Nursing Center" located at 3002 Rowena Ave., Los Angeles, California.  The current term of the Los Feliz Lease is October 1, 1996 through September 30, 2016.  Inclusive of all options to extend the term or renew the Los Feliz Lease, there is less than 3 years left on the Los Feliz Lease.

**Los Feliz Cure**:  Based on Los Feliz's review of its books and records, Los Feliz believes that there is no default amount which would need to be cured in connection with its assumption and assignment of the Los Feliz Lease.  The Los Feliz Landlord has not filed any proof of claim asserting any different cure claim amount.  Los Feliz therefore assumes that there is no dispute with the Los Feliz Landlord over the amount of the Los Feliz cure claim.

29.    <u>The One Lease of Plaza Healthcare Center LLC ("Plaza").</u>    Plaza filed its bankruptcy case on March 4, 2014.  Plaza owns and operates, pursuant to a lease agreement (including any amendments thereto) (the "<u>Plaza Lease</u>") with Santa Ana Investment Group LLC, as lessor (the "<u>Plaza Landlord</u>"), a 145-bed skilled nursing facility known as "Country Villa Plaza Convalescent Center" located at 1209 Hemlock Way, Santa Ana, California (the "<u>Plaza Facility</u>").  The current term of the Plaza Lease is August 6, 1985 through November 30, 2016.  Inclusive of all options to extend the term or renew the Plaza Lease, there is less than 18 years left on the Plaza Lease.

**Plaza Cure**:  Based on Plaza's review of its books and records, Plaza believes that the default amount which would need to be cured in connection with its assumption and assignment of the Plaza Lease is **$9,444.80**.[8]  This is comprised of the March Stub Rent due under the Plaza Lease.  The Plaza Landlord did not file any proof of claim.  The Plaza Lease includes a promissory note evidencing an indebtedness owing by Plaza to the Plaza Landlord which was the result of a loan made by the Plaza Landlord to Plaza to enable Plaza to fund renovations to the Plaza Facility.  The current outstanding balance owing by Plaza under this promissory note is approximately $208,374.44.  The Plaza Lease provides that the amounts due under this note are treated as additional rent under the Plaza Lease. However, Plaza is current on the payment of all promissory note obligations.

30.    <u>The One Lease of Mountainside Operating Company Center LLC ("Mountainside").</u>  Mountainside filed its bankruptcy case on March 5, 2014.  Mountainside owns and operates, pursuant to a lease agreement (including any amendments thereto) (the "<u>Mountainside Lease</u>") with 1311 East Date Street LLC, as lessor (the "<u>Mountainside Landlord</u>"), a 99-bed skilled nursing facility known as "Country Villa Hacienda Healthcare Center" located at 1311 E. Date Street, San Bernardino, California (the "<u>Mountainside Facility</u>").  The current term of the Mountainside Lease is July 1, 2001 through June 30, 2016.  Inclusive of all options to

---

[8]  Plaza erroneously scheduled this claim in its bankruptcy schedules in the amount of $77,768.10.

extend the term or renew the Mountainside Lease, there is less than 8 years left on the Mountainside Lease.

**Mountainside Cure**:  Based on Mountainside's review of its books and records, Mountainside believes that there is no default amount which would need to be cured in connection with Mountainside's assumption and assignment of the Mountainside Lease.[9]  The Mountainside Landlord has not filed any proof of claim so Mountainside assumes that the Mountainside Landlord agrees that there is no default amount which would need to be cured in connection with Mountainside's assumption and assignment of the Mountainside Lease.

31.    The One Lease of North Point Health & Wellness Center LLC ("North Point"). North Point filed its bankruptcy case on March 5, 2014.  North Point owns and operates, pursuant to a lease agreement (including any amendments thereto) (the "North Point Lease") with Bullard Fresno Investments, LLC, as lessor (the "North Point Landlord"), a 99-bed skilled nursing facility known as "NorthPointe Healthcare Centre" located at 668 Bullard Ave., Fresno, California (the "North Point Facility").  The current term of the North Point Lease is December 7, 2011 through December 7, 2031.  Inclusive of all options to extend the term or renew the North Point Lease, there is less than 23 years left on the North Point Lease.

**North Point Cure**:  Based on North Point's review of its books and records, North Point believes that the default amount which would need to be cured in connection with North Point's assumption and assignment of the North Point Lease is **$8,910**.  This is comprised of the March Stub Rent due under the North Point Lease.  The North Point Landlord has not filed any proof of claim asserting any different cure claim amount.  North Point therefore assumes that there is no dispute with the North Point Landlord over the amount of the North Point cure claim.

---

[9] Mountainside erroneously scheduled this claim in its bankruptcy schedules in the amount of $6,722.31..

In addition to the foregoing, during this bankruptcy case, an issue and dispute arose between North Point and the North Point Landlord with regard to the following:

Paragraph 9.4 of the North Point Lease requires North Point as "Tenant" "to make at least One Million Dollars ($1,000,000) in Tenant Improvements to the Facility ('the Improvements') not later than five years after the Commencement Date of the Lease (the 'Trigger Date')." The Commencement Date of the North Point Lease was December 7, 2011, which means that all of these Tenant Improvements are required to be completed by December 7, 2016. During the pendency of North Point's bankruptcy case, North Point provided the North Point Landlord with a summary showing that $1,401,850.89 of Tenant Improvements have been made to the North Point Facility, along with all of the backup documentation. "Tenant Improvements" is defined only in Paragraph 9.4 of the North Point Lease as improvements to the North Point Facility without any further specificity as to what does and what does not constitute a "Tenant Improvement".

Pre-petition, the prior management for North Point (Michael Torgan and Julianne Williams) met in person with Jacob Cohen as the representative of the North Point Landlord to review all such Tenant Improvements which North Point was later advised were approved by Jacob Cohen. North Point has "before" and "after" pictures of the North Point Facility showing the significant improvement to the North Point Facility resulting from the Tenant Improvements done by North Point. This information has been delivered to the North Point Landlord. Additionally, even if the North Point Landlord can establish that the required Tenant Improvements have not yet been made, the North Point Lease allows for these Tenant Improvements to be completed by December 7, 2016, which is more than 2 years away. The Purchaser is aware of this provision of the North Point Lease, as well as North Point's and North Point Landlord's disagreements regarding such provision. For purposes of determining cure amounts due under the

North Point Lease, North Point submits that neither such provision nor the parties' potential disputes thereon is relevant.  North Point is <u>NOT</u> asking the Court to make any determination in this regard as North Point believes that this issue is not ripe for adjudication or relevant to North Point's assumption of the North Point Lease or assignment of the North Point Lease to the Purchaser.  North Point understands that the North Point Landlord wanted to make sure that the Purchaser was aware of this issue.  Since the Purchaser is aware of this issue, North Point believes that there is no need for the Court to deal with this issue at this time.  That will be an issue between the North Point Landlord and the Purchaser, if ever, in the future.

32.    <u>The One Lease of South Healthcare Center LLC ("South").</u>    South filed its bankruptcy case on March 5, 2014.  South owns and operates, pursuant to a lease agreement (including any amendments thereto) (the "<u>South Lease</u>") with Westover Properties, as lessor (the "<u>South Landlord</u>"), a 87-bed skilled nursing facility known as "Country Villa South Convalescent Center" located at 3515 Overland Ave., Los Angeles, California.  The current term of the South Lease is December 23, 1976 through January 31, 2017.  Inclusive of all options to extend the term or renew the South Lease, there is less than 13 years left on the South Lease.

**South Cure**:  Based on South's review of its books and records, South believes that the default amount which would need to be cured in connection with its assumption and assignment of the South Lease is **$4,983.83**.  This is comprised of the March Stub Rent due under the South Lease.  The South Landlord has filed a proof of claim (as claim number 37 on the South claims register) asserting a cure claim in the amount of $4,963.83, which is $20 lower than the figure that South believes is owing.  South will simply pay the higher cure amount.

33.    The schedule below summarizes the Debtors' contentions of the Cure Amounts for all of the Non-Insider Leases:

| Debtor Lessee | Landlord | Facility | Cure |
|---|---|---|---|
| Belmont Heights Healthcare Center, LLC | Emanuel Newman and Alisa Newman, Trustees of the Newman Family Trust, established August 9, 1994, and Uri Mandelbaum and Brenda Mandelbaum, Trustees of the Mandelbaum Trust dated November 1, 1988 | Country Villa Belmont Heights Healthcare Center | $10,275.85 |
| Claremont Helthcare Center Inc. | Health Care Property Partners | Country Villa Claremont Healthcare Center | $5,983.37 |
| Country Villa East LP | Flora Rosman, Trustee of the Rosman Trustee u/t/d February 19, 1980 | Country Villa Pavilion Nursing Center County Villa Terrace Nursing Center Country Villa Terrace Assisted Living Facility | $167,590 |
| Country Villa East LP | Superior Convalescent LLC | Country Villa Sheraton Nursing & Rehabilitation Center | $11,735.74 |
| Country Villa Imperial LLC | Sam Krieger and Certie Krieger, Trustees of the Krieger Family Trust u/t/a dated January 7, 1985 | Healthcare Center of Bella Vista | $3,756.77 |
| Los Feliz Healthcare Center LLC | L.F. Enterprises | Country Villa Los Feliz Nursing Center | $0 |
| Plaza Heathcare Center LLC | Santa Ana Investment Group LLC | Country Villa Plaza Convalescent Center | $9,444.80 |
| Mountainside Operating Company LLC | 1311 East Date Street LLC | Country Villa Hacienda Healthcare Center | $0 |
| North Point Health & Wellness Center LLC | Bullard Fresno Investments, LLC | NorthPointe Healthcare Centre | $8,910 |
| South Healthcare Center LLC | Westover Properties | Country Villa South Convalescent Center | $4,983.83 |

34.    The Affected Debtors have been current on the payment of their post-petition rents due under the Non-Insider Leases, and intend to remain current on the payment of their post-petition rents through the Sale Effective Date.  Therefore, the Affected Debtors are not aware of any Cure Amounts due and payable in connection with the assumption and assignment of the Non-Insider Leases beyond the amounts set forth above.

35.    The principal of the Purchaser (Shlomo Rechnitz), through affiliated entities that he controls, is one of the largest, if not the largest, owners and operators of skilled nursing

facilities in the State of California.  He is extremely well known and well regarded by the various State agencies involved with skilled nursing facilities, and he has a long history of acquiring financially distressed skilled nursing facilities and turning them around into financially profitable entities.  In fact, the Debtors understand that Shlomo Rechnitz is the person that the various State agencies frequently look to in order to have him take over financially distressed skilled nursing facilities which are seized or taken over by the State.

36.     The Term Sheet requires the Purchaser to fully cooperate with the Affected Debtors in the Affected Debtors' efforts to assume and assign the Non-Insider Leases to the Purchaser, including providing the Affected Debtors and the Court with the information necessary to demonstrate adequate assurance of future performance under the Non-Insider Leases, including a personal guarantee by SR of the obligations under the Non-Insider Leases if required to do so by the Court.  The Affected Debtors are informed and believe that SR is negotiating directly with the lessors of the Affected Facilities related to the Affected Debtors' proposed assignment of the Non-Insider Leases to the Purchaser.  The Affected Debtors, working in conjunction with the Purchase, will provide the Court and any of the lessors of the Affected Facilities with whatever reasonable financial information is required to enable the Affected Debtors (and the Purchaser) to satisfy the adequate assurance of future performance standard.

## II.

### DISCUSSION

**A.      The Bankruptcy Court Should Authorize the Affected Debtors to Assume and Assign to the Purchaser All of the Non-Insider Leases.**

Barring exceptions not herein relevant, sections 365(a) and 1107(a) authorizes a debtor in possession, "subject to the Court's approval, ... [to] assume or reject any executory contract or unexpired lease of the debtor."  A debtor in possession may assume or reject executory contracts for the benefit of the estate.  In re Klein Sleep Products, Inc., 78 F.3d 18, 25 (2d. Cir. 1996); In re Central Fla. Metal Fabrication, Inc., 190 B.R. 119, 124 (Bankr. N.D. Fla. 1995); In re Gucci, 193 B.R. 411, 415 (S.D.N.Y. 1996).  In reviewing a debtor in possession's decision to assume or reject an executory contract, a bankruptcy court should apply the "business judgment test" to

determine whether it would be beneficial to the estate to assume it.  In re Continental Country Club, Inc., 114 B.R. 763, 767 (Bankr. M.D. Fla. 1990); see also In re Gucci, 193 B.R. at 415.  The business judgment standard requires that the court follow the business judgment of the debtor unless that judgment is the product of bad faith, whim, or caprice.  In re Prime Motors Inns, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991), citing Lubrizol Enterprises v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986).

Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign its executory contracts and unexpired leases, provided the debtor first assumes such executory contracts and unexpired leases in accordance with section 365(b)(1), and provides adequate assurance of future performance by the assignee.  Pursuant to section 365(b)(1), assumption of executory contracts and unexpired leases requires a debtor to: (a) cure any existing defaults under such agreements; (b) compensate all non-debtor parties to such agreements for any actual pecuniary loss resulting from the defaults; and (c) provide adequate assurance of future performance under the contract or lease.  11 U.S.C. § 365(b)(1); see also In re Bowman, 194 B.R. 227, 230 (Bankr. D. Ariz. 1995); In re AEG Acquisition Corp., 127 B.R. 34, 44 (Bankr. C.D. Cal. 1991), aff'd 161 B.R. 50 (9th Cir. B.A.P. 1993).  Pursuant to section 365(f)(1) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease pursuant to section 365(f)(2) of the Bankruptcy Code notwithstanding any provision in such executory contract or unexpired lease that prohibits, restricts or conditions the assignment of such executory contract or unexpired lease.

The assumption and assignment of executory contracts furthers the goals of Chapter 11 of promoting reorganization by balancing the debtor's interest in maximizing the value of its estate against the contracting party's interest in receiving the benefit of its bargain and being protected against default by the debtor after assumption has occurred.  In re Embers 86th Street. Inc., 184 B.R. 892, 896 (Bankr. S.D.N.Y. 1995).

As set forth in the Term Sheet, the Affected Debtors are required to assume and assign to the Purchaser, as the winning bidder at the Auction, all of the Non-Insider Leases.  As a result, by this Motion, the Affected Debtors are seeking to assume and assign to the Purchaser all of the Non-Insider Leases.  A complete schedule of the Non-Insider Leases, including the belief and

contentions of the Affected Debtors as to the existence of any default amounts which would need to be cured in connection with the Affected Debtors' assumption and assignment to the Purchaser of the Non-Insider Leases, is attached as Exhibit 2 to the annexed Roles Declaration.

In connection with this Motion, the Affected Debtors are requesting an order of the Court providing that the Cure Amounts set forth in Exhibit 2 to the annexed Roles Declaration are the Cure Amounts which the Affected Debtors must pay to the lessors of the Non-Insider Leases to enable the Affected Debtors to satisfy the cure requirements of section 365(b)(1)(A) of the Bankruptcy Code. The Affected Debtors therefore submit that any party that fails to file a timely objection to this Motion should be deemed to have consented to the Affected Debtors' proposed Cure Amounts and be forever barred from challenging the Affected Debtors' proposed Cure Amounts.

### III.

### CONCLUSION

For all of the reasons set forth above, the Debtors respectfully request that the Court enter an order:

1. approving the Affected Debtors' immediate assumption of all of the Non-Insider Leases and approving the Affected Debtors' assignment of all of the Non-Insider Leases to the Purchaser effective as of the Sale Effective Date;

2. finding and ordering that (i) the Cure Amounts which must be paid by the Affected Debtors to the lessors of the Affected Facilities in connection with the Affected Debtors' assumption and assignment to the Purchaser of the Non-Insider Leases are the amounts set forth in Exhibit "2" to the Roles Declaration, (ii) the Affected Debtors have the right to pay all such Cure Amounts within ten days following the Sale Effective Date, (iii) adequate assurance of future performance has been demonstrated by the Purchaser with respect to the Non-Insider Leases, (iv) any party that fails to file a timely objection to this Motion shall be deemed to have consented to the Motion, including, *e.g.*, the Affected Debtors' proposed Cure Amounts, and be forever barred from challenging the assumption and assignment of the Non-Insider Leases (including, e.g., any purchase or extension options therein) or the Affected

26

Debtors' proposed Cure Amounts, or from asserting any claim against the Affected Debtors or the Purchaser (or any other party) on account of any cure costs related to the Non-Insider Leases, and (v) any claims of any of the lessors of the Affected Facilities that were scheduled by any of the Debtors in their bankruptcy schedules filed with the Court and/or asserted by the lessors in any proofs of claim shall be automatically deemed reduced to $0 following the payment of the Cure Amounts to the lessors without the need for the Debtors to file any amendments to their bankruptcy schedules or any objections to the proofs of claim filed by the lessors; and

3.    granting such other and further relief as the Court deems just and proper.

Dated:  August 13, 2014

BELMONT HEIGHTS HEALTHCARE CENTER, LLC
CLAREMONT HEALTHCARE CENTER INC.
COUNTRY VILLA EAST LP
COUNTRY VILLA IMPERIAL LLC
LOS FELIZ HEALTHCARE CENTER LLC
PLAZA HEALTHCARE CENTER LLC
MOUNTAINSIDE OPERATING COMPANY LLC
NORTH POINT HEALTH & WELLNESS CENTER LLC
SOUTH HEALTHCARE CENTER LLC

By:   */s/ Ron Bender*
Ron Bender
Monica Y. Kim
Krikor J. Meshefejian
Lindsey L. Smith
Levene, Neale, Bender, Yoo & Brill L.L.P.
Attorneys for Chapter 11 Debtors
and Debtors in Possession

## **DECLARATION OF JERRY ROLES**

I, Jerry Roles, hereby declare as follows:

1.      I submit this Declaration in support of the motion (the "Motion") to which this Declaration is attached.

2.      I am the Chief Financial Officer for all of the nineteen above-captioned, jointly-administered, chapter 11 debtors and debtors in possession (collectively, the "Debtors").  I am therefore familiar with the Debtors' business operations, finances and books and records.  I have extensive experience in the skilled nursing facility industry.

3.      The Debtors are primarily engaged in the business of owning and operating skilled nursing facilities in Southern California.  Collectively, the Debtors own and operate 18 skilled nursing facilities which provide 24 hours per day, 7 days per week and 365 days per year care to patients who reside at these facilities, and one assisted living facility.  As of February 27, 2014, the Debtors' facilities had approximately 1,711 patients and were staffed by approximately 2,113 employees.  The Debtors' facilities currently have a total number of approximately 1,905 beds.

4.      All of the Debtors' facilities are duly licensed by the California Department of Public Health ("CDPH") and certified for participation in the Title XVIII ("Medicare") and Title XIX ("Medi-Cal") programs.  All of the Debtors' facilities are managed by an affiliated entity, Country Villa Service Corp ("CVSC"), which was founded in 1969.  CVSC has been a recognized leader in the operations and management of skilled nursing facilities in the State of California and has concurrently managed 50 nursing facilities within the State.  While there are nineteen separate Chapter 11 Debtors, the Debtors essentially operate as one consolidated business entity.  CVSC manages and handles all of the administrative tasks for all of the Debtors, for which CVSC is paid a monthly management fee.  CVSC is not in bankruptcy at this time.

5.      In addition to having common ownership, the Debtors have common creditors. Many of the largest unsecured creditors in these cases are common creditors of many of the Debtors. Additionally, all or most of the Debtors are borrowers under a common pre-petition

credit arrangement that had been entered into pre-petition with secured creditor Private Bank and Trust ("Private Bank").

6.    The Debtors operated their business pre-petition in accordance with a pre-petition accounts receivable credit arrangement with Private Bank.  While Private Bank only included the accounts receivable of 16 of the 19 Debtors in its borrowing base computations, Private Bank's lien extends to the accounts receivable and other personal property of all of the Debtors with the exception of Country Villa Nursing Center Inc.

7.    As of the Petition Dates, the aggregate indebtedness of Private Bank was (i) approximately $6.3 million under the accounts receivable line of credit, and (ii) approximately $852,000 under a term note (plus a certain letter of credit that has since been extinguished).  The Debtors do not dispute the liens of Private Bank.  At the request of the Debtors, an individual by the name of Shlomo Rechnitz ("SR"), personally or through an affiliate, acquired the Private Bank indebtedness during the Debtors' bankruptcy cases.  The Debtors requested SR to acquire the Private Bank indebtedness because Private Bank was being unnecessarily restrictive on the Debtors' post-petition use of funds and was incurring an excessive and unjustifiable amount of professional fees monitoring the Debtors' bankruptcy cases and business operations when the Debtors believed that there was no question that Private Bank was adequately protected by an overwhelming equity cushion.

8.    As of the Petition Dates, the Debtors collectively had cash on hand of approximately $2,231,518, and the Debtors have been able to continue to maintain a sizeable cash balance through the duration of their bankruptcy cases.

9.    The Debtors' primary assets consist of their accounts receivable (owing primarily by Medi-Cal and Medicare) and the facilities themselves.  All of the Debtors' facilities are leased.  As of January 31, 2014, the Debtors had total accounts receivable of approximately $26,830,827, and this figure remains relatively constant.  The Debtors generate annual revenue of approximately $170 million.

10.    After careful consideration of all of their various options for exiting these bankruptcy cases, all of the Debtors, working in conjunction with the Official Committee of

Unsecured Creditors ("Committee"), determined that a sale of substantially all of the Debtors' assets and their related skilled nursing/assisted living facilities was the best option for maximizing value and return to creditors.

11.    Given the numerous moving parts in these cases, the Debtors concluded that having an open auction with no stalking horse bidder and/or having an open auction where prospective bidders were free to bid on all aspects involving the Debtors, including individual facilities, would be completely chaotic and unmanageable.  Instead, the Debtors concluded that creating an overall and sensible deal structure with a viable stalking horse bidder on favorable terms if one could be found and then subjecting that deal structure to overbid at an auction sale was in the overwhelming best interests of these estates.  In that regard, the Debtors concluded that SR was the ideal person to serve the role of a stalking horse bidder in these cases if an agreement could be reached with him on favorable terms for the Debtors.  All of these reasons are described in detail in the motion that was filed by the Debtors on June 11, 2014 for approval of the Binding Plan Term Sheet [Dkt. No. 364], which was approved by the Court at a hearing held on July 2, 2014.

12.    On July 18, 2014, the Court entered its order [Dkt No. 487) (the "Term Sheet Order") approving the Binding Plan Term Sheet, which Term Sheet Order, among other things, scheduled an overbid auction (the "Auction") to be held on July 28, 2014, at 10:00 a.m., and specifically authorized the Debtors to enter into an interim management agreement with the winning bidder at the Auction pending a plan or sale.  A copy of the Binding Plan Term Sheet, dated May 30, 2014, is attached hereto as Exhibit 1.

13.    The Binding Plan Term Sheet (the "Term Sheet") was the result of extensive negotiations and documentation between the Debtors and the Committee, on the one hand, and SR, on the other hand.  The Term Sheet essentially created a deal structure of a transaction for SR or his designees (defined herein as the "Purchaser") to acquire the Debtors or their assets (excluding the Debtors' cash) for the agreed upon cash purchase price of $62 million (subject to certain limited adjustments), with the transaction to be subject to overbid at the Auction to be

held before the Court on July 28, 2014.[10]  In order for any overbidder to participate at the Auction, the overbidder was required to submit a qualifying overbid by July 21, 2014 in compliance with the specific terms set forth in the Term Sheet and the Term Sheet Order.

14.     At the Auction held on July 28, 2014, the Court ultimately determined that no qualifying overbid was timely submitted, and, therefore, deemed the Purchaser's bid as set forth in the Term Sheet to be the winning bid and the Purchaser to be the winning bidder.

15.     While the Term Sheet contemplates the ultimate transaction between the Debtors and the Purchaser occurring through a confirmed plan of reorganization or an asset sale, the Debtors and the Purchaser have agreed that they will proceed to consummate their ultimate transaction by way of an asset sale.  The Debtors expect that the Court hearing on their asset sale motion will take place on or after October 1, 2014, with a planned closing date (or "Sale Effective Date" as defined in the Term Sheet) of on or after October 31, 2014, but in no event later than December 31, 2014.  Since the transaction will be occurring through an asset sale, the basic concept will be that the references in the Term Sheet to the "Plan Effective Date" and the timing of events for the "Plan Effective Date" would in effect be changed to the "Sale Effective Date."[11]

16.     As indicated above, the Debtors own a total of 19 facilities.  Each of the 19 facilities is subject to a real property lease where the respective Debtor is the lessee under the lease.  The ten real property leases pertaining to the Motion, as amended and supplemented, together with all rights thereunder, including, *e.g.*, any purchase or extension options (the "Non-Insider Leases") relate to 12 of the facilities (the "Affected Facilities")[12] and are with landlords who have no affiliation with any of the Debtors.  The landlords of the remaining 7 leases

---

[10] The Auction date was selected by the Court at a case status conference held on June 4, 2014.

[11]   All capitalized terms used herein shall have the meanings given in the Term Sheet unless otherwise defined.  In the event of any inconsistency between the terms of the Term Sheet and this Motion, the terms of the Term Sheet shall control.

[12] One of the Debtors is the lessee of 4 of the Facilities affected by this Motion under two leases while each of the other eight Affected Debtors is the lessee of 1 of the Facilities affected by this Motion, each under one lease, which is why only nine of the Debtors (defined herein as the "Affected Debtors") are parties to this Motion to assume and assign ten leases as to the twelve Affected Facilities.

covering the remaining 7 facilities are owned in substantial part and controlled by Stephen and Diane Reissman ("Reissmans"), who are founders, owners and officers of the Debtors, and, therefore, insiders of the Debtors (the "Insider Leases").  The Term Sheet provides for the landlords of the Insider Leases to enter into new written lease agreements with the Purchaser, as the winning bidder, based on certain economic terms which are set forth in the Term Sheet.

17.    Pursuant to the Order Extending Deadlines for Debtors to Assume or Reject Non-Residential Real Property Leases entered by the Court on June 30, 2014 [Dkt. No. 412], the deadline by which Debtor Plaza Healthcare Center LLC must assume or reject its real property lease was extended through September 30, 2014, and the deadline by which the remaining Debtors must assume or reject their real property leases was extended through October 1, 2014.

18.    By the Motion and as contemplated by the Term Sheet, the Affected Debtors are seeking Court approval to assume now and to assign to the Purchaser effective as of the Sale Effective Date all 10 of the Non-Insider Leases.  A complete description of the Non-Insider Leases, including the Affected Debtors' contentions as to the amounts of any defaults which would need to be cured in connection with the Affected Debtors' assumption and assignment to the Purchaser of the Non-Insider Leases, is set forth below.  A schedule of the Affected Debtors' contentions as to the required cure amounts is attached hereto as Exhibit 2.

19.    The cure amounts required to be paid as a condition to the Affected Debtors assuming and assigning the Non-Insider Leases to the Purchaser (the "Cure Amounts") will either be paid by the Debtors from the Debtors' existing cash on hand prior to the Sale Effective Date, or will be paid from the "Cash Component" (of $62 million subject to certain limited adjustments) to be paid by the Purchaser to the Debtors on the Sale Effective Date.  I believe that the Debtors will clearly have sufficient cash without any of the Cash Component to pay for all required Cure Amounts, but clearly will have sufficient cash once the Sale Effective Date occurs.

20.    The Purchaser is required to fully cooperate with the Affected Debtors in the Affected Debtors' efforts to assume and assign the Non-Insider Leases to the Purchaser, including providing the Affected Debtors and the Court with the information necessary to demonstrate adequate assurance of future performance under the Non-Insider Leases, including a

personal guarantee by SR of the obligations under the Non-Insider Leases if required to do so by the Court. I understand from my discussions with SR that SR is negotiating directly with the lessors of the Affected Facilities to resolve any issues or concerns any such lessors have with regard to the Affected Debtors' assignment of the Non-Insider Leases to the Purchaser.

21. The assumption and assignment of the Non-Insider Leases to the Purchaser is a key component of the Term Sheet and the assets to be purchased by the Purchaser. Accordingly, for all of the reasons stated herein and in connection with the Term Sheet, the Affected Debtors respectfully request that the Court grant the Motion without delay to allow for the Affected Debtors to assume the Non-Insider Leases prior to the expiration of the deadlines by which the Affected Debtors must assume or reject the Non-Insider Leases and to assign the Non-Insider Leases to the Purchaser as of the Sale Effective Date.

22. It should be noted that as contemplated by the Term Sheet, the Reissmans and the Purchaser have reached agreement on the form of new written lease agreements that they will enter into effective as of the Sale Effective Date (expected to be on or after October 31, 2014, but in no event later than December 31, 2014). In order to avoid having the Insider Leases be deemed statutorily rejected prior to the Sale Effective Date, the seven Debtors and the Reissmans have entered into a stipulation extending the deadline for the seven Debtors to assume or reject the Insider Leases to the earlier to occur of the Sale Effective Date (expected to be on or after October 31, 2014, but in no event later than December 31, 2014) and December 31, 2014. The Court hearing on the motion to approve such stipulation will be held concurrently with the hearing on the Motion.

23. While there are a total of twelve Affected Facilities covered by the Non-Insider Leases, there are only a total of ten Non-Insider Leases because one of the Non-Insider Leases covers three of the Affected Facilities as more explained below. As a result, a total of ten Non-Insider Leases are the subject of the Motion. The following is a description of each of the ten Non-Insider Leases and related Cure Amounts:

24. <u>The One Lease of Belmont Heights Healthcare Center LLC ("Belmont")</u>. Belmont filed its bankruptcy case on March 5, 2014. Belmont owns and operates, pursuant to a

lease agreement (including any amendments thereto) (the "Belmont Lease") with Emanuel Newman and Alisa Newman, Trustees of the Newman Family Trust, established August 9, 1994, and Uri Mandelbaum and Brenda Mandelbaum, Trustees of the Mandelbaum Trust dated November 1, 1988, as lessor (the "Belmont Landlord"), a 117-bed skilled nursing facility known as "Country Villa Belmont Heights Healthcare Center" located at 1730 Grand Avenue, Long Beach, California.  I understand that the current term of the Belmont Lease is September 1, 1998 through August 31, 2018.  Inclusive of all options to extend the term or renew the Belmont Lease, I believe that there is less than 5 years left on the Belmont Lease.

> **Belmont Lease Cure**:  Based on my review of Belmont's books and records, I believe that the default amount which would need to be cured in connection with Belmont's assumption and assignment of the Belmont Lease is **$10,275.85**.  This is comprised of the unpaid pre-petition rents due under the Belmont Lease for the first five days of March, 2014 ("March Stub Rent").  I understand that the Belmont Landlord has not filed any proof of claim asserting any different cure claim amount.  I therefore assume that there is no dispute with the Belmont Landlord over the amount of the Belmont cure claim.

25.    The One Lease of Claremont Healthcare Center Inc. ("Claremont").  Claremont filed its bankruptcy case on March 5, 2014.  Claremont owns and operates, pursuant to a lease agreement (including any amendments thereto) (the "Claremont Lease") with Health Care Property Partners, as lessor (the "Claremont Landlord"), a 99-bed skilled nursing facility known as "Country Villa Claremont Healthcare Center" located at 590 S. Indian Blvd., Claremont, California (the "Claremont Facility").  I understand that the current term of the Claremont Lease is September 1, 2002 through August 30, 2017.  Inclusive of all options to extend the term or renew the Claremont Lease, I believe that there is less than 14 years left on the Claremont Lease.

> **Claremont Lease Cure**:  Based on my review of Claremont's books and records, I believe that the default amount which would need to be cured in connection with Claremont's assumption and assignment of the Claremont Lease is **$5,983.37**.  This is comprised of the March Stub Rent due under the Claremont

Lease.  I understand that the Claremont Landlord has filed a proof of claim (as claim number 12 on the Claremont claims register) asserting a cure claim in the amount of $18,326.19.  Claremont, working in conjunction with the Purchaser as appropriate, will attempt to resolve this discrepancy with the Claremont Landlord in advance of the hearing on the Motion.[13]

26.    <u>The Two Leases of Country Villa East LP ("East").</u>  East filed its bankruptcy case on March 5, 2014.

A.    <u>East Lease 1</u>.  East owns and operates three facilities under one master lease agreement (including any amendments thereto, collectively, "<u>East Lease 1</u>") with Flora Rosman, Trustee of the Rosman Trustee u/t/d February 19, 1980, as lessor (the "<u>East Landlord 1</u>").  The three facilities are (i) a 59-bed skilled nursing facility known as "Country Villa Pavilion Nursing Center" located at 5916 W. Pico Blvd., Los Angeles, California (the "<u>Pavilion Facility</u>"). (ii) a 49-bed skilled nursing facility known as "Country Villa Terrace Nursing Center" located at 6070 W. Pico Blvd., Los Angeles, California ("<u>Terrace Facility</u>"), and (iii) a 136-bed assisted living facility known as "Country Villa Terrace Assisted Living Facility" located at 6050 W. Pico Blvd., Los Angeles, CA ("<u>Terrace AL Facility</u>").  I understand that the current term of East Lease 1 is March 16, 1996 through March 31, 2016.  Inclusive of all options to extend the term or renew East Lease 1, I believe that there is less than 22 years left on East Lease 1.

**East Lease 1 Cure**:  Based on my review of East's books and records, I believe that the default amount which would need to be cured in connection with East's

---

[13] While not a cure issue, I understand that the Claremont Landlord has scheduled a hearing before this Court relating to the Claremont Lease for September 3, 2014, at 10:00 a.m., as to the interim management by the Purchaser, pending a Sale Effective Date, authorized for all other Facilities by this Court's July 18, 2014 order.  By stipulation previously approved by this Court, the Debtors agreed that, despite this Court's July 18, 2014 order, as to the Claremont Facility, the Claremont Landlord could object thereto until 10 days after the Auction. I understand that the Claremont Landlord has so objected and set hearing thereupon for September 3, 2014, at 10:00 a.m. Claremont, working in conjunction with the Purchaser, will attempt to resolve the Claremont Landlord's objection in a consensual manner.  If that is not possible, Claremont or the Purchaser may file pleadings pertinent to the scheduled September 3, 2014 hearing to address this issue.

assumption and assignment of East Lease 1 is $134,510 total for the Terrace Facility and the Terrace AL Facility, and $33,080 for the Pavilion Facility, for a total cure amount of **$167,590**. This is comprised of: (a) March Stub Rent of $8,180.59 and delinquent rents resulting from CPI increases going to back to 2005 which were never paid totaling $126,329.41 for the Terrace Facility and Terrace AL Facility, and (b) March Stub Rent of $3,932.24 and delinquent rents resulting from CPI increases going back to 2005 which were never paid totaling $29,147.76 for the Pavilion Facility. I understand that the East 1 Landlord has filed a proof of claim (as claim number 40 on the East claims register) asserting a cure claim in the amount of $266,922.38. East, working in conjunction with the Purchaser as appropriate, will attempt to resolve this discrepancy with the East 1 Landlord in advance of the hearing on the Motion.

B.    East Lease 2. In addition to the three (3) facilities identified above, East owns and operates, pursuant to a lease agreement (including any amendments thereto, collectively "East Lease 2") with Superior Convalescent LLC ("East Landlord 2"), a fourth facility consisting of a 138-bed skilled nursing facility known as "Country Villa Sheraton Nursing & Rehabilitation Center" located at 9655 Sepulveda Blvd., North Hills, CA ("Sheraton Facility"). I understand that the current term of East Lease 2 is January 1, 1997 through December 31, 2016. Inclusive of all options to extend the term or renew East Lease 2, I believe that there is less than 18 years left on East Lease 2.

\*\***East 2 Cure**: Based on my review of East's books and records, I believe that the default amount which would need to be cured in connection with East's assumption and assignment of East Lease 2 is **$11,735.74**. This is comprised of the March Stub Rent due under East Lease 2. I understand that the East 2 Landlord has not filed any proof of claim asserting any different cure claim amount. I therefore assume that there is no dispute with the East 2 Landlord over the amount of the East Lease 2 cure claim.

I believe that East Landlord 1 and/or East Landlord 2 may contend that certain extension options under East Lease 1 and/or East Lease 2 expired pre-petition due to pre-petition defaults by

36

East.  Based on East's ability to cure and reinstate under the Bankruptcy Code, the discussion of cure herein, and the facts set forth herein and in and as supported by this Declaration, East is requesting that the approval of the Motion will be a determination that the assumption by East of East Lease 1 and East Lease 2 and assignment of  East Lease 1 and East Lease 2 to the Purchaser includes all rights of East under East Lease 1 and East Lease 2, including such extension options.

27.  <u>The One Lease of Country Villa Imperial LLC ("Imperial").</u>  Imperial filed its bankruptcy case on March 5, 2014.  Imperial owns and operates, pursuant to a lease agreement (including any amendments thereto) (the "<u>Imperial Lease</u>") with Sam Krieger and Certie Krieger, Trustees of the Kreiger Family Trust u/t/a dated January 7, 1985, as lessor (the "<u>Imperial Landlord</u>"), a 99-bed skilled nursing facility known as "Healthcare Center of Bella Vista" located at 933 E. Deodar St., Ontario, California.  I understand that the current term of the Imperial Lease is March 31, 1998 through March 31, 2018.  Inclusive of all options to extend the term or renew the Imperial Lease, I believe that there is less than 9 years left on the Imperial Lease.

> \*\***Imperial Cure**:  Based on my review of Imperial's books and records, I believe that the default amount which would need to be cured in connection with Imperial's assumption and assignment of the Imperial Lease is **$3,756.77**.  This is comprised of the March Stub Rent due under the Imperial Lease.  I understand that the Imperial Landlord has filed a proof of claim (as claim number 2 on the Imperial claims register) asserting a cure claim in the same amount of $3,756.77.

28.  <u>The One Lease of Los Feliz Healthcare Center LLC ("Los Feliz").</u>  Los Feliz filed its bankruptcy case on March 5, 2014.  Los Feliz owns and operates, pursuant to a lease agreement (including any amendments thereto) (the "<u>Los Feliz Lease</u>") with L.F. Enterprises, as lessor (the "<u>Los Feliz Landlord</u>"), a 131-bed skilled nursing facility known as "Country Villa Los Feliz Nursing Center" located at 3002 Rowena Ave., Los Angeles, California.  I understand that the current term of the Los Feliz Lease is October 1, 1996 through September 30, 2016.  Inclusive of all options to extend the term or renew the Los Feliz Lease, I believe that there is less than 3 years left on the Los Feliz Lease.

**Los Feliz Cure**:  Based on my review of Los Feliz's books and records, I believe that there is no default amount which would need to be cured in connection with Los Feliz's assumption and assignment of the Los Feliz Lease.  I understand that the Los Feliz Landlord has not filed any proof of claim asserting any different cure claim amount.  I therefore assume that there is no dispute with the Los Feliz Landlord over the amount of the Los Feliz cure claim.

29.    <u>The One Lease of Plaza Healthcare Center LLC ("Plaza").</u>  Plaza filed its bankruptcy case on March 4, 2014.  Plaza owns and operates, pursuant to a lease agreement (including any amendments thereto) (the "<u>Plaza Lease</u>") with Santa Ana Investment Group LLC, as lessor (the "<u>Plaza Landlord</u>"), a 145-bed skilled nursing facility known as "Country Villa Plaza Convalescent Center" located at 1209 Hemlock Way, Santa Ana, California (the "<u>Plaza Facility</u>").  I understand that the current term of the Plaza Lease is August 6, 1985 through November 30, 2016.  Inclusive of all options to extend the term or renew the Plaza Lease, I believe that there is less than 18 years left on the Plaza Lease.

**Plaza Cure**:  Based on my review of Plaza's books and records, I believe that the default amount which would need to be cured in connection with Plaza's assumption and assignment of the Plaza Lease is **$9,444.80**.[14]  This is comprised of the March Stub Rent due under the Plaza Lease.  I understand that the Plaza Landlord did not file any proof of claim.  The Plaza Lease includes a promissory note evidencing an indebtedness owing by Plaza to the Plaza Landlord which was the result of a loan made by the Plaza Landlord to Plaza to enable Plaza to fund renovations to the Plaza Facility.  I believe that the current outstanding balance owing by Plaza under this promissory note is approximately $208,374.44.  The Plaza Lease provides that the amounts due under this note are treated as additional rent under the Plaza Lease.  However, Plaza is current on the payment of all promissory note obligations.

---

[14]  Plaza erroneously scheduled this claim in its bankruptcy schedules in the amount of $77,768.10.

30.    The One Lease of Mountainside Operating Company Center LLC ("Mountainside").  Mountainside filed its bankruptcy case on March 5, 2014.  Mountainside owns and operates, pursuant to a lease agreement (including any amendments thereto) (the "Mountainside Lease") with 1311 East Date Street LLC, as lessor (the "Mountainside Landlord"), a 99-bed skilled nursing facility known as "Country Villa Hacienda Healthcare Center" located at 1311 E. Date Street, San Bernardino, California (the "Mountainside Facility").  I understand that the current term of the Mountainside Lease is July 1, 2001 through June 30, 2016.  Inclusive of all options to extend the term or renew the Mountainside Lease, I believe that there is less than 8 years left on the Mountainside Lease.

**Mountainside Cure**:  Based on my review of Mountainside's books and records, I believe that there is no default amount which would need to be cured in connection with Mountainside's assumption and assignment of the Mountainside Lease.[15]  I understand that the Mountainside Landlord has not filed any proof of claim so Mountainside assumes that the Mountainside Landlord agrees that there is no default amount which would need to be cured in connection with Mountainside's assumption and assignment of the Mountainside Lease.

31.    The One Lease of North Point Health & Wellness Center LLC ("North Point").  North Point filed its bankruptcy case on March 5, 2014.  North Point owns and operates, pursuant to a lease agreement (including any amendments thereto) (the "North Point Lease") with Bullard Fresno Investments, LLC, as lessor (the "North Point Landlord"), a 99-bed skilled nursing facility known as "NorthPointe Healthcare Centre" located at 668 Bullard Ave., Fresno, California (the "North Point  Facility").  I understand that the current term of the North Point Lease is December 7, 2011 through December 7, 2031.  Inclusive of all options to extend the term or renew the North Point Lease, I believe that there is less than 23 years left on the North Point Lease.

**North Point Cure**:  Based on my review of North Point's books and records, I believe that the default amount which would need to be cured in connection with

---

[15] Mountainside erroneously scheduled this claim in its bankruptcy schedules in the amount of $6,722.31.

North Point's assumption and assignment of the North Point Lease is **$8,910**.  This is comprised of the March Stub Rent due under the North Point Lease.  I understand that the North Point Landlord has not filed any proof of claim asserting any different cure claim amount.  I therefore assume that there is no dispute with the North Point Landlord over the amount of the North Point cure claim.

In addition to the foregoing, during this bankruptcy case, an issue and dispute arose between North Point and the North Point Landlord with regard to the following:

Paragraph 9.4 of the North Point Lease requires North Point as "Tenant" "to make at least One Million Dollars ($1,000,000) in Tenant Improvements to the Facility ('the Improvements') not later than five years after the Commencement Date of the Lease (the 'Trigger Date')."  The Commencement Date of the North Point Lease was December 7, 2011, which means that all of these Tenant Improvements are required to be completed by December 7, 2016.  During the pendency of North Point's bankruptcy case, North Point provided the North Point Landlord with a summary showing that $1,401,850.89 of Tenant Improvements have been made to the North Point Facility, along with all of the backup documentation.  "Tenant Improvements" is defined only in Paragraph 9.4 of the North Point Lease as improvements to the North Point Facility without any further specificity as to what does and what does not constitute a "Tenant Improvement".

I am advised that pre-petition, the prior management for North Point (Michael Torgan and Julianne Williams) met in person with Jacob Cohen as the representative of the North Point Landlord to review all such Tenant Improvements.  I understand that North Point was later advised that such Tenant Improvements were approved by Jacob Cohen.  North Point has "before" and "after" pictures of the North Point Facility showing the significant improvement to the North Point Facility resulting from the Tenant Improvements done by North Point.  This information has been delivered to the North Point Landlord.

Additionally, even if the North Point Landlord can establish that the required Tenant Improvements have not yet been made, the North Point Lease allows for these Tenant Improvements to be completed by December 7, 2016, which is more than 2 years away.  I have confirmed with SR that the Purchaser is aware of this provision of the North Point Lease, as well as North Point's and North Point Landlord's disagreements regarding such provision.  For purposes of determining cure amounts due under the North Point Lease, I submit that neither such provision nor the parties' potential disputes thereon is relevant.  North Point is <u>NOT</u> asking the Court to make any determination in this regard as I believe that this issue is not ripe for adjudication or relevant to North Point's assumption of the North Point Lease or assignment of the North Point Lease to the Purchaser.  I understand that the North Point Landlord wanted to make sure that the Purchaser was aware of this issue.  Since the Purchaser is aware of this issue, I believe that there is no need for the Court to deal with this issue at this time.  That will be an issue between the North Point Landlord and the Purchaser, if ever, in the future.

32.    <u>The One Lease of South Healthcare Center LLC ("South")</u>.    South filed its bankruptcy case on March 5, 2014.  South owns and operates, pursuant to a lease agreement (including any amendments thereto) (the "<u>South Lease</u>") with Westover Properties, as lessor (the "<u>South Landlord</u>"), a 87-bed skilled nursing facility known as "Country Villa South Convalescent Center" located at 3515 Overland Ave., Los Angeles, California.  I understand that the current term of the South Lease is December 23, 1976 through January 31, 2017.  Inclusive of all options to extend the term or renew the South Lease, I believe that there is less than 13 years left on the South Lease.

**South Cure**:  Based on my review of South's books and records, I believe that the default amount which would need to be cured in connection with South's assumption and assignment of the South Lease is **$4,983.83**.  This is comprised of the March Stub Rent due under the South Lease.  I understand that the South Landlord has filed a proof of claim (as claim number 37 on the South claims

register) asserting a cure claim in the amount of $4,963.83, which is $20 lower than the figure that South believes is owing.  South will simply pay the higher cure amount.

33.    The schedule contained in Exhibit 2 of my Declaration below summarizes the Debtors' contentions of the Cure Amounts for all of the Non-Insider Leases.

34.    The Affected Debtors have been current on the payment of their post-petition rents due under the Non-Insider Leases, and intend to remain current on the payment of their post-petition rents through the Sale Effective Date.  Therefore, I am not aware of any Cure Amounts due and payable in connection with the assumption and assignment of the Non-Insider Leases beyond the amounts set forth above.

35.    It is my understanding that the principal of the Purchaser (Shlomo Rechnitz), through affiliated entities that he controls, is one of the largest, if not the largest, owners and operators of skilled nursing facilities in the State of California.  It is also my understand that SR is extremely well known and well regarded by the various State agencies involved with skilled nursing facilities, and that he has a long history of acquiring financially distressed skilled nursing facilities and turning them around into financially profitable entities.  In fact, I understand that SR is the person that the various State agencies frequently look to in order to have him take over financially distressed skilled nursing facilities which are seized or taken over by the State.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

36.    The Term Sheet requires the Purchaser to fully cooperate with the Affected Debtors in the Affected Debtors' efforts to assume and assign the Non-Insider Leases to the Purchaser, including providing the Affected Debtors and the Court with the information necessary to demonstrate adequate assurance of future performance under the Non-Insider Leases, including a personal guarantee by SR of the obligations under the Non-Insider Leases if required to do so by the Court.  As I indicated above, I am informed and believe that SR is negotiating directly with the lessors of the Affected Facilities related to the Affected Debtors' proposed assignment of the Non-Insider Leases to the Purchaser.  The Affected Debtors, working in conjunction with the Purchase, will provide the Court and any of the lessors of the Affected Facilities with whatever reasonable financial information is required to enable the Affected Debtors (and the Purchaser) to satisfy the adequate assurance of future performance standard.

37.    Attached hereto as Exhibit 3 is the Purchaser's list of intended Purchaser entities to be the assignees of the Non-Insider Leases and the Insider Leases, along with the Purchaser's list of the intended Purchaser entities to be the operating entities.  I obtained this list from the Purchaser.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 13th day of August, 2014, in Los Angeles, California.

_____

JERRY ROLES

**EXHIBIT "1"**

**BINDING PLAN TERM SHEET**

(May 30, 2014)

This Binding Plan Term Sheet is hereby entered into by and between Stephen Reissman ("SR") and Diane Reissman ("DR"), on behalf of themselves and their affiliated trusts and entities and the 1989 Reissman Irrevocable Trust (collectively, the "Reissmans"), Shlomo Rechnitz ("SR") and/or his designees (collectively, the "Plan Funders" or "Stalking Horse Parties"), and Plaza Healthcare Center LLC ("PHC") (Case No. 8:14-bk-11335-CB), Plaza Convalescent Center LP (Case No. 8:14-bk-11337-CB), Belmont Heights Healthcare Center LLC (Case No. 8:14-bk-11358-CB) ("Belmont"), Claremont Healthcare Center Inc. (Case No. 8:14-bk-11375-CB), Country Villa East LP (Case No. 8:14-bk-11371-CB), Country Villa Imperial LLC (Case No. 8:14-bk-11370-CB), Country Villa Nursing Center Inc. (Case No. 8:14-bk-11364-CB), Country Villa Southbay LLC (Case No. 8:14-bk-11360-CB), East Healthcare Center LLC (Case No. 8:14-bk-11372-CB), Los Feliz Healthcare Center LLC (Case No. 8:14-bk-11368-CB), Mountainside Operating Company LLC (Case No. 8:14-bk-11367-CB), North Healthcare Center LLC (Case No. 8:14-bk-11366-CB), North Point Health & Wellness Center LLC (Case No. 8:14-bk-11365-CB), RRT Enterprises LP (Case No. 8:14-bk-11363-CB), Sheraton Healthcare Center, LLC (Case No. 8:14-bk-11362-CB), South Healthcare Center LLC (Case No. 8:14-bk-11361-CB), Westwood Healthcare Center LLC (Case No. 8:14-bk-11359-CB), Westwood Healthcare Center LP (Case No. 8:14-bk-11376-CB), and Wilshire Healthcare Center LLC (Case No. 8:14-bk-11373-CB).

1.    Bankruptcy Cases.  PHC and Plaza Convalescent Center LP each filed a voluntary petition under chapter 11 of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on March 4, 2014 before the United States Bankruptcy Court, Central District of California, Santa Ana Division (the "Bankruptcy Court").  On March 5, 2014, all of the other seventeen affiliated entities – namely Belmont Heights Healthcare Center LLC, Claremont Healthcare Center Inc., Country Villa East LP, Country Villa Imperial LLC, Country Villa Nursing Center Inc., Country Villa Southbay LLC, East Healthcare Center LLC, Los Feliz Healthcare Center LLC, Mountainside Operating Company LLC, North Healthcare Center LLC, North Point Health & Wellness Center LLC, RRT Enterprises LP, Sheraton Healthcare Center, LLC, South Healthcare Center LLC, Westwood Healthcare Center LLC, Westwood Healthcare Center LP, and Wilshire Healthcare Center LLC (together with PHC and Plaza Convalescent Center LP, collectively, the "Debtors" and each, individually, a "Debtor") - each filed a voluntary chapter 11 petition under chapter 11 of the Bankruptcy Code. The Debtors' nineteen chapter 11 bankruptcy cases are being jointly administered with the PHC bankruptcy case serving as the lead bankruptcy case.

-1-

     2.    <u>Nursing/Assisted Living Facilities and Other Assets</u>.  The Debtors, in the aggregate, currently own eighteen skilled nursing facilities and one assisting living facility – for a total of nineteen facilities (individually, a "<u>Facility</u>", and, collectively, the "<u>Facilities</u>").  Each of the nineteen Facilities is subject to a real property lease (each, together with any options thereupon, a "<u>Lease</u>" and collectively the "<u>Leases</u>") where the respective Debtor is the lessee under the Lease.  Twelve of those Leases are with landlords who have no affiliation with the Debtors.  The landlords of the remaining seven Leases are owned in substantial part and controlled by the Reissmans or affiliates of the Reissmans (collectively, the "<u>Seven Landlord Entities</u>").  Other assets of the Debtors besides the Leases, include other unexpired leases relating to the Facilities, vendor and other contracts to which any of the Debtors is a party, furniture, fixtures and equipment which are owned by the Debtors and not the landlords, inventories, resident records and contracts, deposits, prepaids and development rights, the "<u>Purchased Receivables</u>," which is hereby defined as the Debtors' outstanding accounts receivable (inclusive of those based upon Medi-Cal retroactive payment increases) as of 11:59 p.m. on the earliest to occur of the Sale Effective Date, the Plan Effective Date and the Interim Management Agreement Effective Date (each defined below), and all Causes of Action (as defined below) of the Debtors' estates (the "<u>Other Assets</u>," and together with the Leases, the "<u>Assets</u>").  Other Assets specifically does not include any of the "<u>Debtors' Cash</u>," which is hereby defined as the Debtors' cash on hand as of 11:59 p.m. on the earliest to occur of the Sale Effective Date, the Plan Effective Date and the Interim Management Agreement Effective Date. "<u>Causes of Action</u>" are defined herein, subject to the following sentence, as all litigation rights and claims of the Debtors or their estates, including, without limitation, (a) any such rights or claims of the Debtors' estates which are necessary for the Plan Funders to obtain the full economic benefit of the Assets, particularly the Purchased Receivables, including the ability of the Plan Funders to maximize their recovery from the Assets and to defend against any offset or recoupment rights asserted against any of the Assets, (b) any and all claims or causes of action the Debtors' estates have against any of the Reissman Releasees (defined below), and (c) any defense to an asserted lien, interest or encumbrance in any Asset. "<u>Causes of Action</u>" herein do not include avoidance causes of action under the Bankruptcy Code, except with respect to any avoidance causes of action against any of the Reissman Releasees and avoidance causes of action that can be asserted in defense to, or to offset, any assumed claim or any claim against any Asset transferred hereunder to a Plan Funder or to any of their designees, which avoidance causes of action that are excepted from this carve-out, instead, are included as part of the Causes of Action being acquired by the Plan Funders.  Disclaimers as to the Assets include:

a.    The Plan Funders, on behalf of themselves and their designees, understand and agree that although it is customary that a real property lease for a skilled nursing facility have a term between 25 and 30 years, including option periods, nonetheless, other than the New Seven Leases described in subparagraph 3(g), below, none of the other Leases being assigned by the Debtors has a term of as long as 25 to 30 years. In that regard, the following are the Leases being assigned herein with a term, as may be extended under existing options, of less than 25 years (with the Plan Funders recognizing and agreeing that the Debtors are not making any representations or warranties regarding the remaining length of term and/or options under these Leases, which are being assigned to the Plan Funders on an "AS IS" "WHERE IS" basis, and it is the full and complete responsibility of the Plan Funders to review the Leases themselves and arrive at their own conclusions, with the Plan Funders being obligated to consummate the transactions contemplated by this Binding Plan Term Sheet even if the actual remaining length of term and/or options under these Leases is different than set forth below):

    i.   Country Villa Bella Vista (9333 E. Deodar St., Ontario, CA 91764) – Less than 9 years (3/2023)

    ii.   North Point Health and Wellness Center (668 E. Bullard Avenue, Fresno, CA 93710) – Less than 23 years (12/2036);

    iii.   Country Villa Los Feliz (3002 Rowena Avenue, Los Angeles, CA 90039) – Less than 3 years (9/2016);

    iv.   Country Villa Pavillion (5916 W. Pico Blvd., Los Angeles, CA 90035) – Less than 22 years (3/2036);

    v.   Country Villa Terrace (6070 W. Pico Blvd., Los Angeles, CA 90035)  – Less than 22 years (3/2036);

    vi.   Country Villa Terrace ALC (6050 W. Pico Blvd., Los Angeles, CA 90035) - Less than 22 years (3/2036);

    vii.   Country Villa Plaza (1209 Hemlock Way, Santa Ana, CA 92707) – Less than 18 years (11/2031);

    viii.   Country Villa Sheraton (9655 Sepulveda Blvd., North Hills, CA 91343) – Less than 18 years (12/2031);

    ix.   Country Villa South (3515 Overland Avenue, Los Angeles, CA 90034) - Less than 13 years (1/31/27);

-3-

      x.   Country Villa Belmont Heights (1730 Grand Avenue, Long Beach, CA 90804) – Less than 5 years (8/2018);

      xi.   Country Villa Claremont (590 S. Indian Hill Blvd., Claremont, CA 91711) – Less than 14 years (2027); and

      xii.   Country Villa Hacienda (1311 E. Date Street, San Bernardino, CA 92404) – Less than 8 years (6/2021).

The Plan Funders, on behalf of themselves and their designees, further understand and agree that the Debtors have no responsibility to the Plan Funders or their designees to seek or to obtain extensions of or any other additional or changed terms to any existing Lease to be assigned hereunder, or to provide any assistance to the Plan Funders in this regard.

      b.   The Plan Funders, on behalf of themselves and their designees, understand and accept that approximately 103 beds at the Facilities are subject to waivers issued by the California Department of Health Services. The Plan Funders further understand and agree that such waivers are renewed annually, that there is no guarantee of any such further renewals being granted by the California Department of Health Services, and that the Debtors have no responsibility to obtain any further waivers for the Plan Funders or their designees, and only must act in good faith to attempt to do so before the earliest to occur of the Sale Effective Date, the Plan Effective Date and the Interim Management Agreement Effective Date, with the Debtors having no responsibility with respect thereto thereafter, and with the Plan Funders remaining obligated to consummate the transactions contemplated by this Binding Plan Term Sheet even if the Debtors are not successful in their good faith attempt to obtain any further waivers.

      3.   <u>Plan of Reorganization</u>.  The Debtors will promptly prepare, file[1] and attempt to confirm, by an order in a form reasonably acceptable to the Debtors and the Plan Funders, a plan of reorganization (the "<u>Plan</u>") in their

---

[1] The goal of the parties to this Binding Plan Term Sheet is for the Debtors to file the Plan and related Disclosure Statement with the Bankruptcy Court by Wednesday, June 25, 2014 and to obtain an entered order of the Bankruptcy Court confirming the Plan as soon as possible thereafter and hopefully by September 30, 2014.   All of the parties to this Binding Plan Term Sheet fully recognize that these dates are just goals and may be unachievable and outside the control of the parties to this Binding Plan Term Sheet, and all of the parties to this Binding Plan Term Sheet agree to work collaboratively to obtain an entered order confirming the Plan as soon as possible and to be bound to all of the terms of this Binding Plan Term Sheet provided, however, that the Plan Funders may terminate their obligations hereunder if the Plan is not confirmed by December 31, 2014 or if the Plan Effective Date does not occur by March 15, 2015 through no fault of the Plan Funders.

bankruptcy cases which Plan is reasonably approved as to form and signed by the Plan Funders acknowledging that the Plan Funders have approved and have agreed to fund the Plan and which contains the following basic terms:

      a.   <u>Plan Funders to Acquire Debtors</u>.  The Plan Funders or an entity or entities designated by the Plan Funders[2] will acquire 100% of the equity ownership interests of all of the Debtors (which will require the cancellation of the existing equity interests of the Debtors and issuance of 100% of the new equity interests in the Reorganized Debtor(s) to the Plan Funders), with the Facilities and the Other Assets to be allocated among the Plan Funders in the manner determined by the Plan Funders.  Subject to the approval of the Bankruptcy Court, the Plan Funders in their sole discretion will decide the corporate structure for ownership of the Reorganized Debtor(s)' assets from and after the Plan Effective Date. The Reorganized Debtor(s) shall continue ownership of all of the Leases and Other Assets, subject to assumption and rejection of unexpired leases and executory contracts as provided below.

      b.   <u>Sale In Lieu of New Equity</u>.  At any time prior to the initial disclosure statement hearing, the Plan Funders may elect to cause the Debtors to modify the Plan to provide for the equity interests in the Debtors to remain intact and, instead, for the Debtors to (i) sell all of the Assets free and clear of liens, claims (including all litigation claims (which includes litigation claims related to class action lawsuits) and all claims of any governmental entities other than Assumed Governmental Liabilities), encumbrances and interests, and (ii) assign all of the Assumed Contracts (defined below in paragraph 3.f) as of the date of sale on the same economic terms as provided herein (the "<u>Sale</u>") to the Plan Funders or an entity or entities designated by the Plan Funders ("<u>Newco</u>") (in which case the Plan will provide for Newco to operate the Facilities under the Debtors' provider agreements pursuant to the terms and conditions of a usual and customary Management and Operations Transfer Agreement (a "<u>MOTA</u>") from and after the date of closing of the Sale (the "<u>Sale Effective Date</u>") pending Newco obtaining its/their own such provider agreements with the government), in which event the parties shall work cooperatively and in good faith to amend the Plan to so reflect.

      c.   <u>The Cash Component</u>.  On the "<u>Plan Effective Date</u>" (which shall be the fifteenth day following the date of entry of the Bankruptcy Court

---

[2] While the Plan Funders shall remain liable for all of their obligations under this Binding Plan Term Sheet, the Plan Funders shall have the right to bring in partners to participate with them in this acquisition and/or partners or non-affiliated third parties to purchase or take assignment of some of the Facilities or Leases or Other Assets, recognizing that all of the disclosure and financial qualification requirements provided for herein shall continue to apply to all such participants.

order confirming the Plan regardless of whether any appeal has been brought with respect to the Plan confirmation order provided no stay of the Plan confirmation order has been ordered by a court of competent jurisdiction), the total cash sum of sixty-two million dollars ($62,000,000.00) (the "Cash Component")[3] shall be released or credited to the Debtors' bankruptcy estates from funds deposited by the Plan Funders or certain loans as set forth below (subject to the "Accounts Receivable Adjustment" as defined below).[4]  Other than with respect to any currently unknown or unliquidated liabilities of the Debtors (such as unasserted liability for Medicare/medical overpayments) that the necessary governmental agencies require be assumed by any owner of the Facilities (the "Assumed Governmental Liabilities"), the Plan Funders shall have no liability for and no obligation to assume any debts or obligations of the Debtors' estates.  Other than the Assumed Governmental Liabilities and based upon the Debtors' obligations under the Plan to make specified distributions (such as from the Cash Component), the Plan Funders shall have no obligation to pay any of the claims, debts or obligations of the Debtors that are not satisfied by the Cash Component or otherwise, and the Plan shall provide that the Leases and Other Assets are free and clear of, and that any Reorganized Debtor(s) and the debtors' and the estates' successors shall receive a full and complete discharge of, any and all claims, debts and obligations (other than the Assumed Governmental Liabilities) which are not satisfied by the Cash Component or otherwise under the Plan.  By acquiring 100% of the new equity interests in the Reorganized Debtor(s), and as a result of the discharge, the Plan Funders will be acquiring direct or indirect ownership of all of the Assets (which Assets expressly do not include the Debtors' Cash) free and clear of all claims, debts and obligations (other than the Assumed Governmental Liabilities).

      d.    Treatment of Administrative, Secured and Priority Claims. The Plan will provide for all allowed secured claims, all allowed post-bankruptcy administrative claims, and all allowed pre-bankruptcy priority claims to be paid in full from the Cash Component and the Debtors' Cash (collectively, the "Plan Cash") on the later to occur of three business days following the (i) Plan Effective Date and (ii) the date of entry of a Bankruptcy Court order allowing such claim if there is any dispute over the amount of any such claim or if the Bankruptcy Code requires the entry of an order allowing such claim, provided

---

[3] The Debtors and the Plan Funders will work together in good faith to arrive at a mutually acceptable allocation of the Cash Component among the Assets if necessary or requested by any of the parties for any purpose, including for tax purposes or bankruptcy purposes, with the Bankruptcy Court to serve as the final arbiter of any dispute with no right to appeal.

[4] As provided herein below, the Private Bank Debt and the Post-Petition Plan Funders Loan (each as defined below) are included as parts of the Cash Component such that the Plan Funders are hereby credit bidding the Private Bank Debt and the Post-Petition Plan Funders Loan under this Binding Plan Term Sheet.

that the Plan shall also permit payment of ordinary course administrative claims in the ordinary course on and after the Plan Effective Date, and recognizing that the Private Bank Debt and Post-Petition Plan Funders Loan (defined below in paragraph 4.a and 4.c) will not be paid out of the Plan Cash if the Stalking Horse Bidders are the winning bidder at the Auction because the Stalking Horse Bidders are credit bidding the full amount of the Private Bank Debt and the Post-Petition Plan Funders Loan herein as parts of its Cash Component.

            e.    <u>Treatment of General Unsecured Claims and Equity Interests</u>. Subject to any appropriate hold back of a reserve from the Plan Cash to be used to pay (i) the post-Effective Date fees and expenses of professionals employed by the Debtors' estates, and (ii) the post-Effective Date fees and costs owing to the United States Trustee, and subject to the requirement of the establishment of the Receivables Trust Account (defined below), the balance of the Plan Cash remaining after payment in full of all allowed secured claims, all allowed post-bankruptcy administrative claims, and all allowed pre-bankruptcy priority claims (the "<u>Remaining Funds</u>") shall be used to pay the allowed non-priority general unsecured claims.[5]  If the Remaining Funds equals or exceeds the total amount of allowed non-priority general unsecured claims, then the holders of allowed non-priority general unsecured claims will be paid in full and any remaining balance of the Remaining Funds (whether originally derived from the Debtors' Cash or the Cash Component) shall be distributed to the owners of the Debtors in accordance with their ownership interest percentages unless a dispute arises among the owners in which case the funds will be distributed in the manner directed by the Bankruptcy Court.  If the Remaining Funds are less than the total amount of allowed non-priority general unsecured claims, then the holders of allowed non-priority general unsecured claims will share pro rata in the Remaining Funds unless the Bankruptcy Court orders otherwise.  Subject to the approval of the Bankruptcy Court, the Debtors (and the Creditors Committee provided the Creditors Committee agrees to be a joint proponent of the Plan which is the desire of the Debtors) shall have the right to

---

[5]  The Plan Funders, in their sole unfettered discretion, may elect, subject to Bankruptcy Court approval, to assume, and have treated as unimpaired under the Plan, any or all liquidated, general unsecured claims for "Quality Assurance Fees" payable to the government that are not Disputed Claims (defined in footnote 6 below) as of the Plan Effective Date, in which case the Cash Component and Remaining Funds will be decreased by the exact amount of any such claims as of the Plan Effective Date.    If the Plan Funders so elect and the Bankruptcy Court so approves, the Debtors' estates shall have no further liability for such claims. If the Debtors determine this is necessary to enable Bankruptcy Court approval of this provision, the Plan Funders will deposit cash in such exact amount of such claims in an account maintained by LNBYB at First Republic Bank to be held in trust and disbursed back to the Plan Funders to the extent they present reasonable evidence that the subject claims have been satisfied or waived or the Debtors released from liability therefor.

structure the Plan in any manner they deem appropriate to deal with Disputed Claims,[6] including separate classification.[7]

        f.      <u>Treatment of Executory Contracts and Unexpired Leases</u>. On the Plan Effective Date, the Debtors shall assume as obligations of the Reorganized Debtor(s) all of the Debtors' executory contracts and unexpired leases which the Plan Funders desire to be assumed (collectively, the "<u>Assumed Contracts</u>") except for any contracts which are not assignable as a matter of law and as to which the other parties to such contracts do not consent to such assumption and assignment.  In connection with the Plan, the Debtors (based upon information provided to the Debtors by the Plan Funders) will provide an initial indication of those executory contracts and unexpired leases which the Plan Funders, in their sole discretion, elect to have become Assumed Contracts.  While the Plan Funders shall have the right determine which executory contracts will be Assumed Contracts, to the extent the Debtors are parties to any collective bargaining agreements which the Plan Funders do not want to have as Assumed Contracts in their current form, the Plan Funders will provide the Debtors with amended terms to such collective bargaining agreements which would cause the Plan Funders to include such amended collective bargaining agreements as part of the Assumed Contracts or otherwise cooperate with the Debtors to enable the Debtors to satisfy all of the Bankruptcy Code requirements to enable the Debtors to reject such collective bargaining agreements.  Within thirty days prior to the date of the

---

[6] A Claim that is "disputed" for purposes of the definition of a "<u>Disputed Claim</u>" herein includes (i) any claim as to which there is pending a filed objection as to such claim, (ii) any claim as to which the Debtors dispute the validity, security, priority or amount even if no objection to such claim has yet been filed with the Bankruptcy Court but with respect to which a notice has been filed with the Bankruptcy Court by the Debtors or the Creditors Committee indicating an intent to file an objection to such claim, (iii) any claim which is scheduled by any of the Debtors in its bankruptcy schedules D, E and F ("<u>Scheduled</u>") as disputed, contingent or unliquidated and for which no timely proof of claim has been filed, and (iv) any claim that is not Scheduled and for which no timely proof of claim has been filed.

[7] Subject to the approval of the Bankruptcy Court, the Debtors and the Creditors Committee shall have the right (but only if they jointly agree) to require the Plan Funders to assume and to pay in cash out of the Cash Component at the closing of the transactions contemplated by this Binding Plan Term Sheet a fixed amount of any liquidated and allowed general unsecured claims with no other or different liability to such creditors required to be assumed (the "<u>Direct Creditor Payment Election</u>").  The fixed amount to be paid through the Direct Creditor Payment Election (the "<u>Direct Payment Amount</u>") cannot exceed the lesser of the portion of the Cash Component otherwise payable in cash as Remaining Funds or $15 million.  Payment of any Direct Payment Amount will reduce the remaining Cash Component (and, thus, Remaining Funds) payable by the Plan Funders to the Debtors in cash by the exact same amount so paid, thereby resulting in no economic impact to the Plan Funders.

Plan confirmation hearing, unless the counter-party to the contract agrees to a later date, the Plan Funders in their sole discretion will make a final determination of those executory contracts and unexpired leases which the Plan Funders intend to have become Assumed Contracts. Any cure amounts required to be paid in connection with the Assumed Contracts will be paid out of the Plan Cash. The Plan Funders will fully cooperate with the Debtors in the Debtors' efforts to assume (or to assume and assign as appropriate) all Assumed Contracts, including providing the Debtors and the Bankruptcy Court with the information necessary to demonstrate adequate assurance of the Reorganized Debtors' future performance under such Assumed Contracts, including personal guarantees of real property lease obligations if required to do so by the Bankruptcy Court to demonstrate adequate assurance of the Reorganized Debtors' future performance under such Assumed Contracts. Subject to the foregoing and the approval of the Bankruptcy Court, the Plan Funders may designate the particular assignee for each Assumed Contract. The Plan Funders may negotiate directly with the non-debtor third parties to the Debtors' executory contracts and unexpired leases ("Contract Counterparties") as to cures, modifications and/or extensions of Assumed Contracts, provided that the Plan Funders will condition any such agreements reached with any Contract Counterparties to the Plan Funders being deemed the winning bidder at the Auction so as not to preclude any winning overbidder from instead contracting on the same or different terms with the Contract Counterparties as to the applicable contracts or leases (recognizing that the Plan Funders can provide no assurance that any such terms will be made available to any such overbidder).

g. New Leases with the Seven Landlord Entities. On the Plan Effective Date, the Plan Funders (or their financially qualified assignee(s) or designee(s)) (the "New Tenant(s)") [8] and the Seven Landlord Entities will enter into new written leases (the "New Seven Leases") with respect to the seven Facilities where the Seven Landlord Entities are the landlords (the "Seven Facilities"). The Plan Funders and the Seven Landlord Entities will work in good faith to reach an agreement on the form of the New Seven Leases forthwith (with the intent to have the final form of the New Seven Leases fully drafted and agreed upon by the Seven Landlord Entities and the Plan Funders by June 25, 2014), recognizing that the New Seven Leases will have the following basic terms: (A) the initial annual rent will total $4,135,585 broken down as $342,355 for Country Villa Bay Vista Healthcare; $528,265 for

---

[8]  The identification of any New Tenant other than the undersigned Plan Funders under this Binding Plan Term Sheet is subject to the consent of each of the applicable Seven Landlord Entities, the consent of which may be withheld by each of the Seven Landlord Entities for good cause, including, without limitation, the existence of any dispute between such proposed New Tenant and the Seven Landlord Entities or any of its parents, ultimate owners or affiliates (e.g., the Reissmans).

Country Villa East Healthcare Center; $464,986 for Country Villa Mar Vista Nursing Center; $763,132 for Country Villa North Healthcare Center; $880,494 for Country Villa Rehab Center; $722,473 for Country Villa Westwood Health; and $433,880 for Country Villa Wilshire Nursing (with the Seven Landlord Entities having the right to reallocate the initial annual rent among the Seven Facilities differently provided this reallocation is done by June 25, 2014); (B) they will be triple net; (C) they will have an initial term of 15 years with three, five-year options followed by a fourth option for four additional years; (D) the annual rent will increase or decrease each year by the CPI during the initial and option terms; (E) they will include the usual and customary provisions to require the New Tenant upon termination of any of the Seven New Leases for any reason whatsoever to use its reasonable efforts to turn over all records and to take all actions necessary, helpful or convenient to enable the Seven Landlord Entities and/or any successor tenant to continue to operate the Seven Facilities without interruption; (F) a security deposit held by the Seven Landlord Entities equal to two-months' rent from the New Tenant to cover any failure by the New Tenant to pay rent or any other financial or monetary covenant or obligation, which security deposit will be returned to the New Tenant two years after the Plan Effective Date; (G) the Seven Landlord Entities are to consent to the New Tenants issuing leasehold deeds of trust to their respective lenders provided that doing so is not prohibited by, or would constitute a default to, the existing respective lenders of the Seven Landlord Entities, (H) the Seven Landlord Entities shall (i) request their respective lenders to execute subordination, non-disturbance and attornment agreements for the benefit of the New Tenants and their lenders (but the unwillingness of the respective lenders of the Seven Landlord Entities to execute subordination, non-disturbance and attornment agreements for the benefit of the New Tenants and their lenders shall not relieve the Plan Funders of any of their obligations under this Binding Plan Term Sheet), (ii) agree to promptly notify the applicable New Tenant of any default by any applicable Seven Landlord Entity to its lender, and (iii) agree that if the Seven Landlord Entities are ever in default to their respective lenders, the New Tenants shall have the right to cure such default and to deduct such cure payments from their future rent obligations to the Seven Landlord Entities, and (I) a covenant on the part of the New Tenants to expend in the aggregate a minimum of three million dollars ($3,000,000.00) during the first three years of the lease term for capital improvements to the Seven Facilities (with proof of funding to be provided to the Seven Landlord Entities) with the New Tenants having the right to allocate the three million dollars ($3,000,000.00) amount of these capital improvements among the Seven Facilities in their sole unfettered discretion, followed by a covenant on the part of the New Tenants to expend beginning in the fourth year of the lease term a minimum of three hundred fifty dollars ($350.00) per bed for each year including and after the fourth year of the lease term (including any option years) increased by 2% per year.  The New Tenant(s) will be accepting the Seven Facilities on an "AS IS" "Where IS" basis

without any representation or warranty by the Seven Landlord Entities as to the condition of the Seven Facilities but with such other representations and warranties as may be customary in similar transactions regarding the Seven Landlord Entities and their organization and good standing, including representations regarding corporate existence, power and authority, and ownership and with a representation, to be dated down to closing, as to the existence of any regulatory waivers as to each Facility. The Parties hereto other than the Plan Funders represent that all of the currently existing regulatory waivers as to each Facility are identified in **Exhibit "A"** hereto. In the event any replacement, repair or improvement is required to be made to any of the Seven Facilities by appropriate governmental authority or otherwise, all such replacements, repairs or improvements shall be made by the New Tenant(s) at the New Tenant(s)' sole cost and expense with no right of offset against or reduction of the New Tenant(s) rental obligations or capital improvements under the New Seven Leases (provided that the New Tenant(s) is to receive any relevant insurance proceeds paid by an insurance company on account of the Seven Facilities, with the New Tenant(s) being solely responsible for obtaining, maintaining and paying for any such insurance policies). The Seven Landlord Entities shall not be responsible for any latent physical defects in the Seven Facilities, and the Seven Landlord Entities shall not be responsible for (i) any change in the physical condition of the Seven Facilities, (ii) any change in the physical use of the Seven Facilities, (iii) any damage occurring to any of the Seven Facilities, or (iv) the existence or future occurrence of any violation of the laws or regulations of any governmental authority to the Seven Facilities. All of the foregoing shall be the sole and complete responsibility of the New Tenant(s) who shall be liable and obligated for all financial obligations under the New Seven Leases and for any and all replacements, repairs or improvements to the Seven Facilities (but the New Tenant(s) shall be entitled to related insurance proceeds and applicable portions of condemnation awards, recognizing that the New Tenant(s) will be solely responsible for obtaining, maintaining and paying for any such insurance policies). The Seven Landlord Entities shall not be responsible, liable or obligated to spend any money repairing or improving the Seven Facilities. During the term of the New Seven Leases, all replacements, repairs, improvements and maintenance of the Seven Facilities shall be the sole responsibility of the New Tenant(s). Except in connection with any damage, destruction or condemnation, the provisions of which shall be substantially in the form attached hereto as **Exhibit "B"**, there shall be no basis upon which the New Tenant(s) shall have the right not to pay all rent and other obligations owing under the New Seven Leases. Regardless of which legal entity the Plan Funders decide to have become the owner of the Seven Facilities, the Plan Funders, their principals, spouses and any family trusts (or any other financially viable guarantors which are acceptable to the Seven Landlord Entities in their sole and absolute discretion) shall personally guaranty the full performance of such owner under the New Seven Leases (with the form of

guaranty to include all usual and customary convenants, waivers, protections and assurances that would be found in a usual and customary personal guaranty of bank debt). Any dispute over the form of the New Seven Leases and any guaranty, including whether they conform to the terms of this Binding Plan Term Sheet, shall be resolved solely by the Bankruptcy Court with no right of appeal. The parties agree that the New Seven Leases and guarantees will provide that any and all post-Plan Effective Date disputes relating to the New Seven Leases other than any unlawful detainer proceedings (including, without limitation, any defenses or counterclaims asserted in such proceedings) shall be resolved by binding arbitration with ADR Services, Los Angeles, with no right to appeal, with the prevailing party entitled to receive its reasonable attorneys' fees and costs as determined by the arbitrator (recognizing that the Seven Landlord Entities reserve all rights to proceed with usual state law landlord eviction and/or unlawful detainer proceedings against the tenants of the New Seven Leases for any failure to comply with any of the terms of the New Seven Leases which is not timely cured, including any failure to pay rent timely). In consideration of being granted the New Seven Leases, in addition to all other consideration that the Plan Funders will be paying to the Debtors, the Reissmans or others in accordance with the terms of this Binding Plan Term Sheet, the Plan Funders will pay cash to the Seven Landlord Entities in the amount of two million dollars ($2,000,000.00) (the "New Seven Leases Key Money") as explained more below.

h.      Collection of Purchased Receivables and Accounts Receivable Adjustment.

1)      Collection of Purchased Receivables. Notwithstanding any contrary provisions hereof, regardless of whether there first occurs a Sale Effective Date, Plan Effective Date or Interim Management Agreement Effective Date, during the first one hundred eighty (180) days following the earliest to occur of the Sale Effective Date, the Plan Effective Date and the Interim Management Agreement Effective Date (the "Relevant Collection Period"), the Debtors shall collect for the Plan Funders or their applicable designees the Purchased Receivables with up to four of the Debtors' employees (the "Collection Team") and turn over such collections, and provide a written report with respect thereto, to the Plan Funders or their applicable designees daily (excluding weekends and holidays). Reductions to the amount of any of the Purchased Receivables or other decisions or agreements relating to the Purchased Receivables that would otherwise affect the Assets or the business of the Plan Funders or their designees only may be made by the Collection Team with the approval of the Plan Funders or any of their applicable designees. The Plan Funders shall reimburse the Debtors monthly in arrears for the costs of the services of the Collection Team and shall endeavor in good faith not to encourage, suggest to, or influence any account debtor as to a Facility to pay another receivable owing with respect to such Facility in lieu of

paying a Purchased Receivable so owing.  The number (up to four), identity and remuneration of the Collection Team members shall be mutually and reasonably agreed by the Debtors and the Plan Funders, provided that any disagreement or dispute with respect thereto shall be resolved solely by the Bankruptcy Court with no right of appeal. Absent the applicable Debtor's consent, the Plan Funders or their designees may hire members of the Collection Team only for periods beginning after the end of the Relevant Collection Period.  The Parties agree that all funds received from collections of the Purchased Receivables shall be applied as the payor indicates. Absent such indication by the payor, (i) funds received from collections during the first ninety (90) days of the Relevant Collection Period shall be applied to the oldest outstanding account receivable owing by the applicable account debtor (*i.e.*, applied to such accounts receivable on a first in, first out (FIFO) basis) and (ii) funds received from collections during the next ninety (90) days (days ninety-one to day one-hundred eighty (91 – 180)) of the Relevant Collection Period shall be applied to the most recent outstanding account receivable owing by the applicable account debtor (*i.e.*, applied to such accounts receivable on a last in, first out (LIFO) basis).

2)    <u>Accounts Receivable Adjustment</u>.   If the actual collections received by the Plan Funders or their applicable designees from the Purchased Receivables during the Relevant Collection Period are less than twenty-seven million dollars ($27,000,000.00), the difference shall be paid to the Plan Funders as a downward adjustment to the Cash Component.   The total sum of seven million dollars ($7,000,000.00) shall be retained by LNBYB in a segregated trust account (the "<u>Receivables Trust Account</u>") until the end of the Relevant Collection Period to provide a source of payment to the Plan Funders in the event of such a downward adjustment to the Cash Component. If the actual collections received by the Plan Funders or their applicable designees from the Purchased Receivables during the Relevant Collection Period are more than twenty-seven million dollars ($27,000,000.00), the difference shall be paid by the Plan Funders to the Debtors as an upward adjustment to the Cash Component, with such payment to be made by the Plan Funders to the Debtors no later than three (3) business days following the Debtors' delivery to the Plan Funders and their applicable designees of the Final Receivables Accounting (defined below in this paragraph).   This contingent upward adjustment liability shall be a joint and several liability for all of the Plan Funders and shall be personally guaranteed by the principals of each of the Plan Funders.  The downward and upward adjustment to the Cash Component described in this paragraph 3.h2) shall be referred to and defined herein as the "<u>Accounts Receivable Adjustment</u>".  Any funds remaining in the Receivables Trust Account after the Accounts Receivable Adjustment shall be added to and become part of the Plan Cash.   The Debtors shall provide the Plan Funders and the Creditors Committee with a detailed report of the collections received by the Plan Funders from the Purchased Receivables by the

tenth day of each month covering the prior calendar month together with a written status report outlining any disputes the Collection Team is having with any account debtors.   No later than ten (10) days following the end of the Relevant Collection Period, the Debtors shall provide the Plan Funders and the Creditors Committee with a detailed report and final accounting of all of the collections received by the Plan Funders from the Purchased Receivables together with a final written status report outlining any disputes the Collection Team is having with any remaining account debtors (the "<u>Final Receivables Accounting</u>").

      4.     <u>Plan Funders' Loans and Deposits</u>.

      a.     <u>Private Bank Debt</u>.   At the request of the Debtors, the Plan Funders (either directly or through an affiliate – defined herein as the "<u>Private Bank Debt Holder</u>") purchased the Debtors' outstanding indebtedness to Private Bank (with all amounts owing with respect thereto, the "<u>Private Bank Debt</u>").   The Private Bank Debt shall be an allowed secured claim under the Plan in an amount not to exceed seven million five hundred thousand dollars ($7,500,000.00) plus any additional amounts hereafter advanced under the Private Bank Debt facility (inclusive of all accrued interest at the non-default rate and reasonable fees and costs, *e.g.*, professional fees incurred by the Private Bank Debt Holder from and after the date the Private Bank Debt Holder purchased the Private Bank Debt which are directly related to the Private Bank Debt).   In the event that someone other than the Plan Funders is deemed by the Bankruptcy Court to be the winning bidder at the Auction, the full amount of the Private Bank Debt will be paid in full from the deposits or funding of the winning overbidder within three business days following entry of the Bankruptcy Court order approving the winning bidder's bid at the Auction.   The Plan Funders shall forthwith take all reasonable steps to cause any personal funds or other personal collateral that has been used to guaranty or further collateralize the Private Bank Debt to be released and/or returned to the respective guarantors.   On a going forward basis so long as this Binding Plan Term Sheet remains in effect, the Plan Funders shall cause the Private Bank Debt Holder to cooperate with the Debtors in the approval of all reasonable operating budgets and variances in the same manner and format as set forth in the sixth interim cash collateral order which was approved by the Bankruptcy Court at hearings held on May 8 and 14, 2014.

      b.     <u>Cash Component Deposits and Funding</u>.   Within two business days following the date of execution of this Binding Plan Term Sheet by all of the parties to this Binding Plan Term Sheet (the "<u>Term Sheet Effective Date</u>"), the Plan Funders shall deposit into a segregated, interest bearing trust account (the "<u>First Trust Account</u>") maintained by bankruptcy counsel to the Debtors (Levene, Neale, Bender, Yoo & Brill L.L.P. "<u>LNBYB</u>") at First Republic Bank a cash sum in the amount of one million dollars ($1,000,000.00) (the "<u>Initial

Deposit"), which shall serve as a credit against the amount of the Cash Component.   Within three business days following the date of entry of the Bankruptcy Court Approvals Order, the Plan Funders shall increase the amount of the Initial Deposit by an additional fourteen million dollars ($14,000,000.00) to a total of fifteen million dollars ($15,000,000.00) by depositing such increased amount into the First Trust Account.   At least five business days prior to the Auction, the Plan Funders shall increase the amount of the Initial Deposit to a total amount of forty million dollars ($40,000,000.00) less the amount of the Private Bank Debt, the Post-Petition Plan Funders Loan and any Belmont Credit (defined below in paragraph 5) by depositing such increased amount into the First Trust Account.   If (a) the Plan is confirmed by the Bankruptcy Court by December 31, 2014 and the Plan Funders elect not to proceed with the transactions contemplated by this Binding Plan Term Sheet, or (b) if the Plan would have been confirmed by the Bankruptcy Court by December 31, 2014 if not for the failure to perform or cooperate by the Plan Funders, as of such date that the Plan Funders elect not to proceed or fail to perform or cooperate, the entire Initial Deposit (if the Interim Management Agreement defined in paragraph 13 below is not then in effect) or all of the sums that are then in the First Trust Account (if the Interim Management Agreement is then in effect) shall be deemed released to the Debtors and the entire amount of the Private Bank Debt and Post-Petition Plan Funders Loan shall be permanently waived and forgiven and retained by the Debtors as their sole property without any right of reimbursement to the Plan Funders AS LIQUIDATED DAMAGES AND NOT AS A PENALTY, IN FULL SATISFACTION OF CLAIMS AGAINST THE PLAN FUNDERS HEREUNDER. THE DEBTORS AND THE PLAN FUNDERS AGREE THAT THE DEBTORS' DAMAGES RESULTING FROM A DEFAULT BY THE PLAN FUNDERS ARE DIFFICULT, IF NOT IMPOSSIBLE, TO DETERMINE AND SUCH AMOUNT IS A FAIR ESTIMATE OF THOSE DAMAGES WHICH HAS BEEN AGREED TO IN AN EFFORT TO CAUSE THE AMOUNT OF SUCH DAMAGES TO BE CERTAIN.   THE PARTIES ACKNOWLEDGE THAT THE PAYMENT OF SUCH LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTIONS 3275 OR 3369, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO THE DEBTORS PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676 AND 1677.   If the Plan is not (or cannot be) confirmed by the Bankruptcy Court by December 31, 2014 other than as a result of any failure to perform or cooperate by the Plan Funders or if the Plan Effective Date does not occur by March 1, 2015 other than as a result of any failure to perform or cooperate by the Plan Funders, upon request of the Plan Funders, the Initial Deposit and any interest accrued thereon shall promptly be fully refunded to the Plan Funders.   If the Plan is not (or cannot be) confirmed by December 31, 2014 or if the Plan Effective Date does not occur by March 1, 2015, upon request of the Plan Funders, any funds other than the Initial Deposit that were deposited by the Plan Funders with LNBYB and any interest accrued thereon shall promptly be fully refunded to the Plan Funders (the "First

Trust Remainder Refund"), provided that if the Interim Management Agreement is in effect at the time of such refund request, such refund shall not be payable if the failure to timely confirm the Plan was as a result of a failure to perform or cooperate by the Plan Funders.

      c.   Post-Petition Plan Funders Loan.  As soon as possible after the Term Sheet Effective Date, and subject to the approval of the Bankruptcy Court, the Plan Funders shall lend to the Debtors on an administrative claim basis a maximum amount of five million dollars ($5,000,000.00) as requested by the Debtors to enable the Debtors to fund any cash flow shortfalls the Debtors have at any of the Facilities or otherwise (including as a result of payments relating to obligations owing to Evergreen Pharmaceuticals) and to pay any professional fees and expenses allowed by the Bankruptcy Court (the "Post-Petition Plan Funders Loan"), with such Post-Petition Plan Funders Loan to accrue interest at the rate of 5% per annum.  The Post-Petition Plan Funders Loan and all accrued interest thereupon shall be due and payable upon the earlier of (a) the Plan Effective Date (by having the amount of the Cash Component reduced, on a dollar-for-dollar basis, by the entire amount of the Post-Petition Plan Funders Loan and accrued interest thereupon outstanding on the Plan Effective Date), (b) the termination of this Binding Plan Term Sheet, and (c) March 1, 2015.  The Debtors shall have the right, but not the obligation, to prepay all or any portion of any outstanding Post-Petition Plan Funders Loan at any time with no prepayment penalty.

      d.   Deposits for New Seven Leases Key Money.  Within ten days prior to the date of the Plan confirmation hearing, the Plan Funders shall deposit into a second segregated, interest bearing trust account (the "Second Trust Account") maintained by LNBYB at First Republic Bank the two million dollars ($2,000,000.00) of New Seven Leases Key Money, which sum shall be distributed to the Seven Landlord Entities in the manner described herein and shall be fully refundable on the same terms and at the same time as any First Trust Remainder Refund would be refundable.  If any disputes exist or arise between the owners of the Seven Landlord Entities as to the appropriate allocation of such two million dollars ($2,000,000.00) and/or the appropriate allocation of the excess cash flow generated by the Seven Facilities (i.e., the difference between the rent paid on account of the New Seven Leases and the amount of the mortgage payments owing to the secured lenders related to the Seven Facilities), the Bankruptcy Court shall serve as the sole forum to resolve such disputes unless the Bankruptcy Court determines otherwise, in which event the Plan Funders may satisfy their obligation with respect to payment of the two million dollars ($2,000,000.00) by depositing such sum into the Second Trust Account, with such funds to be distributed in accordance with an order of the Bankruptcy Court unless the Bankruptcy Court determines otherwise.

e.    <u>Employee Performance Payments</u>.   In addition to all other consideration being paid by the Plan Funders, within ten days prior to the date of the Plan confirmation hearing, the Plan Funders shall deposit into a third segregated, interest bearing trust account (the "<u>Third Trust Account</u>") maintained by LNBYB at First Republic Bank the sum of one million dollars ($1,000,000.00), which sum, unless refunded as set forth below, shall be used solely to make the following payment amounts to each of the following employees of the Debtors: $400,000 - Jerry Roles; $300,000 - Mark Beckel; $100,000 - Scott Petterson; $100,000 - Cheryl Petterson; $100,000 - Mark C De Baca, provided all such employees remain employed providing services for the benefit of the Debtors' estates (in a similar manner to their current employment or as otherwise reasonably requested by the Debtors) through the Plan Effective Date.   If any such employee voluntarily terminates his/her employment prior to the Plan Effective Date, such employee will be deemed to have waived the right to receive such payment and the amount payable to such employee and any accrued interest thereupon shall be refunded to the Plan Funders.   All amounts deposited into the Third Trust Account and any interest accrued thereupon shall be fully refundable to the Plan Funders on the same terms and at the same time as any First Trust Remainder Refund would be refundable.  If the Plan Funders and/or the Reissmans desire to have any of these individuals work for the Debtors' bankruptcy estates, the Reorganized Debtor(s) and/or Newco after the Plan Effective Date, the Plan Funders and/or the Reissmans will negotiate mutually acceptable economic terms directly with such individual(s).

5.    <u>Pending Belmont Sale</u>.  Country Villa South Bay, LLC and Belmont Heights Healthcare Center, LLC (collectively, the "<u>Belmont Debtors</u>") shall, at their discretion and with input from the Creditors' Committee, either (i) not proceed with a motion to sell "Country Villa Belmont Heights Healthcare Center," which is the Facility located at 1730 Grand Avenue, Long Beach, California (the "<u>Belmont Facility</u>"), in which case the Belmont Facility will be included in the Assets, or (ii) subject to the approval of the Bankruptcy Court, proceed with a motion to sell the Belmont Facility to Grand Avenue Healthcare & Wellness Centre, LP (the "<u>Belmont Facility Purchaser</u>") in accordance with the Asset Sale Agreement previously entered into between the Belmont Debtors, on the one hand, and the Belmont Facility Purchaser, on the other hand, and related MOTA agreed to between the parties, with no right of overbid by any other buyers, in which case the amount of the Cash Component shall be reduced from sixty-two million dollars ($62,000,000.00) by the five hundred thousand dollar ($500,000.00) purchase price to be paid for the Belmont Facility by the Belmont Facility Purchaser and by the amounts, if any, owing as of the Plan Effective Date by the Belmont Debtors to the Belmont Facility Purchaser under the applicable asset purchase agreement or management and operations transfer agreement (*e.g.*, including under its indemnity provision) (the "<u>Belmont Credit</u>").   The Plan Funders agree that if

the Belmont Debtors elect to proceed with their sale of the Belmont Facility to the Belmont Facility Purchaser, then subject to the approval of the Bankruptcy Court, the Belmont Debtors have the right to cause the timing of their sale motion to coincide with the timing of the Debtors' motion for approval of the terms in this Binding Plan Term Sheet.

6.      The Insurance Captives.    On the earliest to occur of the Sale Effective Date, the Plan Effective Date and the Interim Management Agreement Effective Date,, at the request of the Reissmans, the Plan Funders shall assume full responsibility for the management and administration, at no fee, of the Debtors' existing Workers Compensation and GL/PL captives (collectively, the "Insurance Captives") to the extent that their operations are limited to addressing and providing administrative and managerial support in connection with determining the settlement and/or liability for any claims asserted from events which occurred prior to the earliest to occur of the Sale Effective Date, the Plan Effective Date and the Interim Management Agreement Effective Date. The Plan Funders agree to use reasonable efforts to minimize (consistent with good insurance adjusting practices and procedures) all costs and liability to the Debtors.   The Debtors contend that in the event that allowed claims asserted against the Insurance Captives exceed the funds in the Insurance Captives, the difference may be considered allowed general unsecured claims against the Debtors' estates which, to the extent allowed, shall be treated in the same manner as other allowed claims of equal priority.   The Plan Funders take no position in this regard.   Commencing with the earliest to occur of the Sale Effective Date, the Plan Effective Date and the Interim Management Agreement Effective Date, the Plan Funders will replace all insurance coverages for the Reorganized Debtor(s) which are currently covered by the Debtors' two Insurance Captives with new insurance, and the Debtors' two Insurance Captives will only be liable, on an occurrence and not a claims made basis, for any claims asserted from or relating to events which occurred prior to the earliest to occur of the Sale Effective Date, the Plan Effective Date and the Interim Management Agreement Effective Date.   The Plan Funders shall not become or be deemed members of the boards of the Insurance Captives or otherwise be put in a position to become liable for the Insurance Captives' liabilities.  If all allowed claims against the Debtors have been paid in full, any excess funds remaining with the Insurance Captives shall be distributed at the direction of the owners of the applicable Insurance Captives, consistent with the applicable law and contracts.   If all allowed claims against the Debtors have not been paid in full, any excess funds will be paid to the Debtors' bankruptcy estates and be used to be distributed to holders of allowed claims, with any remaining excess to be distributed to the Debtors' owners.

7.      Replacement Loans Related to Two of the Seven Facilities.    SR agrees that at the request of the Reissmans which the Reissmans must make no earlier than the earliest to occur of the Sale Effective Date and the Plan

Effective Date and no later than by May 1, 2015, SR shall within thirty days following such request or as soon as practicable thereafter lend either or both Country Villa Wilshire Nursing and Country Villa North Healthcare Center an amount of money equal to their then existing outstanding secured indebtedness to their respective secured lenders to enable Country Villa Wilshire Nursing and/or Country Villa North Healthcare Center to pay off the full amount of such outstanding secured indebtedness (the "New Real Estate Loans").  The New Real Estate Loans will be secured by standard first priority deeds of trust against the real estate owned by Country Villa Wilshire Nursing and/or Country Villa North Healthcare Center (whichever borrows the money). The New Real Estate Loans will (i) be evidenced by standard promissory notes (the "New Real Estate Loans Promissory Notes") executed by Country Villa Wilshire Nursing and/or Country Villa North Healthcare Center (whichever borrows the money), (ii) provide for interest to be paid monthly and to accrue at a market based variable interest rate with a start rate of 5.25% (five and one-quarter percent) per annum and adjusted annually on each anniversary thereof to the then current one-year LIBOR rate (currently, 0.54%) plus 4.71% (up to a maximum interest rate of 8.0% per annum), (iii) have a term of five years, (iv) have no prepayment penalty, and (v) have monthly payments computed based upon a twenty-five year amortization.  The intention of this section is to enable Country Villa Wilshire Nursing and/or Country Villa North Healthcare Center to replace their existing secured loans with more favorable financing from or facilitated by SR.  If the Reissmans elect to obtain the New Real Estate Loans from SR for Country Villa Wilshire Nursing and/or Country Villa North Healthcare Center, the refinancings shall occur through a well recognized escrow and title company which is mutually agreed to by SR and the Reissmans, and SR shall deposit with the escrow company cash equal to the full amount of the refinance within ten days prior to the Plan Effective Date, with the actual refinancings to close on the Plan Effective Date. Alternatively, at the election of SR, SR may make his financial resources available, including that he may provide a personal guaranty to a new lender(s), to assist Country Villa Wilshire Nursing and Country Villa North Healthcare Center to obtain new third-party financing to replace their existing outstanding secured indebtedness with significantly more favorable economic terms on general economic terms as described above or on more favorable terms.  This Section of this Binding Plan Term Sheet is an accommodation being made by SR to the owners of the Country Villa Wilshire Nursing and the Country Villa North Healthcare Center Facilities if the Stalking Horse Bidders are the winning bidders at the Auction.  Any other bidders at the Auction will have the right to comply with all of the terms of this paragraph 7 or agree to increase the initial annual rent for the New Seven Leases by a total of two hundred fifty thousand dollars ($250,000.00) allocated proportionately among the Seven Facilities based upon their initial annual rents as set forth in paragraph 3(g) above, which translates into initial total annual rent of $4,385,585 broken down as follows provided the Seven Landlord Entities do

not reallocate the initial rent among the Seven Facilities by June 25, 2014 which they have the right to do as indicated above: $363,050 for Country Villa Bay Vista Healthcare; $560,199 for Country Villa East Healthcare Center; $493,096 for Country Villa Mar Vista Nursing Center; $809,264 for Country Villa North Healthcare Center; $933,721 for Country Villa Rehab Center; $766,147 for Country Villa Westwood Health; and $460,108 for Country Villa Wilshire Nursing.

8.    <u>Releases</u>.    Effective as of the Term Sheet Effective Date (to be renewed effective as of the earliest to occur of the Sale Effective Date and the Plan Effective Date), the Plan Funders (on behalf of themselves and all of their principals and affiliates) (the "<u>Plan Funder Releasors</u>") shall release SR, DR, the Seven Landlord Entities and all of their partners, officers, insiders, affiliates, attorneys and accountants (the "<u>Reissman Releasees</u>") from any liability that any or all of them have to the Plan Funder Releasors.    Effective as of the Term Sheet Effective Date (to be renewed effective as of the earliest to occur of the Sale Effective Date and the Plan Effective Date), the Debtors, their estates, SR, DR, and the Seven Landlord Entities (on behalf of themselves and all of their principals and affiliates) (the "<u>Reissman Releasors</u>") shall release the Plan Funders and all of their partners, officers, insiders, affiliates, attorneys and accountants (the "<u>Plan Funder Releasees</u>") from any liability that any or all of them have to the Reissman Releasors.    Under no circumstance may the Plan Funder Releasors or Reissman Releasors file or cause to be filed any law suit or other judicial proceeding relating to a released matter against the Reissman Releasees or the Plan Funder Releasees, respectively. The foregoing releases and standstill agreements shall not apply to any liability, law suit or proceeding to enforce any rights or obligations arising under the Plan, this Binding Plan Term Sheet or any definitive documents entered into pursuant hereto.    The foregoing releases shall have no impact upon any claims that SR, DR, the Reissmans or any of their partners, officers, insiders, affiliates have against any of the Debtors.    Effective as of the earliest to occur of the Sale Effective Date and the Plan Effective Date, the Plan Funders will release all of the Reissman Releasees from all Causes of Action and hold harmless and indemnify the Reissman Releasees from any liability that any or all of them have to the Debtors, the Debtors' bankruptcy estates, the Plan Funders and the Plan Funder Releasors on account of all Causes of Action and otherwise. Notwithstanding the foregoing provisions of this paragraph, under this Binding Plan Term Sheet, the Debtors and their estates shall not give or be afforded any release and shall not make or benefit from any covenant not to sue until and unless there is in effect an entered order of the Bankruptcy Court approving this Binding Plan Term Sheet.

9.    <u>Representations by the Plan Funders and No Representations or Warranties By the Debtors</u>.    The Plan Funders have demonstrated to the Debtors that the Plan Funders have available to them without any financing

contingency all of the money needed to fund the Plan Funders' financial obligations under this Binding Plan Term Sheet.  Within five business prior to the Auction, the Plan Funders will disclose all companies, persons or other entities that make up the Plan Funders and the Stalking Horse Parties, including disclosing all parents, subsidiaries and affiliates of the Plan Funders and the Stalking Horse Parties that make up the Plan Funders and the Stalking Horse Parties, and disclose the names of the ultimate controlling or owning individuals or public companies of the Plan Funders and the Stalking Horse Parties.  The Plan Funders and the Stalking Horse Parties hereby acknowledge and agree that the Debtors, SR, DR and the Reissmans have not made and will not be making any representations or warranties in connection with the transactions contemplated by this Binding Plan Term Sheet or the Plan other than regarding corporate existence, power and authority, and ownership of Facilities.   The Plan Funders and the Stalking Horse Parties hereby acknowledge and agree that they have completed all due diligence and investigation that is required by them to consummate all of the transactions required by this Binding Plan Term Sheet and that there is no further due diligence, financing or investigation contingency.   The Plan Funders hereby acknowledge and agree that they will be accepting all of the Assets on an "AS IS" "Where IS" basis without any representation or warranty by the Debtors, SR, DR and the Reissmans.

        10.    <u>Binding Nature of Binding Plan Term Sheet</u>.  Any party hereto may terminate this Binding Plan Term Sheet to which the Stalking Horse Parties are parties and all rights and obligations hereunder upon notice to the other parties hereto if the Bankruptcy Court Approvals Order (defined below in paragraph 11) is not entered by the Bankruptcy Court by July 23, 2014.  Additionally, the provisions of this Binding Plan Term Sheet to which the Stalking Horse Parties are parties shall have no force or effect absent this Binding Plan Term Sheet being fully executed by, and delivered to, each party hereto by May 30, 2014.

        11.    <u>Bankruptcy Court Approvals</u>.  The provisions of this Binding Plan Term Sheet are expressly conditioned upon entry by July 23, 2014 of an order of the Bankruptcy Court (the "<u>Bankruptcy Court Approvals Order</u>") in a form reasonably acceptable to the Debtors and the Plan Funders approving (a) the Auction and bidding procedures contained herein, including approval of the payment of the Break-Up Fee and Stalking Horse Bidders Expense Reimbursement (defined below in Paragraphs 12.a and 12.b) to the Stalking Horse Parties in the event of a successful Overbid (defined below) or alternative transaction, (b) the Debtors' entry into this Binding Plan Term Sheet, and (c) the Debtors' entry into and the terms of the Interim Management Agreement (defined below in paragraph 13) (collectively, the "<u>Bankruptcy Court Approvals</u>").   It is the intention of the Debtors to file this Binding Plan Term Sheet and a motion to request the Bankruptcy Court to

enter the Bankruptcy Court Approvals Order at a hearing to be held on July 2, 2014, or as soon thereafter as is available.  In order for this to occur on regular notice, the Debtors will be required to file their motion with the Bankruptcy Court by June 11, 2014.

12.  <u>Auction and Bidding Procedures</u>.  The Plan funding proposed by the Stalking Horse Parties in this Binding Plan Term Sheet will be subject to overbid at an auction that must be held on or before July 30, 2014 (the "<u>Auction</u>").[9]

a.  If the transactions contemplated hereby are not consummated for any reason other than as a result of any material failure to perform or cooperate by the Plan Funders, in addition to the refund of deposits as provided herein, the Stalking Horse Parties shall be granted an allowed administrative claim against the Debtors' estates in the amount of eight hundred thousand dollars ($800,000.00) (the "<u>Stalking Horse Bidders Expense Reimbursement</u>") for the reasonable costs and out-of-pocket expenses expected to be incurred by the Stalking Horse Parties in connection with their legal, accounting, business and other due diligence and the preparation and negotiation of this Binding Plan Term Sheet and related documents (with the Debtors being jointly and severally liable for payment of such Stalking Horse Bidders Expense Reimbursement).  The Stalking Horse Bidders Expense Reimbursement shall be paid within three business days following the date of entry of the Bankruptcy Court order approving the Auction results to a winning overbidder, with such Stalking Horse Bidders Expense Reimbursement to be paid out of the deposits or funding of the winning overbidder.

b.  In addition to the Stalking Horse Bidders Expense Reimbursement, upon the first to occur of (i) any Debtor, without the prior written consent of the Plan Funders, confirming a chapter 11 plan which is inconsistent with the terms of this Binding Plan Term Sheet and which involves the sale of Assets to someone other than the Plan Funders, (ii) any Debtor otherwise consummating any mergers, consolidations, business combinations, sales or other dispositions of any critical asset or of 20% or more of the Assets to someone other than the Plan Funders or someone designated by the Plan Funders, (iii) a sale or other disposition of 20% or more of the equity interests in any Debtor to someone other than the Plan Funders or someone designated by the Plan Funders and (iv) entry of a Bankruptcy Court order approving the Auction results to a winning overbidder, the Debtors shall pay (in cash) to the

---

[9] The Debtors and Plan Funders (with input from the Creditors Committee) will cooperate and discuss in good faith as to the location at which to conduct the Auction. In the event the parties are unable to reach an agreement, the Bankruptcy Court shall determine the location of the Auction with input from the Debtors, the Creditors Committee, the Plan Funders and any other party in interest.

Stalking Horse Parties a breakup fee in the amount of seven hundred thousand dollars ($700,000.00) (the "Breakup Fee"), with the Debtors being jointly and severally liable for the payment of the Breakup Fee.   The Bankruptcy Court Approvals Order is to include that the Debtors are to be authorized without further Bankruptcy Court order or action to pay any amounts that become due and payable to the Stalking Horse Parties pursuant to this Binding Plan Term Sheet (including, without limitation, the Breakup Fee and the Stalking Horse Bidders Expense Reimbursement) and that the Stalking Horse Parties shall have a super-priority administrative expense priority claim therefor.   If the Debtors do not at the time that they become obligated to pay the Breakup Fee to the Stalking Horse Bidders have sufficient funds to pay the Breakup Fee to the Stalking Horse Bidders without materially impairing their business operations, the Private Bank Debt Holder or Plan Funders shall have the right to cause the Debtors to borrow from the Private Bank Debt Holder or Plan Funders, respectively, the amount of the Breakup Fee as an increase in the amount of the Private Bank Debt or Post-Petition Plan Funders Loan, respectively, to enable the Debtors to pay the Breakup Fee to the Stalking Horse Bidders.   If the Breakup Fee becomes due to be paid to the Stalking Horse Bidders because of the entry of a Bankruptcy Court order approving the Auction results to a winning overbidder, the Breakup Fee shall be paid to the Stalking Horse Bidders within three business days following the date of entry of the Bankruptcy Court order approving the Auction results to a winning overbidder, with the Breakup Fee to be paid out of the deposits or funding of the winning overbidder.  Within three business days following the date of entry of the Bankruptcy Court order approving the Auction results to a winning overbidder other than the Stalking Horse Parties, as described below, the Debtors shall cause all deposits of the Plan Funders plus all interest accrued thereon to be returned to the Plan Funders, all amounts owing under the Post-Petition Plan Funders Loan to be paid to the Plan Funders out of the deposits or funding of the winning overbidder, and all amounts owing under the Private Bank Debt to be paid to the Private Bank Debt Holder out of the deposits or funding of the winning overbidder.

       c.   No party submitting any other offer or Overbid as to the Assets or capital stock or equity interests of any Debtor shall be entitled to any expense reimbursement, breakup fee, or termination or similar fee or payment.

       d.   Prior to receipt by a prospective overbidder of any information (including, but not limited to, business and financial information and access to representatives of the Debtors) from the Debtors, each potential overbidder shall be required to execute an appropriate confidentiality agreement.

e.    To be qualified to participate at the Auction, within five business days prior to the Auction, an overbidder (which includes any group of overbidders working together as one bidder) must have:

i.    Demonstrated to the Debtors that the overbidder has available to it seventy-two million dollars ($72,000,000.00) of cash (or any higher amount that is bid by the overbidder at the Auction) which is not subject to any financing contingency and is otherwise able to consummate all of the transactions contemplated by this Binding Plan Term Sheet;

ii.    Deposited cash in the amount of forty million dollars ($40,000,000.00) into a segregated, interest bearing trust account (the "Overbidder's Trust Account") to be maintained by LNBYB at First Republic Bank;

iii.    Disclosed all companies, persons or other entities that make up the "Plan Funders" under the Overbid, disclosed all parents, subsidiaries and affiliates of such components of the Overbid's "Plan Funders," and disclosed the names of the ultimate controlling or owning individuals or public companies of each component of the Overbid's "Plan Funders."

iv.    Entered into a document, as its bid (the "Overbid"), delivered to counsel for the Debtors, counsel for the Creditors' Committee and counsel for the Stalking Horse Parties, which is accompanied by a copy of this form of the Binding Plan Term Sheet marked to show changes and which, except as follows, is identical to this Binding Plan Term Sheet (e.g., including, without limitation, the provisions as to all components of the cash outlays of the Plan Funders hereunder, including for the Cash Component, increased as described below, for the New Seven Leases Key Money, for taking over certain identified responsibilities as to the Insurance Captives, for the above-described employee performance payments and for replacement of the Private Bank Debt and Post-Petition Plan Funders Loan as provided below, all of the provisions as to the Seven New Leases, and all of the provisions as to the Interim Management Agreement):

1.    The identity of the Plan Funders shall be changed to the overbidder's name and references to obligations of the Stalking Horse Parties shall be deleted;

2.    The Cash Component therein has been increased to an amount equal to at least sixty-four million dollars $64,000,000.00) (the "Minimum Overbid Amount");

3.    The Overbid is void of financing or due diligence contingencies of any kind or any other conditions precedent to such person's

obligation to consummate the transactions contemplated by this Binding Plan Term Sheet other than the Overbid being deemed by the Bankruptcy Court to constitute the winning bid at the Auction and the Plan being confirmed by the Bankruptcy Court; and

4.    Within three business days following the date of entry of the Bankruptcy Court order approving the Auction results to the overbidder as the winning overbidder, in a form reasonable acceptable to the Debtors and the winning overbidder:

a.    All of the deposits made by the Stalking Horse Parties for the First Trust Account, the Second Trust Account and the Third Trust Account and all interest accrued thereupon, are to be replaced with the funds and deposits from the winning bidder and be dealt with and funded in the same manner as set forth in this Binding Plan Term Sheet.

b.    All amounts then outstanding under the Post-Petition Plan Funders Loan and Private Bank Debt shall be immediately repaid in cash in full to the Plan Funders and Private Bank Debt Holder, respectively, with the prospective overbidder agreeing to take assignment thereof or, at the request of the Debtors, provide the Debtors with the identical loans.

f.    If one or more qualifying Overbids from qualifying overbidders are submitted in accordance herewith, the Debtors will conduct the Auction.  At the Auction, the Debtors (jointly with the Creditors' Committee with the Bankruptcy Court to resolve any dispute between the parties) shall have the right to select the highest and best bid from the Stalking Horse Parties and any other qualified overbidder who submitted a qualifying Overbid (the "Highest and Best Bid"), which will be determined by considering, among other things:  (i) the total net consideration to be received by the Debtors' estates (without taking into account the payment of the Breakup Fee and the Stalking Horse Bidders Expense Reimbursement, recognizing that  the Stalking Horse Bidders shall not be permitted to use any Breakup Fee or Stalking Horse Bidders Expenses Reimbursement as part of any bid submitted, to insure that all overbids are put on an equal footing);  (ii) the likelihood of the bidder's ability to close a transaction and the timing thereof; and (iii) any other matter as the Debtors' fiduciary duty may require;[10]  provided, however, that the

---

[10] The Overbid is required by this Binding Plan Term Sheet to be identical to the Binding Plan Term Sheet as described herein. If an Overbid with any impermissible variance from this Binding Plan Term Sheet is considered, such as upon the consent of the Plan Funders, in determining the successful winning bid, the Debtors shall take into account and consider the number, type and nature of any modifications to this

Debtors shall consult with the Creditors Committee in making any such determination.

g.    At the Auction, the Stalking Horse Parties shall have the right to (1) submit further bids along with a markup of this Binding Plan Term Sheet (provided that none of the substantive terms of this Binding Plan Term Sheet are changed without the consent of the Debtors and the Reissmans) and (2) at any time, request that the Debtors announce, subject to any potential new bids, the then current Highest and Best Bid and, to the extent the Stalking Horse Parties request, use reasonable best efforts to clarify any and all questions the Stalking Horse Parties may have regarding the Debtors' announcement of the then current Highest and Best Bid.

h.    Only the qualified overbidders who submitted qualifying Overbids and the Stalking Horse Parties may participate in the Auction.

i.    The Stalking Horse Parties shall have standing to contest the fairness of the Auction, including, but not limited to, the Debtors' determination of the Highest and Best Bid, with the Bankruptcy Court to be the sole arbiter of any dispute with no right of appeal.  The Stalking Horse Parties agree, and all prospective overbidders as a condition to being eligible to participate in the Auction will be required to agree, that the Bankruptcy Court, with input from the Debtors, the Creditors Committee, the Stalking Horse Parties, all qualified overbidders, and all other parties in interest, shall determine the Highest and Best Bid with no right to appeal.

j.    Any Overbids after the initial bid at the Auction must be higher than the then existing lead Overbid in increments of not less than two hundred fifty thousand dollars ($250,000) in cash.

k.    Separate from any overbid of the Plan Funders (which may include credit bidding and other credits as provided herein), the Private Bank Debt Holder, as part of any overbid it may submit, shall have the right to include the amount of the Private Bank Debt as part of any overbid submitted and to receive dollar-for-dollar credit on account of the amount of any Private Bank Debt included in any such overbid to the fullest extent permitted by Section 363(k) of the Bankruptcy Code, provided that the Private Bank Debt Holder agrees that the amount of the Private Bank Debt which will be paid by the Debtors at the closing of the transaction will be reduced by the amount of Private Bank Debt included in any winning overbid submitted by the Private Bank Debt Holder.

---

Binding Plan Term Sheet requested by the overbidder, the extent to which such modifications are likely to delay closing of the transaction, and their cost.

13.    <u>Interim Management Agreement</u>.  As soon as possible after entry of the Bankruptcy Court Approvals Order, the Debtors shall at their expense not to exceed $50,000.00 per month implement a risk management and compliance program reasonably acceptable to the Plan Funders to remain in effect, absent a Sale, until the Plan Effective Date and, if a Sale occurs, until Newco obtains its/their own provider agreements with the government (the "<u>New Operations Start Date</u>").[12]  If the Debtors need additional funding to pay for the additional costs of such programs, the Private Bank Debt Holder or Plan Funders will provide such additional funding to the Debtors by increasing the amount of the Private Bank Debt or Post-Petition Plan Funders Loan, respectively.  While any such new staffing related to the risk management and compliance programs will report to and work under the supervision of the Debtors' senior management, the Plan Funders will have the right to have direct access to, communicate with, and obtain information from such new staffing.   As soon as possible after entry of the Bankruptcy Court order approving the Plan Funders as the winning bidder at the Auction, the Debtors and the Plan Funders shall enter into an industry standard interim management agreement (with the form of the interim management agreement to be fully drafted and agreed upon by the Debtors and the Plan Funders and filed with the Bankruptcy Court by June 25, 2014) (the "<u>Interim Management Agreement</u>").  The Interim Management Agreement shall provide, among other things, as follows:

a.    From the date of entry into the Interim Management Agreement (the "<u>Interim Management Agreement Effective Date</u>") through the New Operations Start Date, the Plan Funders shall receive all of the economic benefits of managing the Facilities and shall bear all of the economic detriments of managing the Facilities.   For all periods until the Interim Management Agreement Effective Date, the Debtors shall receive all of the economic benefits of managing the Facilities and shall bear all of the economic detriments of managing the Facilities.

b.    From the Interim Management Agreement Effective Date through the New Operations Start Date, the Plan Funders shall bear all liability for any and all claims arising from Facility-related actions or events which occur after the Interim Management Agreement Effective Date, and the Plan Funders shall indemnify, defend and hold harmless the Debtors, and all of their partners, officers, insiders, affiliates, attorneys and accountants from any liability that any or all of them have as a result of any such claims. For the period until the Interim Management Agreement Effective Date, the Debtors shall bear all liability for any and all claims arising from Facility-related actions or events

---

[12] If someone other than the Plan Funders is deemed by the Bankruptcy Court to be the winning bidder at the Auction, such winning bidder shall have the right, but not the obligation, to enter into an Interim Management Agreement with the Debtors on the same terms as described herein.

which occur until the Interim Management Agreement Effective Date, and the Debtors shall indemnify and hold harmless the Plan Funders, and all of their partners, officers, insiders, affiliates, attorneys and accountants from any liability that any or all of them have as a result of any such claims.

c.    Commencing with the Interim Management Agreement Effective Date, the Plan Funders shall be responsible for all funding of the operations of the Facilities and for all debts thereafter incurred relating to the Facilities and their operations, and the Plan Funders will cause all such debts to be paid by the Plan Funders on the same terms that the Plan provides or permits satisfaction of administrative claims.  The Plan Funders shall indemnify, defend and hold harmless the Debtors, and all of their partners, officers, insiders, affiliates, attorneys and accountants from any and all such debts which are not paid by the Plan Funders.

d.    Commencing with the Interim Management Agreement Effective Date, the Plan Funders shall be responsible for all billing, accounting and financial systems relating to the Facilities and their operations.  While the Plan Funders shall have the right to continue to use the Debtors' existing billing, accounting and financial systems and personnel, the Plan Funders shall be responsible for payment of all of the expenses related to such billing, accounting and financial systems and personnel.

e.    The Plan Funders shall not be permitted to use or have access to any of the Debtors' Cash existing on the Interim Management Agreement Effective Date.

f.    All of the Debtors' Cash  existing at 11:59 p.m. on the Interim Management Agreement Effective Date shall be and remain the Debtors' cash and shall not be included in the Assets to be acquired, retained or used by the Plan Funders.   From the Interim Management Agreement Effective Date through the closing of the Debtors' cases, the Debtors or their estates shall be responsible for continuing to fund the costs of administering their bankruptcy estates, including the preparation of monthly operating reports and payment of quarterly fees to the United States Trustee.   If the Plan Funders and the Debtors both wish to use the same personnel, the Plan Funders and the Debtors shall pay for their proportionate share of the compensation of such shared personnel based upon the extent of usage, with any dispute to be resolved by the Bankruptcy Court.

14.    Further Documentation.    The Plan Funders, the Debtors, the Reissmans, SR and DR agree to work in good faith to prepare all of the documentation that is required in order for the parties to consummate the transactions contemplated by this Binding Plan Term Sheet and the Plan.

15.   <u>Binding Agreement and Good Faith</u>.   While the parties recognize and agree that further documentation is required to enable the parties to consummate the transactions contemplated by this Binding Plan Term Sheet, the parties do acknowledge and agree that this Binding Plan Term Sheet is intended to be a binding agreement among the parties, which is not subject to any further due diligence or investigation (including with respect to the Leases, their duration, their remaining terms, or their enforceability).   The parties further agree to work in good faith with each other throughout this process in an effort to confirm the Plan and effectuate the purposes of this Binding Plan Term Sheet.   The parties further recognize and agree that by executing this Binding Plan Term Sheet, they are subject to the covenant of good faith and fair dealing implied under California law in every contract, including this Binding Plan Term Sheet.

16.   <u>Dispute Resolution</u>.   Any and all disputes related to this Binding Plan Term Sheet and the transaction contemplated herein, including, but not limited to, the implementation of this Binding Plan Term Sheet or any documents which are subsequently created to implement and consummate the Plan and the terms of, and the transactions contemplated by, this Binding Plan Term Sheet, and all subsequent documentation needed to consummate the Plan and/or the Sale, shall be interpreted under the Bankruptcy Code and resolved solely by the Bankruptcy Court to the extent it accepts such role, with no right of appeal.

17.   <u>Asset Sale Option</u>.   At any time after the entry by the Bankruptcy Court of an order approving the winning bidder at the Auction, the Debtors shall have the right, for any reason, including, but not limited to, concluding that confirming the Plan within the time frames contemplated by this Binding Plan Term Sheet will not be possible or practical, to proceed with seeking to consummate the transactions contemplated by this Binding Plan Term Sheet through a Sale pursuant to, *inter alia*, sections 363(f) and 365 of the Bankruptcy Code, on the same economic terms as contemplated by this Binding Plan Term Sheet.   If through no material fault of the Plan Funders, confirming the Plan within the time frames contemplated by this Binding Plan Term Sheet will not be possible or practical, the Plan Funders also shall have the right to require that the transactions contemplated by this Binding Plan Term Sheet be consummated through a Sale pursuant to, *inter alia*, sections 363(f) and 365 of the Bankruptcy Code, on the same economic terms as contemplated by this Binding Plan Term Sheet.   Any such Sale will be subject to the entry of a Bankruptcy Court order approving such Sale to the winning bidder at the Auction in a form reasonably acceptable to the Debtors and the winning bidder (the "<u>Sale Order</u>").   Following the consummation of such a Sale, the buyer(s) (i.e., the winning bidder(s) at the Auction or any permitted assignees or designees) will operate the Facilities under the Debtors' provider agreements pursuant to the terms and conditions of a MOTA pending the

buyer(s) obtaining its/their own such provider agreements with the government. For any such Sale, the "<u>Sale Effective Date</u>" shall occur by the fifteenth day following the date of entry of the Sale Order regardless of whether any appeal of the Sale Order has been brought provided no stay of the Sale Order has been ordered by a court of competent jurisdiction. The basic concept would be that the references in this Binding Plan Term Sheet to the "Plan Effective Date" and the timing of events for the "Plan Effective Date" would in effect be changed to the "Sale Effective Date".

[Signature Pages Begin on the Next Page]

Agreed:

_____
STEPHEN REISSMAN

_____
DIANE REISSMAN


1989 REISSMAN IRREVOCABLE TRUST


BY: _____

_____, Its Trustee

BY: _____

_____, Its Trustee


PLAZA HEALTHCARE CENTER LLC


By: _____

_____, Its Managing Member


PLAZA CONVALESCENT CENTER LP


By: _____

_____, Its General Partner


-31-

BELMONT HEIGHTS HEALTHCARE CENTER LLC

By: _____

_____, Its Managing Member

CLAREMONT HEALTHCARE CENTER INC.

By: _____

_____, Its _____

COUNTRY VILLA EAST LP

By: _____

_____, Its General Partner

COUNTRY VILLA IMPERIAL LLC

By: _____

_____, Its Managing Member

-32-

COUNTRY VILLA NURSING CENTER INC.

By: _____

_____, Its _____


COUNTRY VILLA SOUTHBAY LLC

By: _____

_____, Its Managing Member


EAST HEALTHCARE CENTER LLC

By: _____

_____, Its Managing Member


LOS FELIZ HEALTHCARE CENTER LLC

By: _____

_____, Its Managing Member

MOUNTAINSIDE OPERATING COMPANY LLC

By: _____
_____, Its Managing Member


NORTH HEALTHCARE CENTER LLC

By: _____
_____, Its Managing Member


NORTH POINT HEALTH & WELLNESS CENTER LLC

By: _____
_____, Its Managing Member


RRT ENTERPRISES LP

By: _____
_____, Its General Partner


-34-

SHERATON HEALTHCARE CENTER, LLC

By: _____

_____, Its Managing Member


SOUTH HEALTHCARE CENTER LLC

By: _____

_____, Its Managing Member


WESTWOOD HEALTHCARE CENTER LLC

By: _____

_____, Its Managing Member


WESTWOOD HEALTHCARE CENTER LP

By: _____

_____, Its General Partner

WILSHIRE HEALTHCARE CENTER LLC

By: _____

_____, Its Managing Member


PLAN FUNDERS


_____

SHLOMO RECHNITZ

WILSHIRE HEALTHCARE CENTER LLC


By: _____

_____, Its Managing Member


PLAN FUNDERS

_____
SHLOMO RECHNITZ   ▸As the 'Plan Funders' and my self"

-36-

# EXHIBIT "2"

Exhibit 2

| Debtor Lessee | Landlord | Facility | Cure |
|---|---|---|---|
| Belmont Heights Healthcare Center, LLC | Emanuel Newman and Alisa Newman, Trustees of the Newman Family Trust, established August 9, 1994, and Uri Mandelbaum and Brenda Mandelbaum, Trustees of the Mandelbaum Trust dated November 1, 1988 | Country Villa Belmont Heights Healthcare Center | $10,275.85 |
| Claremont Helthcare Center Inc. | Health Care Property Partners | Country Villa Claremont Healthcare Center | $5,983.37 |
| Country Villa East LP | Flora Rosman, Trustee of the Rosman Trustee u/t/d February 19, 1980 | Country Villa Pavilion Nursing Center<br>County Villa Terrace Nursing Center<br>Country Villa Terrace Assisted Living Facility | $167,590 |
| Country Villa East LP | Superior Convalescent LLC | Country Villa Sheraton Nursing & Rehabilitation Center | $11,735.74 |
| Country Villa Imperial LLC | Sam Krieger and Certie Krieger, Trustees of the Kreiger Family Trust u/t/a dated January 7, 1985 | Healthcare Center of Bella Vista | $3,756.77 |
| Los Feliz Healthcare Center LLC | L.F. Enterprises | Country Villa Los Feliz Nursing Center | $0 |
| Plaza Heathcare Center LLC | Santa Ana Investment Group LLC | Country Villa Plaza Convalescent Center | $9,444.80 |
| Mountainside Operating Company LLC | 1311 East Date Street LLC | Country Villa Hacienda Healthcare Center | $0 |
| North Point Health & Wellness Center LLC | Bullard Fresno Investments, LLC | NorthPointe Healthcare Centre | $8,910 |
| South Healthcare Center LLC | Westover Properties | Country Villa South Convalescent Center | $4,983.83 |

**EXHIBIT "3"**

| Country Villa Name | Tenant | New Operator | Address | City | State | Zip |
|---|---|---|---|---|---|---|
| Country Villa Bay Vista Healthcare Center | Bay Vista-Let, LLC | Bay Vista Healthcare & Wellness Centre, LP | 5901 Downey Ave. | Long Beach | CA | 90805 |
| NorthPointe Healthcare Centre | Bullard Heights-Let, LLC | Bullard Heights Healthcare & Wellness Centre, LP | 668 E. Bullard Ave. | Fresno | CA | 93710 |
| Country Villa East Nursing Center | East Terrace-Let, LLC | East Terrace Rehabilitation & Wellness Centre, LP | 2415 S. Western Ave. | Los Angeles | CA | 90018 |
| Country Villa Claremont Healthcare Center | Gardenview-Let, LLC | Gardenview Healthcare & Wellness Centre, LP | 590 S. Indian Hill Blvd. | Claremont | CA | 91711 |
| Country Villa Healthcare | Hacienda Heights-Let, LLC | Hacienda Heights Healthcare & Wellness Centre, LP | 1311 E. Date St. | San Bernardino | CA | 92404 |
| Country Villa Los Feliz Nursing Center | Los Feliz-Let, LLC | Los Feliz Healthcare & Wellness Centre, LP | 3002 Rowena Ave. | Los Angeles | CA | 90039 |
| Country Villa Rehabilitation Center | MacArthur Park-Let, LLC | MacArthur Park Rehabilitation & Wellness Centre, LP | 340 S. Alvarado St. | Los Angeles | CA | 90057 |
| Country Villa Mar Vista Nursing Center | Mar Vista-Let, LLC | Mar Vista Country Villa Healthcare & Wellness Centre, LP | 3966 Marcasel Ave. | Los Angeles | CA | 90066 |
| Country Villa Sheraton Nursing & Rehab. Center | North Hills-Let, LLC | North Hills Healthcare & Wellness Centre, LP | 9655 Sepulveda Blvd. | Los Angeles | CA | 91343 |
| Country Villa North Convalescent Center | North Palms-Let, LLC | North Palms Rehabilitation & Wellness Centre, LP | 3233 W. Pico Blvd. | Los Angeles | CA | 90019 |
| Healthcare Center of Bella Vista | Ontario Grove-Let, LLC | Ontario Grove Healthcare & Wellness Centre, LP | 933 E. Deodar St. | Ontario | CA | 91764 |
| Country Villa South Convalescent Center | Overland Terrace-Let, LLC | Overland Terrace Healthcare & Wellness Centre, LP | 3515 Overland Ave. | Los Angeles | CA | 90034 |
| Country Villa Plaza Convalescent Center | Santa Ana-Let, LLC | Santa Ana Healthcare & Wellness Centre, LP | 1209 Hemlock Way | Santa Ana | CA | 92707 |
| Country Villa Wilshire Convalescent Center | West Hollywood-Let, LLC | West Hollywood Healthcare & Wellness Centre, LP | 855 N. Fairfax Ave. | Los Angeles | CA | 90046 |
| Country Villa Westwood Convalescent Center | Westwood-Let, LLC | Westwood Healthcare & Wellness Centre, LP | 12121 Santa Monica Blvd. | Los Angeles | CA | 90025 |
| Country Villa Belmont Heights Healthcare Center | Grand Avenue-Let, LLC | Grand Avenue Healthcare & Wellness Centre, LP | 1730 Grand Ave. | Long Beach | CA | 90804 |
| Country Villa Pavilion Nursing Center | Pavilion-Let, LLC | Pavilion on Pico Healthcre & Wellness Centre, LP | 5916 W. Pico Blvd. | Los Angeles | CA | 90035 |
| Country Villa Terrace Nursing Center | West Pico Terrace-Let, LLC | West Pico Terrace Healthcare & Wellness Centre, LP | 6070 W. Pico Blvd. | Los Angeles | CA | 90035 |
| Country Villa Terrace Assisted Living Center | West Pico Terrace-Let, LLC | West Pico Terrace Assisted Living Center, LP | 6050 W. Pico Blvd. | Los Angeles | CA | 90035 |

# PROOF OF SERVICE OF DOCUMENT

1  I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION AND MOTION FOR AN ORDER APPROVING DEBTORS' ASSUMPTION AND ASSIGNMENT OF UNEXPIRED REAL PROPERTY LEASES AND DETERMINING CURE AMOUNTS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF JERRY ROLES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 13, 2014**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Michael A Abramson    maa@abramsonlawgroup.com
- Russell S Balisok    balisok@stopelderabuse.org
- Robert D Bass    rbass@greenbass.com
- Ron Bender    rb@lnbyb.com
- Richard S Berger    rberger@lgbfirm.com, marizaga@lgbfirm.com;ncereseto@lgbfirm.com;msutton@lgbfirm.com
- Manuel A Boigues    bankruptcycourtnotices@unioncounsel.net
- Matthew Borden    borden@braunhagey.com, fair@braunhagey.com
- Michael J Bujold    Michael.J.Bujold@usdoj.gov
- Steven Casselberry    scasselberry@mrllp.com, jjacobs@mrllp.com
- Cheryl S Chang    Chang@Blankrome.com, Lalocke@Blankrome.com;RMerten@Blankrome.com
- Jacquelyn H Choi    jchoi@swesq.com
- Baruch C Cohen    bcc4929@gmail.com, pjstarr@starrparalegals.com
- Marianne M Dickson    MDickson@seyfarth.com, shobrien@seyfarth.com
- Caroline Djang    cdjang@rutan.com
- Joseph A Eisenberg    jae@jmbm.com, vr@jmbm.com;tgeher@jmbm.com;bt@jmbm.com;jae@ecf.inforuptcy.com
- Fahim Farivar    lawyercpa@gmail.com
- William L Foreman    wforeman@oca-law.com, laiken@oca-law.com
- Eric J Fromme    ejf@jmbm.com, lo2@jmbm.com
- Jeffrey K Garfinkle    jgarfinkle@buchalter.com, docket@buchalter.com;dcyrankowski@buchalter.com
- Fredric Glass    fglass@fairharborcapital.com
- Christina Goebelsmann    cgoebelsmann@wargofrench.com
- Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
- D Edward Hays    ehays@marshackhays.com, ecfmarshackhays@gmail.com
- Mark S Horoupian    mhoroupian@sulmeyerlaw.com, ppenn@sulmeyerlaw.com;mhoroupian@ecf.inforuptcy.com;ppenn@ecf.inforuptcy.com
- Ivan L Kallick    ikallick@manatt.com, ihernandez@manatt.com
- David I Katzen    katzen@ksfirm.com, schuricht@ksfirm.com
- Gerald P Kennedy    gerald.kennedy@procopio.com, kristina.terlaga@procopio.com;calendaring@procopio.com;efile-bank@procopio.com
- Monica Y Kim    myk@lnbrb.com
- K Kenneth Kotler    kotler@kenkotler.com, zoe@kenkotler.com
- Ian Landsberg    ilandsberg@landsberg-law.com, bgomelsky@landsberg-law.com;cdonovan@landsberg-law.com;dzuniga@landsberg-law.com
- Mary D Lane    mal@msk.com, mec@msk.com
- Leib M Lerner    leib.lerner@alston.com
- Elan S Levey    elan.levey@usdoj.gov, louisa.lin@usdoj.gov
- Howard S Levine    howard@cypressllp.com, jennifer@cypressllp.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                    **F 9013-3.1.PROOF.SERVICE**

- Elizabeth A Lossing    elizabeth.lossing@usdoj.gov
- Craig G Margulies    craig@marguliesfaithlaw.com,
  staci@marguliesfaithlaw.com;mhillel@marguliesfaithlaw.com;fahim@marguliesfaithlaw.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Kenneth Miller    kmiller@ecjlaw.com
- Benjamin Nachimson    ben.nachimson@wgfllp.com
- Tara L Newman    tara.newman@doj.ca.gov
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Christopher E Prince    cprince@lesnickprince.com
- Hanna B Raanan    hraanan@marlinsaltzman.com,
  jhawkes@marlinsaltzman.com;sshepard@marlinsaltzman.com;irvinefileclerk@marlinsaltzman.com
- Hamid R Rafatjoo    hrafatjoo@venable.com, kfox2@venable.com;bclark@venable.com
- Brett Ramsaur    bramsaur@swlaw.com, kcollins@swlaw.com
- Paul R Shankman    pshankman@jhindslaw.com
- Lindsey L Smith    lls@lnbyb.com
- Adam D Stein-Sapir    info@pfllc.com
- Alan Stomel    alan.stomel@gmail.com, astomel@yahoo.com
- Kelly Sweeney    ksweeney@spiwakandiezza.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Jeanne C Wanlass    jwanlass@loeb.com, karnote@loeb.com;ladocket@loeb.com
- Joshua D Wayser    joshua.wayser@kattenlaw.com,
  jessica.mickelsen@kattenlaw.com;kim.johnson@kattenlaw.com,ecf.lax.docket@kattenlaw.com,adelle.shafer@kattenlaw.com
- Andrew F Whatnall    awhatnall@daca4.com
- Elisa B Wolfe-Donato    Elisa.Wolfe@doj.ca.gov
- Jennifer C Wong    bknotice@mccarthyholthus.com
- David Wood    dwood@marshackhays.com, ecfmarshackhays@gmail.com
- Benyahou Yeroushalmi    ben@yeroushalmilaw.com
- Kristin A Zilberstein    bknotice@mccarthyholthus.com, kzilberstein@mccarthyholthus.com

**2.  SERVED BY UNITED STATES MAIL**: On **August 13, 2014**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 13, 2014**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Service by Attorney Service***
The Honorable Catherine E. Bauer
United States Bankruptcy Court
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5165 / Courtroom 5D
Santa Ana, CA 92701-4593

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 13, 2014 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Emanual Newman and Alisa Newman,
Trustees of the Newman Family Trust and
Uri Mandelbaum and Brenda Mandelbaum
Trustees of the Mandelbaum Trust
1911 Marlia Court
Tarzana, CA 91356

Health Care Property Partners
4675 MacArthur Court, Suite 900
Newport Beach, CA 92660

Flora Rosman, Truste of the Rosman Truste
u/t/d February 19, 1980, Flora Rosman
716 N. Oakhurst Drive
Beverly Hills, CA 90210

Superior Convalescent LLC
Warren L. Breslow, Agent for Service of
Process
5150 Overland Ave.
Culver City, CA 90230

Sam Krieger and Certie Krieger, Turstees of
the Krieger Family Trust u/t/a dated January
7, 1985
300 N. Swall Drive,  #168
Beverly Hills, CA 90211

L.F. Enterprises
c/o Robert Shuwarger
11075 Santa Monica Blvd., Suite 150
Los Angeles, CA 90025

L.F. Enterprises
Robert E. Lejuwann, Agent for Service of
Process
291 Andes Way
Fullerton Ca 92881

340 South Alvarado, Inc.
c/o Stephen Reissman, Agent for Service of
Process
Country Villa Health Services
5120 W. Goldleaf Circle, 4th Floor
Los Angeles, CA 90056

Santa Ana Investment Group LLC
Phillip M Eyring, Agent for Service of
Process
1777 North California Blvd., Ste 300
Walnut Creek Ca 94596

Santa Ana Investment Group LLC
Phillip M. Eyring
1657 N. California Blvd., Suite 201
Walnut Creek, CA 94596

5901 Downey Avenue, LLC
c/o Stephen Reissman, Agent for Service of
Process
Country Villa Health Services
5120 W. Goldleaf Circle, 4th Floor
Los Angeles, CA 90056

12121 Santa Monica Blvd., LLC
c/o Stephen Reissman, Agent for Service of
Process
Country Villa Health Services
5120 W. Goldleaf Circle, 4th Floor
Los Angeles, CA 90056

2145 S. Western Avenue LLC
c/o Stephen Reissman
Country Villa Health Services
5120 W. Goldleaf Circle, 4th Floor
Los Angeles, CA 90056

1311 East Date Street LLC
Attn: Richard and Robert Shpall
21204 Rimpath Drive
Covina, CA 91724

1311 East Date Street LLC
S. Jack Fenigstein, Agent for Process
1900 Avenue Of The Stars, Suite 2300
Los Angeles, CA 90067

3233 West Pico Boulevard LLC
c/o Stephen Reissman
Country Villa Health Services
5120 W. Goldleaf Circle, 4th Floor
Los Angeles, CA 90056

3233 West Pico Boulevard LLC
c/o Joel Saltzburg, Agent for Service of
Process
Country Villa Health Services
5120 W. Goldleaf Circle, 4th Floor
Los Angeles, CA 90056

Bullard Fresno Investments, LLC
1645 High Valley Place
Encino, CA 91436

Bullard Fresno Investments, LLC
Henry N Jannol, Agent for Service of
Process
10850 Wilshire Blvd., Suite 825
Los Angeles Ca 90024

3966 Marcasel Avenue LLC
c/o Stephen Reissman, Agent for Service of
Process
Country Villa Health Services
5120 W. Goldleaf Circle, 4th Floor
Los Angeles, CA 90056

Westover Properties
P.O. Box 1843
Huntington Beach, CA 92647

Westover Properties
Virginia Macleith, Agent for Service of
Process
17162 Gothard Street
Huntington Beach, CA 92647

855 North Faifax Avenue, LLC
c/o Stephen Reissman
Country Villa Health Services
5120 W. Goldleaf Circle, 4th Floor
Los Angeles, CA 90056

855 North Faifax Avenue, LLC
c/o Joel Saltzburg, Agent for Service of
Process
Country Villa Health Services
5120 W. Goldleaf Circle, 4th Floor
Los Angeles, CA 90056