1  RICHARD M. PACHULSKI (Cal. Bar No. 90073)
   ROBERT B. ORGEL (Cal. Bar No. 101875)
2  PACHULSKI STANG ZIEHL & JONES LLP
   10100 Santa Monica Blvd., 13th Floor
3  Los Angeles, CA  90067
   Telephone: (310) 277-6910
4  Facsimile: (310) 201-0760
   E-mail:  rpachulski@pszjlaw.com
5            rorgel@pszjlaw.com

6  Attorneys for Shlomo Rechnitz

7

8               UNITED STATES BANKRUPTCY COURT
                CENTRAL DISTRICT OF CALIFORNIA
9                    SANTA ANA DIVISION

10  In re:                                    Lead Case No.: 8:14-bk-11335-CB
                                              (Jointly Administered)
    Plaza Healthcare Center LLC,              Case No. 8:14-bk-11337-CB
11                                            Case No. 8:14-bk-11358-CB
            Debtor and Debtor-in-Possession.  Case No. 8:14-bk-11359-CB
12                                            Case No. 8:14-bk-11360-CB
                                              Case No. 8:14-bk-11361-CB
13                                            Case No. 8:14-bk-11362-CB
                                              Case No. 8:14-bk-11363-CB
14          ALL MY COMMEMTS IN CAPS          Case No. 8:14-bk-11364-CB
                                              Case No. 8:14-bk-11365-CB
15              SHLOMO                        Case No. 8:14-bk-11366-CB
    ☒ Affects All Debtors                     Case No. 8:14-bk-11367-CB
16                                            Case No. 8:14-bk-11368-CB
    ☐ Affects Belmont Heights Healthcare Center LLC   Case No. 8:14-bk-11370-CB
17  ☐ Affects Claremont Healthcare Center Inc.        Case No. 8:14-bk-11371-CB
    ☐ Affects Country Villa East LP                   Case No. 8:14-bk-11372-CB
18  ☐ Affects Country Villa Imperial LLC              Case No. 8:14-bk-11373-CB
    ☐ Affects Country Villa Nursing Center Inc.       Case No. 8:14-bk-11375-CB
19  ☐ Affects Country Villa Southbay LLC              Case No. 8:14-bk-11376-CB
    ☐ Affects East Healthcare Center LLC              Chapter 11 Cases
20  ☐ Affects Los Feliz Healthcare Center LLC
    ☐ Affects Mountainside Operating Company LLC      OPPOSITION OF SHLOMO
21  ☐ Affects North Healthcare Center LLC             RECHNITZ TO EMERGENCY
    ☐ Affects North Point Health & Wellness Center    MOTION TO DISQUALIFY
22  LLC                                               STALKING HORSE PARTIES FROM
    ☐ Affects Plaza Convalescent Center LP            (1) INTERIM MANAGEMENT OF
23  ☐ Affects Plaza Healthcare Center LLC             DEBTORS' FACILITIES, AND (2)
    ☐ Affects RRT Enterprises LP                      PURCHASING DEBTORS'
24  ☐ Affects Sheraton Healthcare Center LLC          FACILITIES OR ASSETS;
    ☐ Affects South Healthcare Center LLC             DECLARATION OF MARK JOHNSON
25  ☐ Affects Westwood Healthcare Center LLC
    ☐ Affects Westwood  Healthcare Center LP          Date:   August 29, 2014
26  ☐ Affects Wilshire Healthcare Center LLC          Time:   10:00 a.m.
                                                      Place:  Courtroom 5D
27          Debtors and Debtors-in-Possession.                411 West Fourth Street
                                                              Santa Ana, CA  92701
28                                                    Judge:  Hon. Catherine Bauer

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

**TO THE HONORABLE CATHERINE BAUER, UNITED STATES BANKRUPTCY JUDGE, AND TO ALL INTERESTED PARTIES:**

Shlomo Rechnitz ("Rechnitz") hereby opposes the *Emergency Motion to Disqualify Stalking Horse Parties From (1) Interim Management of Debtors' Facilities, and (2) Purchasing Debtors' Facilities or Assets* (the "Emergency Motion") filed by the California Department of Health Care Services ("DHCS") and California Department of Public Health ("CDPH" and, together with DHCS, the "State"), and represents as follows:

**I.**

**INTRODUCTION**

The Emergency Motion does not address any emergency, does not implicate any issue of patient care and safety and does not raise any issues even suggesting that the Stalking Horse Parties' management of the Debtors' facilities would impair those facilities' operations.  It has one purpose: to extort a favorable resolution of a financial regulatory dispute with Rechnitz as to a single cost report.  Its allegations have nothing to do with Rechnitz's qualifications to operate skilled nursing facilities – indeed, the State itself has consistently commended Rechnitz as an outstanding operator. ***Above all, nothing in the Emergency Motion even remotely justifies the outrageous statements that "Rechnitz is a violator of industry laws and regulations" or that he "tends to not comply with regulatory requirements" or that he may not satisfy the "good character" requirement for licensure.***  There is absolutely no admissible evidence that supports these allegations and they should be stricken.[1]  The fact that the State is not satisfied with Rechnitz's compliance as to its complex financial regulatory requirements does not entitle the State to engage in irresponsible, baseless and injurious character assassination.  That such defamatory statements are made on the State's behalf is reprehensible, and they should be withdrawn on the record.

---

[1] Rule 12(f) of the Federal Rules of Civil Procedure provides, in pertinent part, that "[u]pon motion made by a party . . . the court may order stricken from any pleading any . . . scandalous matter." Fed. R. Civ. P. 12(f); see 5A C. Wright and A. Miller, Federal Practice and Procedure (Civil) 2d § 1382, at 712 (1990) ("'Scandalous' matter is that which improperly casts a derogatory light on someone, most typically a party to the action.") (footnote omitted); 2 Moore's Federal Practice § 12.37[3] at 12-97 ("'Scandalous' generally refers to any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court.") (footnote omitted).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

DOCS_LA:281012.6 73538/001

Every material fact that underlies the Emergency Motion has been known to the State for months. Any "emergency" is self-created. The State has known of the potential interim management by the Stalking Horse Parties since at least June 11, 2014, when the Debtors filed their motion seeking approval of such interim management – which the State elected not to oppose. And, as recently as August 19, 2014, the State stipulated to the form of management agreement for the Stalking Horse Parties and asked for and got changes to the agreement to reflect that its rights are preserved for the sale hearing yet to occur and the sale motion yet to be filed. In fact, the State has been completely aware of everything as it happens in these cases, and has been an active participant. Any objection to the Stalking Horse Parties' interim management needed to be made in response to the June 11, 2014 Term Sheet Motion (defined below) which the State did not oppose. The order was not appealed and no motion for reconsideration or for relief from judgment was filed, and there are no new facts that would support any such motion in any event. The State can hardly argue that its own decision to impose a 20% withhold on reimbursements on *other* facilities owned by Rechnitz constitutes a new fact or creates an emergency it could not have foreseen.

As the State well knows, transitioning the management of eighteen skilled nursing facilities (and one assisting living facility) at the same time requires a tremendous amount of work, effort and coordination. Between the Debtors' employees and patients, there are nearly 4,000 human beings affected by this transfer. The planning for the transition has been going on for weeks, in reliance on the approval of the interim management agreement and, indeed, the State's stipulation to its terms. This planning cannot be undone in a day. There is simply no excuse for waiting until the afternoon of the last business day before the management transfer to object to the identity of the Stalking Horse Parties and their interim management of the Debtors' facilities.

Conversely, no harm is engendered by moving forward with the interim management agreement pending the outcome of the sale motion. In the event that the Stalking Horse Parties do not ultimately acquire the Debtors' facilities, management can be re-transitioned in an orderly fashion. In the meantime, pending a final transfer, facilities' employees will remain on the Debtors' payrolls, and collections and expenses will be segregated and accounted for. Indeed, the sale terms

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

require such accounting in order to determine adjustments to the purchase price. There is obviously no risk to patient care and safety. Even if the State commences withholding a portion of Medi-Cal reimbursements at Rechnitz's other facilities (which will not be known until September 22, 2014 at the earliest), the Debtors' facilities will not be impacted. As the Debtors' monthly operating reports reflect, the facilities are cash-flow positive. Indeed, the only risk in terms of patient care arises from the confusion that will occur if the transfer of management does not occur on September 1, 2014, as long planned for almost every facility.

Rechnitz, the management company he utilizes, and the State are engaged in a dispute over whether Rechnitz has an obligation to file one single cost report for an unrelated vendor that he contends he lacks the ability to file because of his use of an independent management company. The State's declarations are rife with inadmissible hearsay,[2] and its irresponsible rhetoric is way out of proportion to the substance of its objections. That the management company used by Rechnitz does not file a cost report - whether because it contests having an obligation to do so or because Rechnitz cannot compel it to do so - does not make Rechnitz a lawbreaker or a person of bad character. Indeed, Rechnitz and his counsel met with representatives of the State, including one of the declarants, on August 13, 2014 and discussed the pending acquisition, and at no point was any opposition raised to the pending acquisition. The State cannot withhold reimbursements as to the Debtors' facilities. Any notion that the State's actions might affect Rechnitz's financial wherewithal is speculative and its effect on interim management remote. Moreover, the dispute between Rechnitz and the State as to the financial regulatory matters will and must be resolved. This, however, is not the forum to do it.

Another example of overblown rhetoric is the State's reference to the potentially severe consequences of a federal CMS enforcement order that was issued to one facility relating to compliance with Medicare requirements. In fact, it is a routine form letter that every facility receives following an unsuccessful annual Medicare survey. In the past 24 months, nearly 600 facilities in California have received the same form letter. Notably, CMS has declined to support the

---

[2] Due to the shortness of time, evidentiary objections will be made at the hearing.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

DOCS_LA:281012.6 73538/001

1  Emergency Motion. Patently, such mischaracterizations and speculation cannot be the basis of

2  emergency relief. The Court need not address on an emergency basis the State's untimely and

3  unmeritorious objections to the Stalking Horse Parties' taking over interim management of the

4  Debtors' facilities.

5

6                                    II.

7                               BACKGROUND

8      A.  **The Bankruptcy Case**

9          On June 11, 2014, the Debtors filed, and served on the State, *Debtors' Motion For An Order:*

10 *(1) Authorizing Debtors' Entry Into Binding Plan Term Sheet; (2) Establishing Auction Sale and*

11 *Overbid Procedures; (3) **Approving Interim Management Agreement For Winning Bidder At The***

12 ***Auction**; (4) Approving Payment Of A Break-Up Fee And Expense Reimbursement In The Event Of*

13 *A Successful Overbid; (5) Approving Releases; and (6) Granting Related Relief* [Dkt. No. 364] (the

14 "Term Sheet Motion") (emphasis added).

15         The Term Sheet Motion sought, *inter alia*, approval of the Debtor's entry into the "Binding

16 Term Sheet" (the "Term Sheet"), the scheduling of an auction (the "Auction") to be held on July 28,

17 2014 (to establish the highest and best bid for the Debtors' estates), and the entry into an interim

18 management arrangement by the Debtors and the Stalking Horse Parties or winning bidder at the

19 Auction.  The State did not object to the Term Sheet Motion.

20         At a hearing held on July 2, 2014, the Court granted the Term Sheet Motion and on July 18,

21 2014, the Court entered its order granting that motion [Dkt. No. 487] (the "Term Sheet Order").  The

22 Term Sheet Order specifically provides:

23              *Authorization is granted for the Debtors' entry into an Interim Management*

24              *Agreement with the Plan Funders on the terms set forth in the Term Sheet (and*

25              *with a winning bidder at the Auction if the winning bidder so elects).*

26 Term Sheet Order ¶ 4 (emphasis added).

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

5

At the July 28, 2014 hearing, the Court determined that no qualifying overbid was timely submitted and, on July 31, 2014, the Court entered its order determining the Stalking Horse Parties to be the winning bidder [Dkt. No. 556].

On August 5, 2014, the Debtors filed and served, including upon the State, a *Notice of Debtors' Intent to Enter Into Interim Management Agreement and Management and Operations Transfer Agreement* (the "IMA Notice") [Dkt. No. 576]. Extensive conversations and negotiations ensued between the Debtors, the State, the federal government and the Stalking Horse Parties during the week following the filing of the State's formal objection. During this time, the urgency of having notice, so that careful planning could occur for a management changeover, was emphasized to the State.

Agreement was reached. On August 19, 2014, the Debtors and Stalking Horse Parties and the State, along with the federal government, filed a *Stipulation Resolving Concerns of DHCS and HHS re Form of Interim Management Agreement Proposed by Debtors* [Dkt. No. 607]. The parties submitted a revised form of IMA, "***to which revised form of IMA both DHCS and HHS do not object as to use during the period until a Sale's closing***." A copy of the Stipulation is appended hereto as Exhibit 1.

Nonetheless, more than a week later still, and 16 days after the State filed its formal objection to the IMA Notice, the State filed its "emergency" motion.

## B.    **Financial Regulatory Dispute**.

The dispute between the State and the management company for Rechnitz discussed in the declarations of Jean Iacino and Bob Sands relates to Rechnitz's alleged failure to file cost reports. At this time, there is only one single cost report that is allegedly outstanding, and it is controlled by an unrelated third party. All other documents and reports have been filed. Other than one cost report, there is not one document requested by DHCS that has not been filed or provided. The sole outstanding document is a report from a third party not owned or controlled by Rechnitz. DHCS has repeatedly refused since January 2014 to meet with Rechnitz to discuss this and related issues. Rechnitz has repeatedly agreed to provide any and all documents within his control to DHCS.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

DOCS_LA:281012.6 73538/001

1    On August 13, 2014 Rechnitz and counsel met with Kathleen Billingsley (Chief Deputy

2    Director of Policy and Programs for CDPH), Jean Iacino (declarant and Chief of Compliance), Scott

3    Vivona (former Chief of Field Operations for CDPH) and Belinda Whitsett (counsel for CDPH).

4    During this meeting, they discussed the pending acquisition in this bankruptcy proceeding, and at no

5    point did CDPH representatives raise any opposition to the pending acquisition.  Indeed, Rechnitz's

6    organization is an approved Temporary Manager by CDPH, and over the past seven years, CDPH

7    has retained Rechnitz's company numerous times to act as a Temporary Manager for distressed

8    facilities due to his company's expertise and management ability. This appointment has never been

9    rescinded and remains in effect today.

10    Jean Iacino's declaration contains the only statements related to patient care issues.

11    According to Ms. Iacino, one of Rechnitz's 57 facilities received a notice from CMS (the federal

12    government agency with respect to Medicare matters) (in April 2014) stating that the facility could

13    receive a denial of payment, civil money penalties, and/or a termination, if it failed to achieve

14    substantial compliance.  What Ms. Iacino failed to state is that the letter received by that facility is

15    the standard, routine form letter that every facility receives following an unsuccessful annual

16    Medicare survey.  In the past 24 months, nearly 600 facilities in California have received the same

17    form letter.

18    **III.**

19    **ARGUMENT**

20    The Emergency Motion should be denied for several reasons.

21    First, there is no emergency (and even if there were, it is entirely self-created).  The timing of

22    the Emergency Motion is outrageous.  Not a single material fact underlying the Emergency Motion

23    was unknown to the State in June when the Debtors filed the Term Sheet Motion asking for authority

24    to enter in an interim management agreement with the Stalking Horse Parties.  The only "new" fact

25    is the State's prospective 20% withhold on Medi-Cal reimbursements as to Rechnitz's other

26    facilities.  But the State knew everything it needed to know to take that action at the time that it was

27    required to object to the Term Sheet Motion.  It cannot create its own "new facts" to create an

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

DOCS_LA:281012.6 73538/001

1  emergency.  It does not constitute an emergency in any event: it creates at best a prospective

2  financial burden for Rechnitz contingent on numerous factors that are not ripe for consideration.

3          Second, any objection to the Stalking Horse Parties' interim management had to be made in

4  response to the Term Sheet Motion.  The State did not object and it did not appeal from the Term

5  Sheet Order.  It presents no facts or legal authority that would justify reconsideration or relief from

6  the judgment.

7          Third, refusing to permit the Stalking Horse Parties to assume interim management at this

8  point in time – one business day before the transition is to take place – is utterly untenable.  Planning

9  for the transition has been in process for weeks, in reliance on the Court's approval of the IMA and

10 the State's stipulation to its specific terms.  Pulling the plug on the transition without notice will

11 profoundly disrupt management of the facilities, the very result the State professes that it is seeking

12 to prevent.

13         Fourth, permitting the Stalking Horse Parties to assume interim management does not create

14 any risk either financially or in terms of patient care.  Pending a final transfer, the facilities'

15 employees will remain on the Debtors' payrolls, and collections and expenses will be segregated and

16 accounted for.  If necessary, re-transitioning can be conducted on an orderly basis.  And the State's

17 allegations do not relate to any concerns about the quality of operations at Rechnitz's facilities, and

18 certainly have no bearing whatsoever on patient care at the Debtor's Facilities.

19         Fifth, there is no need to decide anything other than interim management on an emergency

20 basis.  The sale motion has not even been filed.  The State's objections to the Stalking Horse Parties

21 are based on allegations that relate to a financial regulatory dispute concerning a single cost report.

22 To the extent the objections can still be made and are not barred by the Term Sheet Order, they

23 comprise objections to the sale motion that has yet to be filed, to be heard in a contested matter on

24 regular notice.  They are not properly raised and decided on one day's notice.

25         The audacious timing of the Emergency Motion evinces the singular purpose of extorting a

26 favorable resolution of the State's financial regulatory dispute with Rechnitz concerning cost reports

27 at his facilities.  It should be summarily denied.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

DOCS_LA:281012.6 73538/001

1    Character counts. Rechnitz treasures his reputation. Due to the State's recklessness in their

2    efforts to address a financial matter with respect to which Rechnitz has and will continue to be fully

3    cooperative, Rechnitz fears greatly that lay people and maybe legal professionals would read the

4    Emergency Motion and suspect Rechnitz of being of bad character. These defamatory statements

5    may not be actionable, but Rechnitz hopes that the Court could require that they be retracted and

6    make findings as to their being wholly without merit or support.

7

8                                             **IV.**

9                                      **CONCLUSION**

10    WHEREFORE, for all the foregoing reasons, Rechnitz respectfully requests that the Court

11    deny the Emergency Motion.

12

13    Dated:  August 28, 2014                 PACHULSKI STANG ZIEHL & JONES LLP

14                                            By:   */s/ Robert B. Orgel* _____

15                                                  Richard M. Pachulski
                                                    Robert B. Orgel

16

17                                                  Counsel for Shlomo Rechnitz

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

DOCS_LA:281012.6 73538/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

## DECLARATION OF MARK A. JOHNSON

I, MARK A. JOHNSON, declare:

1.      I am an attorney admitted to practice law in the State of California and am a partner at the law firm of Hooper, Lundy & Bookman, P.C., regulatory counsel to both the above-defined Debtors and the above-defined Stalking Horse Parties.

2.      The facts stated herein are of my own personal knowledge, and if called upon to testify, I could and would competently testify thereto.

3.      I am familiar with the issues raised by the declarations of Jean Iacino and Robert Sands.  For the past several months I have represented the Stalking Horse Parties or their subsidiaries or affiliates on the regulatory matters raised in the Emergency Motion.

4.      <u>Cost Reporting Issues</u>.

        a.      With regard to the cost reporting issues, there is only one single cost report that is allegedly outstanding, but it is controlled by a third party unrelated to Shlomo Rechnitz. All other documents and reports have been filed.  Other than one cost report, there is not one document requested by DHCS that has not been filed or provided.  The sole outstanding document is a report from a third party not owned or controlled by Mr. Rechnitz or his related entities.  It is my understanding that Mr. Rechnitz has been requesting a meeting with DHCS since January 2014 to discuss this and related issues and that DHCS has repeatedly refused such a meeting.  Robert Sands (declarant) has never met with me to discuss any concerns or, to my knowledge, with Mr. Rechnitz. My understanding is that Mr. Rechnitz has repeatedly agreed to provide any and all documents within his control to DHCS.

        b.      On Monday, August 25, 2014 the Audits and Investigations Branch of DHCS agreed to a meeting to discuss our position regarding the one contested cost report.  To my understanding, Mr. Rechnitz has provided DHCS notice that he authorizes DHCS to demand any and all relevant documents and has further agreed to support any request, including a subpoena or other such document, to enforce production of any and all documents required by DHCS.

DOCS_LA:281012.6 73538/001

c.    I will be prepared to speak more fully to the history of discussions with DHCS regarding this one contested cost report in Court at the hearing on the Emergency Motion.

5.    On Wednesday, August 13, 2014 at 3:00 p.m., Mr. Rechnitz and I met with Kathleen Billingsley (Chief Deputy Director of Policy and Programs for the California Department of Public Health ("CDPH")), Jean Iacino (declarant and Chief of Compliance), Scott Vivona (former Chief of Field Operations for the California Department of Public Health) and Belinda Whitsett (counsel for the California Department of Public Health) to discuss Mr. Rechnitz's operations.  During this meeting, we discussed the pending acquisition in this bankruptcy proceeding.  At no point during the meeting did CDPH representatives raise any opposition to the pending acquisition.  Moreover, we are in the process of scheduling follow up meetings to provide additional information to CDPH about the acquisition and the expanded infrastructure of Mr. Rechnitz's operations.

6.    Over the past seven years, CDPH has retained Mr. Rechnitz's company to act as a Temporary Manager for distressed facilities due to his company's expertise and ability to manage facilities.

7.    Over the past seven years, CDPH has engaged Mr. Rechnitz's company to act as a receiver for distressed facilities due to his company's expertise and ability to manage facilities.  In 2012, Mr. Rechnitz's organization was approved, at the request of CDPH, as a receiver for Central Coast Nursing Center (Chapman v. Central Coast Nursing Center, Santa Barbara County Superior Court,  Case No. 1382467) .  CDPH has repeatedly commended Mr. Rechnitz and his organization for their extraordinary efforts on behalf of Medi-Cal and Medicare beneficiaries and the State of California.  Kathleen Billingsley and Scott Vivona have stated to me on multiple occasions that his efforts have directly benefited patients in California.  Attached hereto as Exhibit "2" is the petition filed by CDPH.  According to CDPH, "The Department recommends Brius, LLC (Brius), through Shlomo Rechnitz, Chief Executive Officer, be appointed as the receiver.  Brius has an excellent background and reputation."  The petition further states: "Mr. Rechnitz is a highly qualified

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

DOCS_LA:281012.6 73538/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

1    individual and has an excellent background and reputation."  Despite accepting the appointment of

2    receiver in this case, neither Mr. Rechnitz nor Brius accepted any fee from CDPH for its services.

3        8.    Mr. Rechnitz's organization is an approved Temporary Manager by CDPH.  Attached

4    hereto as Exhibit "3" is the confirmation from CDPH approving Mr. Rechnitz's organization as a

5    Temporary Manager in the State of California.  This appointment allows CDPH to utilize Mr.

6    Rechnitz's organization to assume responsibility of distressed facilities to ensure appropriate patient

7    care.  CDPH has relied on Mr. Rechnitz's organization numerous times in the past five years to take

8    over operations of distressed facilities to ensure that patients are protected.  This appointment has

9    never been rescinded and remains in effect today.

10        9.    Jean Iacino's declaration contains the only statements related to patient care issues.

11    According to Ms. Iacino, one of Mr. Rechnitz's 57 facilities received a notice from CMS (the federal

12    government agency with respect to Medicare matters) (in April 2014) stating that the facility could

13    receive a denial of payment, civil money penalties, and/or a termination, if it failed to achieve

14    substantial compliance.  What Ms. Iacino failed to state is that the letter received by that facility is

15    the standard, routine form letter that every facility receives following an unsuccessful annual

16    Medicare survey.  In the past 24 months, nearly 600 facilities in California have received the same

17    form letter.

18        I declare under penalty of perjury that the foregoing is true and correct.

19        Executed this 28th day of August, 2014, at Los Angeles, California.

20

21        *[Mr. Johnson will be present in Court to attest*
22        *to the foregoing facts]*
       MARK A. JOHNSON

23

24

25

26

27

28

DOCS_LA:281012.6 73538/001

# EXHIBIT 1

1  RON BENDER (SBN 143364)
   MONICA Y. KIM (SBN 180139)
2  KRIKOR J. MESHEFEJIAN (SBN 255030)
   LINDSEY L. SMITH (SBN 265401)
3  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
4  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
5  Telephone:  (310) 229-1234;
   Facsimile:  (310) 229-1244
6  Email: rb@lnbyb.com; myk@lnbyb.com;
   kjm@lnbyb.com; lls@lnbyb.com
7  Attorneys for Chapter 11 Debtors and Debtors in Possession

8                    UNITED STATES BANKRUPTCY COURT
                       CENTRAL DISTRICT OF CALIFORNIA
9                          (SANTA ANA DIVISION)

10 | In re:                                        | ) Lead Case No.: 8:14-bk-11335-CB
11 |                                                | ) Jointly administered with:
   | Plaza Healthcare Center LLC,                   | ) Case No. 8:14-bk-11337-CB
12 |                                                | ) Case No. 8:14-bk-11358-CB
   |         Debtor and Debtor in Possession.       | ) Case No. 8:14-bk-11359-CB
13 | _____          | ) Case No. 8:14-bk-11360-CB
14 | ☒  Affects All Debtors                         | ) Case No. 8:14-bk-11361-CB
   |                                                | ) Case No. 8:14-bk-11362-CB
15 | ☐ Affects Belmont Heights Healthcare Center LLC | ) Case No. 8:14-bk-11363-CB
16 | ☐ Affects Claremont Healthcare Center Inc.     | ) Case No. 8:14-bk-11364-CB
   | ☐ Affects Country Villa East LP                | ) Case No. 8:14-bk-11365-CB
17 | ☐ Affects Country Villa Imperial LLC           | ) Case No. 8:14-bk-11366-CB
   | ☐ Affects Country Villa Nursing Center Inc.    | ) Case No. 8:14-bk-11367-CB
18 | ☐ Affects Country Villa Southbay LLC           | ) Case No. 8:14-bk-11368-CB
19 | ☐ Affects East Healthcare Center LLC           | ) Case No. 8:14-bk-11370-CB
   | ☐ Affects Los Feliz Healthcare Center LLC      | ) Case No. 8:14-bk-11371-CB
20 | ☐ Affects Mountainside Operating Company LLC   | ) Case No. 8:14-bk-11372-CB
   | ☐ Affects North Healthcare Center LLC          | ) Case No. 8:14-bk-11373-CB
21 | ☐ Affects North Point Health & Wellness Center | ) Case No. 8:14-bk-11375-CB
   | LLC                                            | ) Case No. 8:14-bk-11376-CB
22 | ☐ Affects Plaza Convalescent Center LP         | ) Chapter 11 Cases
   | ☐ Affects Plaza Healthcare Center LLC          | )
23 | ☐ Affects RRT Enterprises LP                   | ) **STIPULATION RESOLVING**
   | ☐ Affects Sheraton  Healthcare Center LLC      | ) **CONCERNS OF DHCS AND HHS**
24 | ☐ Affects South Healthcare Center LLC          | ) **RE FORM OF INTERIM**
25 | ☐ Affects Westwood Healthcare Center LLC       | ) **MANAGEMENT AGREEMENT**
   | ☐ Affects Westwood Healthcare Center LP        | ) **PROPOSED BY DEBTORS**
26 | ☐ Affects Wilshire Healthcare Center LLC       | )
   |                                                | ) [No Hearing Required]
27 |        Debtors and Debtors in Possession.      | )
28 | _____          |

                                      1

This Stipulation is hereby entered by and between the above-captioned, nineteen jointly administered chapter 11 debtors and debtors in possession (collectively, the "Debtors") through their counsel, the California Department of Health Care Services ("DHCS") through its counsel (the Attorney General of California), and the United States Department of Health and Human Services on behalf of the Centers for Medicare and Medicaid Services ("HHS") through its counsel (the United States Attorney's Office), and is consented to below by the "Stalking Horse Parties" (as defined in the "Binding Plan Term Sheet" (the "Term Sheet") attached as Exhibit "1" to the Declaration of Jerry Roles that was filed as Docket No. 371 in support of the Debtors' motion that was filed as Docket No. 364 (the "Motion")), through its counsel, with respect to the following premises:

A.    On July 18, 2014, the Court entered its order (the "IMA Order") approving the Motion [Docket No. 487], which specifically provides that "[a]uthorization is granted for the Debtors' entry into an Interim Management Agreement with the Plan Funders on the terms set forth in the Term Sheet."

B.    On July 31, 2014, the Court entered its order [Docket No. 556] approving the Stalking Horse Parties as the winning bidder to either become the counterparty to the Debtors in a sale transaction for acquisition of all or substantially all of the Debtors' assets (the "Sale") or to acquire control of such assets through a chapter 11 plan (the "Plan").

C.    On August 5, 2014, the Debtors filed a notice with the Court [Docket No. 576] (the "IMA Notice"), attaching as Exhibit 1 thereto a copy of a form of "Interim Management Agreement and Management and Operations Transfer Agreement" (the "Form Agreement") that they proposed as, among other things, the form of 'Interim Management Agreement' ("IMA"), referenced in the IMA Order and to serve as substantially the form of each individual agreement to be entered into prior to a Sale for each of the Debtors' facilities.

    i.    The Form Agreement (Section 3.3) already reflects that there will be no attempt to transfer the Debtors' Medicare and Medi-Cal provider agreements until a Sale Closing (which itself cannot occur absent further Court approval):  "[U]ntil the Sale Closing, the Provider Agreements shall remain the property of Licensee."

DOCS_LA:280581.2 73538/001

015

ii.    The text of the IMA Notice itself reflects in part, as follows, the Debtors' consistent position that the form of the management and operations transfer agreement ("<u>MOTA</u>") to be in effect after and upon any Sale would be subject to a further and separate Court order (distinct from the IMA Order), approving the form of such MOTA, as may be sought and possibly obtained in connection with the hearing on a motion to approve the Sale (such position referred to hereinafter as the "<u>Limited Nature of the IMA</u>"):

> For sake of ease, the Debtors and the Stalking Horse Parties agreed to combine the form of Interim Management Agreement and the form of a Management and Operations Transfer Agreement (commonly known as a "MOTA") into one document. However, the MOTA provisions in the Form Agreement, by their terms, will not take effect until the ultimate consummation of a transaction between the Debtors and the Stalking Horse Parties pursuant to which the Stalking Horse Parties become the owners of the Facilities and related assets. Using the Form Agreement, the Debtors and the Stalking Horse Parties will enter into nineteen, separate Interim Management Agreements.

iii.    The IMA Notice also contemplates that the Debtors will consider and  possibly address creditor concerns regarding the form of the IMA:

> Understanding that the Debtors' entry into an Interim Management Agreement with the Stalking Horse Parties already has been approved by the Court, if any party has any objection to the particular Form Agreement, agreed upon by the Debtors and the Stalking Horse Parties, or any provision thereof, the Debtors request that such party contact any or all of the people identified below as representatives of the Debtors and the Stalking Horse Parties by no later than Tuesday, August 12, 2014, to discuss and attempt to resolve any such objection.

D.    On or before August 7, 2014, DHCS and HHS expressed to the Debtors certain concerns regarding the Form Agreement.

**NOW THEREFORE, THE DEBTORS, DHCS AND HHS, WITH THE CONSENT OF THE STALKING HORSE PARTIES, HEREBY STIPULATE AND AGREE AS FOLLOWS**:

1.    To clarify the Limited Nature of the IMA and make other minor changes or corrections, the Debtors have revised the Form Agreement for the IMA to include the changes

reflected in the redlined form of IMA attached hereto as **Exhibit A**, to which revised form of IMA

both DHCS and HHS do not object as to use during the period until a Sale's closing.  **Exhibit A**

adds to the Form Agreement, among other things, a new Section 2.6:

> 2.6    This Agreement is intended to serve as the "Interim Management
> Agreement" referenced in an order entered in the Bankruptcy Case by the Court on
> July 18, 2014 [Docket Number 487] . . . .  This Agreement also is intended to serve
> as a management and operations transfer agreement ("MOTA") in the event of a
> Sale Closing; however, this Agreement will be used as a MOTA only after notice
> and a hearing, and after the Court's consideration of any objections of interested
> parties.  ABSENT FURTHER COURT ORDER AUTHORIZING USE OF THIS
> FORM OF AGREEMENT IN CONNECTION WITH A SALE TRANSACTION
> OR AUTHORIZING USE OF A FORM OF THIS AGREEMENT TO WHICH
> THIS AGREEMENT IS AMENDED, THERE SHALL OCCUR AN EARLY
> CANCELLATION DATE HEREOF (AS PROVIDED HEREIN) AND THIS
> AGREEMENT, IN ITS CURRENT FORM, WILL NOT BE IN EFFECT UPON
> OR AFTER A SALE CLOSING.

2.    Entry of the IMA Order by its terms expressly was <u>not</u> a determination, <u>and</u>

<u>execution of an IMA will not be a determination</u>, regarding whether, either upon closing of the Sale

or upon the effective date of the Plan, regardless of which occurs, there will or will not be successor

liability for the Stalking Horse Parties or joint and several liability of the Stalking Horse Parties and

the Debtors or whether the Court has jurisdiction to decide such issues, in each case on account of

any Medi-Cal Provider Agreements, Medi-Cal overpayments, or quality assurance fees (the "<u>DHCS</u>

<u>Issues</u>"), and all rights as to the DHCS Issues of the DHCS are preserved.

3.    Entry of the IMA Order by its terms expressly was <u>not</u> a determination, <u>and</u>

<u>execution of an IMA will not be a determination</u> of whether, either upon a closing of the Sale or

upon the effective date of the Plan, regardless of which occurs, there will or will not be successor

liability for the Stalking Horse Parties on account of any Medicare Provider Agreement(s) or of

any overpayments, cure amounts, rights of recoupment and setoff, and/or any other compliance

requirements under applicable Medicare statute, regulations, policies and procedures

(collectively, the "<u>Medicare Issues</u>"); and all rights as to the Medicare Issues of HHS are

preserved.

4

DOCS_LA:280581.2 73538/001

017

1

Dated:    August 19 2014                          PLAZA HEALTHCARE CENTER LLC, ET AL.

2

3

                                                  By:   /s/ Ron Bender

4                                                 Ron Bender
                                                  Monica Y. Kim
5                                                 Krikor J. Meshefejian
                                                  Lindsey L. Smith
6                                                 Levene, Neale, Bender, Yoo & Brill L.L.P.

7
                                                  Attorneys for Chapter 11 Debtors
8                                                 and Debtors in Possession

9

10   Dated:    August 18, 2014                      STEPHANIE YONEKURA
                                                  ACTING UNITED STATES ATTORNEY
11                                                LEON W. WEIDMAN
                                                  ASSISTANT UNITED STATES ATTORNEY
12                                                CHIEF, CIVIL

13

14                                                By:   Elan S Levey

15                                                ELAN S. LEVEY
                                                  Assistant United States Attorney
16

17                                                Attorneys for United States Department of Health
                                                  & Human Services, on behalf of Centers for
18                                                Medicare and Medicaid Services

19

20

21

22

23

24

25

26

27

28

                                            5

DOCS_LA:280581.2 73538/001

018

1   Dated: August 19, 2014              KAMALA D. HARRIS
2                                       ATTORNEY GENERAL OF CALIFORNIA
3
4                                       By: _Elisa Donato_
5                                       DIANE S. SHAW
                                        Supervising Deputy Attorney General
6                                       ELISA B. WOLFE-DONATO  Deputy  Attorney
                                        General State Bar No. 120357
7                                       California Department of Justice
8                                       300 South Spring Street, Suite 1702
                                        Los Angeles, CA  90013-1256
9                                       Telephone:  (213) 897-0633
                                        Fax:  (213) 897-5775
10                                      E-mail:  Elisa.Wolfe@doj.ca.gov
11
                                        Attorneys for Creditor
12                                      California Department of Health Care Services
13
14  CONSENT:
15
        The Stalking Horse Parties consent to the foregoing.
16
17  Dated:    August 15 2014            PACHULSKI STANG ZIEHL & JONES LLP
18
19                                      By: _____
20                                      Richard M. Pachulski (CA Bar No. 90073)
                                        Dean A. Ziehl (CA Bar No. 84529)
21                                      Robert B. Orgel (CA Bar No. 101875)
                                        10100 Santa Monica Blvd., 13th Floor
22                                      Los Angeles, CA 90067-4003
                                        Telephone:  (310) 277-6910
23                                      Facsimile:  (310) 201-0760
24                                      Attorneys for Shlomo Rechnitz
25
26
27
28

                                        6

Case 8:14-bk-11335-CB    Doc 607    Filed 08/19/14    Entered 08/19/14 17:08:17    Desc
Main Document    Page 7 of 47

# EXHIBIT A

## FORM INTERIM MANAGEMENT AGREEMENT AND
## MANAGEMENT AND OPERATIONS TRANSFER AGREEMENT

### [*INSERT NAME OF FACILITY*]

This INTERIM MANAGEMENT AGREEMENT AND MANAGEMENT AND OPERATIONS TRANSFER AGREEMENT (this "**Agreement**") is made and entered into as of this [_____] day of [_____], 2014 (the "**Effective Date**"), by and between [*Insert legal name of facility and dba name*], a California [_____], (the "**Licensee**") and [*Insert ~~legal~~ Shlomo Rechnitz or his assignee, as applicable*], a California [_____], ("**New Operator**" and, together with the Licensee, the "**Parties,**" and each a "**Party**"), with reference to the following facts:

### RECITALS

**A.**      **WHEREAS**, Licensee (also a "**Debtor**") and a number of its affiliates (collectively the "**Debtors**") each have filed separate voluntary chapter 11 bankruptcy cases (in the United States Bankruptcy Court, Central District, Santa Ana Division (the "**Court**") as to which Debtor's bankruptcy case is Case No. 8:14-bk – [_____] CV (the "**Bankruptcy Case**"); and

**B.**      **WHEREAS**, Licensee is the operator of that certain skilled nursing facility known as [_____], located at [_____] (the "**Facility**") under a license and permits (collectively, the "**License**") from the California Department of Public Health ("**CDPH**").  Prior to commencement of the Bankruptcy Case, the Licensee leased the Facility (the "**Prepetition Lease**") as tenant from [_____] (the "**Landlord**"); and

**C.**      **WHEREAS**, in connection with prosecuting such Bankruptcy Case, Licensee is a party to that certain "Binding Plan Bid Term Sheet" dated ~~[May 30, 2014]~~, a true and correct copy of which is attached hereto as **Exhibit "1"** (the "**Bid Term Sheet**") by and among the Licensee and its affiliates and [Shlomo Rechnitz] as the "Plan Funders"; and

**D.**      **WHEREAS,** pursuant to the Bid Term Sheet, control of substantially all of the Licensee's assets (including its assets related to the Facility) will be obtained by the Plan Funders or their assignees (a "**Control Change**") either (1) through the vesting in the Plan Funders or their assignees of the equity interests in the Debtors (the "**Equity Transaction**") on or following the effective date of a chapter 11 plan providing therefor (the "**Equity Closing**"), which Equity Closing itself would occur only after entry of an order confirming a chapter 11 plan (the "**Confirmation Order**") or (2) upon the closing of transactions (the "**Sale Closing**") of a sale to the Plan Funders or their assignees of all or substantially all of the Debtors' assets, and the assumption by the Debtors and assignment to the Plan Funders or their assignees of selected contracts or leases of the Debtors (the "**Sale Transaction**") on or following entry of an order approving the Sale Transaction (the "**Sale Order**") (which Sale Order may be, *inter alia*, in the form of a Confirmation Order if the Sale Transaction is authorized under a chapter 11 plan); and

~~DOCS_LA:279581.12 73538/001~~
DOCS_LA:279581.17 73538/001

**E.**    **WHEREAS,** Section 13 of the Bid Term Sheet provides that, consistent with achieving a Sale Closing or Equity Closing (each, a "**Closing**") and prior thereto, the Plan Funders or their assignee and Debtor shall or may enter into an interim management agreement for the Plan Funders to manage the Facility prior to a Closing; and

**F.**    **WHEREAS,** Section 3b and Section 17 of the Bid Term Sheet provide that if the Plan Funders seek to accomplish a Control Change through a Sale Transaction, then the Plan Funders and the Licensee shall enter into a usual and customary management and operations transfer agreement to be in effect upon and after the Sale Closing; and

**G.**    **WHEREAS**, in the event that a Closing occurs, effective thereupon, the Prepetition Lease will ~~be~~ have been assumed by the Debtor and assigned (as assigned, the "**Assigned Lease**") to _____ (the "**Sub Landlord**") or a new lease (the "**New Lease**") will become effective for the Facility as between the Landlord and the Sub Landlord, (2) Sub Landlord, as landlord, will sublease the Facility to New Operator under the terms of a new sublease (the "**Sublease**"), and (3) New Operator and Licensee will enter into a further sublease of the Facility, the form of which is attached hereto as **Exhibit "2"** and incorporated herein by this reference (the "**Interim Sub-Sublease**"); and

**H.**    **WHEREAS**, consistent with the Bid Term Sheet, the New Operator under this ~~Agrement~~ Agreement is the [Plan Funders or their assignee] and, in order to facilitate a transition of operational and financial responsibility from Licensee to New Operator in a manner that will ensure the continued operation of the Facility after the Operations Transfer Date (defined below) in compliance with applicable law and in a manner which does not jeopardize the health and welfare of the residents of the Facility, Licensee and New Operator are desirous of documenting the terms and conditions pursuant to which New Operator will manage the Facility for Licensee as of the Operations Transfer Date and certain other terms and conditions relevant to the transition of operational and financial responsibility from Licensee to New Operator.

**NOW, THEREFORE**, in consideration of the foregoing premises and the mutual covenants of the Parties set forth herein, **IT IS HEREBY AGREED AS FOLLOWS**:

1.    **DEFINITIONS AND RULES OF CONSTRUCTION**

1.1    For purposes of this Agreement, capitalized terms shall have the meanings defined in this Agreement, including the following:~~.~~

1.1.1.    "**Early Cancellation Date**" means a date selected by the Parties for termination of this Agreement upon their further written agreement therefor, or the first date as of which a Closing no longer can occur under the Bid Term Sheet.

1.1.2.    "**Lease**" shall means the lease of the Facility from the Landlord then in effect, whether the Prepetition Lease, Assigned Lease or New Lease. References in this Agreement to standards or requirements of the "Lease" shall be to the higher standards or more stringent requirements of the Lease, Sublease or Interim Sub Sublease, as applicable, provided

~~DOCS_LA:279581.12 73538/001~~

DOCS_LA:279581.17 73538/001

that if there is a direct conflict in the terms of such leases that is not resolved by this rule of construction, the terms of the Lease then in effect with the Landlord shall control.

          1.1.3.  "**Licensure Date**" shall be the date upon which CDPH issues the New License (defined below).

          1.1.4.  "**Manager Approvals**" means the New Operator's receipt of all of (i) the New License for the New Operator, (ii) a tie-in notice as to the Provider Agreements (defined below) for the New Operator, (iii) the authority for the New Operator to bill the Centers for Medicare and Medicaid Services and the Medicare program in the New Operator's name for goods or services provided at or in connection with the Facility, and (iv) the New Operator's right to provide and be paid for providing at the Facility goods and services to Medicare beneficiaries.

          1.1.5.  "**MOTA Provisions**" are the provisions of this Agreement set forth in **Addendum A** to this Agreement.

          1.1.6.  "**MOTA Termination Date**" means the first date as of which has occurred the Manager Approvals, unless the Parties select a later date.

          1.1.7.  "**New License**" means all licenses to, and permits for, the New Operator from CDPH as necessary to permit its operation of the Facility.

          1.1.8.  "**Operations Transfer Date**" shall be [_____ __], 2014.

          1.1.9.  "**Provider Agreements**" mean, collectively, the Licensee's Medicare and Medi-Cal provider agreements and Licensee's Medicare and Medi-Cal provider numbers.

          1.2  All capitalized terms not defined in this Agreement shall have the meanings ascribed to them in the Bid Term Sheet (defined below).  If there is a conflict between terms defined herein and in the Bid Term Sheet, the terms expressly defined in this Agreement shall control as used herein only.

          1.3  If there is a conflict between the MOTA Provisions, when applicable, and the other provisions of this Agreement, the MOTA Provisions shall control.

          1.4  The Bid Term Sheet (**Exhibit "1"**) is incorporated herein by reference. In the event of any conflict between the Bid Term Sheet and this Agreement other than as to defined terms, the Bid Term Sheet shall control.

2.      **TERM, MOTA PROVISIONS, AND MEDICARE / MEDI-CAL OPERATIONS**

          2.1  This Agreement shall be in effect from the Effective Date and shall terminate if an Early Cancellation Date occurs.

3

2.2  If the Operations Transfer Date is a date prior to the date of a Closing, then, from the Effective Date until a Closing, all of this Agreement's provisions shall be in effect <u>other than</u> the MOTA Provisions set forth on **Addendum A,** but, if a Sale Closing ~~occurs~~<u>is authorized and occurs, and the current form of this Agreement is authorized for use in connection with such Sale Closing, then</u>, from the date ~~thereof~~<u>of such Sale Closing</u>, all of the provisions of this Agreement, including the MOTA Provisions, shall be in effect.

2.3  If the Operations Transfer Date is a date on or after ~~a~~ <u>an authorized</u> Sale Closing <u>and if the form of this Agreement has been approved in connection therewith</u>, then, from the Effective Date, all of the provisions of this Agreement, including the MOTA Provisions, shall be in effect.

2.4  As more fully set forth in <u>Section 3</u>, under this Agreement, New Operator shall manage the Facility for Licensee until, absent occurrence of an Early Cancellation Date, the Equity Closing in the event of an Equity Transaction and the Licensure Date in the event of <u>authorization for and the occurrence of</u> a Sale Transaction.

2.5  In the event <u>of authorization for and the occurrence</u> of a Sale Closing, after the Licensure Date and until occurrence of the Manager Approvals, Licensee and New Operator shall continue to operate under this Agreement for the sole purposes of continued cooperation and management of billing and collection of receivables from Medicare and Medi-Cal and the handling of Medicare and Medi-Cal payments (the "**Medicare / Medi-Cal Operations**").

<u>2.6    This Agreement is intended to serve as the "Interim Management Agreement" referenced in an order entered in the Bankruptcy Case by the Court on July 18, 2014 [Docket Number 487] that specifically provides that "[a]uthorization is granted for the Debtors' entry into an Interim Management Agreement with the Plan Funders on the terms set forth in the Term Sheet." This Agreement also is intended to serve as a management and operations transfer agreement ("MOTA") in the event of a Sale Closing; however, this Agreement will be used as a MOTA only after notice and a hearing, and after the Court's consideration of any objections of interested parties.    ABSENT FURTHER COURT ORDER AUTHORIZING USE OF THIS FORM OF AGREEMENT IN CONNECTION WITH A SALE TRANSACTION OR AUTHORIZING USE OF A FORM OF THIS AGREEMENT TO WHICH THIS AGREEMENT IS AMENDED, THERE SHALL OCCUR AN EARLY CANCELLATION DATE HEREOF (AS PROVIDED HEREIN) AND THIS AGREEMENT, IN ITS CURRENT FORM, WILL NOT BE IN EFFECT UPON OR AFTER A SALE CLOSING.</u>

3.    **MANAGEMENT OF THE FACILITY**

3.1  Commencing on the Operations Transfer Date and ending on the earlier of the Early Cancellation Date, the Equity Closing and the Licensure Date (the "**Management Period**"), Licensee hereby appoints New Operator as its sole and exclusive manager of the Facility. Licensee shall cooperate with New Operator in all respects to facilitate the transition of management of the Facility from Licensee to New Operator.

3.2  In connection with New Operator's assumption of operational and financial responsibility for the Facility, as of the Operations Transfer Date, Licensee shall immediately allow New Operator to use the Licensee's Provider Agreements. Notwithstanding the foregoing, subject to applicable law, Licensee shall remain ultimately responsible for the daily operational decisions and the care delivered to the residents at the Facility during the Management Period and accordingly, Licensee shall have the right to confer and consult with New Operator on any administrative, business, or management matters concerning the operation of the Facility during the Management Period; provided, however, such ultimate responsibility shall not relieve New Operator from its obligations specified in this Section 3, all of which shall apply during the Management Period.

3.3  On the Operations Transfer Date, Licensee acknowledges that it will be transferring to New Operator management of its operations of the Facility but not its Provider Agreements.  From the Operations Transfer Date until an Equity Closing or occurrence of all of the Manager Approvals (and thus even after a Sale Closing), the Parties agree that New Operator shall be entitled to bill for and receive payment with respect to the Licensee's License and the Provider Agreements.  In the event of a Sale Closing:  (a) until the Sale Closing, the Provider Agreements shall remain the property of Licensee; (b) upon the Sale Closing, Licensee will assign the Provider Agreements to the New Operator; (c) on the Licensure Date, New Operator will assume sole and complete liability pursuant to applicable law for assignment and assumption of the Provider Agreement, provided that that Licensee will remain liable for any obligations arising prior to the Operations Transfer Date under the Provider Agreements; and (d) nonetheless, after the Licensure Date and until occurrence of the Manager Approvals, Licensee and New Operator shall continue the Medicare / Medi-Cal Operations.

3.4  New Operator shall arrange, at its sole cost and expense, for the provision during the Management Period (and, in the event of a Sale Transaction, as to the Medicare and Medi-Cal Matters, until receipt by New Operator of the Manager Approvals) of the bookkeeping, accounting, and administrative functions as reasonably necessary for the efficient and proper operation of the Facility, including, but not limited to, the following:

3.4.1.  Preparation and maintenance of business records and financial and other reports;

3.4.2.  Establishment and administration of accounting procedures and controls;

3.4.3.  Financial and business planning;

3.4.4.  Processing and payment of accounts payable;

3.4.5.  Billing, processing and collection of accounts receivable, including the billing and completion of any reports and forms that may be required by insurance companies, governmental agencies, or other third-party payors; and

3.4.6.  Providing and processing of all employee record keeping, payroll accounting (including social security and other payroll tax reporting), and benefits for all employees of the Facility.

3.5  New Operator shall arrange for the maintenance, repair, trash removal, and janitorial services during the Management Period that may be necessary to maintain the Facility and equipment in a clean and safe condition and in good repair in accordance with the standards established by the Lease.  New Operator shall arrange for laundry service for the Facility.  Any replacement of or purchase of additional equipment shall require the mutual approval of Licensee (which approval shall not be unreasonably withheld, conditioned or delayed) and of Landlord (subject to the Lease).

3.6  New Operator shall arrange for the utilities during the Management Period reasonably required for operation of the Facility, including, but not limited to, telephone, electricity, gas, water and refuse disposal.

3.7  New Operator shall arrange for the provision and replenishment, as New Operator deems necessary, during the Management Period of all supplies and inventory used in the Facility.  On the Operations Transfer Date, Licensee shall ensure that the supplies and inventory at the Facility, including, without limitation, perishable food, non-perishable food, central supplies, linen, housekeeping and other supplies, in each case, as of the Operations Transfer Date, is in condition, quantity and quality sufficient to meet the regular operating needs of the Facility as required by applicable law.

3.8  New Operator shall be responsible for all aspects of administration of employees with respect to the Facility, including hiring, training, supervision, and termination.  Termination decisions with respect to employees at the Facility shall be made by New Operator in a manner consistent with applicable policies at the Facility.  In the event of a Sale Closing, subject to the provisions of Section 10 below and Section 3h 1) of the Bid Term Sheet (as to the Licensee's employment of a "**Collection Team**"):  (a) New Operator shall hire as employees-at-will all employees that New Operator determines to be necessary to effectively and efficiently operate the Facility during the Management Period; (b) all employees so hired shall be employed by New Operator except as otherwise determined by New Operator and Licensee including that persons associated with the New Operator or its affiliates who are not permanently assigned to the Facility may provide general supervision with respect to the Facility and its operations and management; and (c) during the Management Period, New Operator shall maintain worker's compensation insurance as required by law or under the Lease and employer's liability insurance in accordance with the New Operator's standard policy.

3.9  New Operator, on behalf of the Facility shall arrange for maintenance during the Management Period of the payroll records of all employees, for the issuance of paychecks on a twice monthly basis, and for the payment and withholding from such paychecks of appropriate amounts for income tax, social security, unemployment insurance, and for all benefits, including vacation, holidays, and other benefits in accord with the approved policies.

DOCS_LA:279581.12 73538/001

DOCS_LA:279581.17 73538/001

3.10 New Operator shall have the right to revise the fee schedules for the services rendered by the Facility, provided that New Operator shall consult with Licensee before doing so.

3.11 New Operator may with the consent of Licensee change the name of the Facility during the Management Period to a name it chooses, provided, however, that any changed name, before or after the Licensure Date, shall not include the words "**Country Villa**" unless both the New Operator and Licensee agree/consent.

3.12 During the Management Period, New Operator shall pay to Landlord the rent due under the Lease in a timely manner in accordance with the terms thereof and shall otherwise fulfill the obligations imposed on the tenant under the Lease whether or not the Sale Closing has occurred.

3.13 In conformity with applicable law, Licensee and New Operator shall not discriminate against Medicare and Medi-Cal patients who request services at the Facility.

3.14 During the Management Period, New Operator shall comply with any and all codes, ordinances, rules, regulations, and requirements of all federal, state, and municipal authorities now in force, or which may hereafter be in force, pertaining to the Facility and its operations.

3.15 New Operator shall comply with the terms and provisions of the Lease during the Management Period.

3.16 Throughout the Management Period, Licensee shall maintain a possessory interest in the Facility, which, in the event of a Sale Transaction with respect to the Facility, shall continue until the Licensure Date.

4.    **BILLINGS, COLLECTIONS AND ACCOUNTS RECEIVABLE**

4.1    New Operator shall, on behalf of Licensee, use its good faith efforts to bill patients and payors, and collect all cash revenue resulting from Facility operations (a) during the Management Period and (b) in the event of a Sale Closing, as to the Medicare / Medi-Cal Operations, after the Licensure Date and until occurrence of the Manager Approvals (the "**Medicare / Medi-Cal Operating Period**").  Licensee agrees to cooperate with New Operator to make available such billing and accounting information and to provide such financial records for review as shall be necessary to accomplish the billing and collection of patient charges for services provided for in this Section 4.1 and to cooperate with New Operator in the completion of reports and claim forms as necessary to procure payments and reimbursement from governmental agencies, insurance carriers or other third party payors.   Licensee hereby authorizes New Operator during the Management Period and, in the event of a Sale Closing, during the Medicare / Medi-Cal Operating Period (collectively, the "**Operating Periods**") to do the following:

7

4.1.1.  To bill patients in Licensee's name, on Licensee's behalf, and under the appropriate Provider Agreements, specifically including services provided to Medicare and Medi-Cal patients during the Operating Periods, and the resulting revenue will be treated as revenue of Licensee (subject to New Operator's right to direct the use of such funds as herein provided and subject to New Operator's right to the Management Fee pursuant to <u>Section 5</u> hereof).

4.1.2.  To collect accounts receivable resulting from billing both before and during the Operating Periods in Licensee's name and on Licensee's behalf;

4.1.3.  To receive payments from insurance companies, prepayments from health care plans, and payments from all other third party payors for such services provided during the Operating Periods;

4.1.4.  To take possession of and endorse in the name of Licensee any notices, checks, money orders, insurance payments, and other instruments received in payment of the accounts receivable resulting from such billings during the Operating Periods and deposit them directly in New Operator's account; and.

4.1.5.  To initiate legal proceedings in accordance with policies approved by the Licensee to collect any accounts or monies owed to the Facility or Licensee related to the Facility during the Operating Periods.

4.2     Reference is made to the provisions in the Bid Term Sheet, including but not limited to <u>Section 3h</u> of the Bid Term Sheet, which is set forth below at <u>Section 4.4</u>, which Bid Term Sheet is incorporated herein by reference.  On the Operations Transfer Date, Licensee shall execute such documentation as may be required by its depository banks to add such person or persons designated by New Operator as an additional signatory on any depository bank account of Licensee in which is deposited payments, including by Medicare or Medi-Cal, for services rendered by Licensee on and after the Operations Transfer Date (collectively, the "**Licensee's Depository Bank Account**").  All of the Licensee's cash in Licensee's Depository Bank Account prior to the Operations Transfer Date may be withdrawn by Licensee (as New Operator will have no right to collections received prior to the Operations Transfer Date for services provided prior to such date).  From the Operations Transfer Date until an Early Cancellation Date, if any, Licensee shall not, without court approval, withdraw funds from Licensee's Depository Bank Account, issue checks on Licensee's Depository Bank Account, or otherwise instruct the bank with respect to the disposition of any funds deposited into Licensee's Depository Bank Account.  Nothing herein shall prohibit Licensee from withdrawing any funds in the Licensee's Depository Bank Accounts up to the Operations Transfer Date, so that, on the Operations Transfer Date, Licensee's Depository Bank Account is at a zero balance.

<u>4.3</u>     <u>Subject to Section 3h of the Bid Term Sheet, Licensee shall cooperate with New Operator to establish a weekly transfer of all remittances received from third party payors, including Medicare and Medi-Cal, or the applicable fiscal intermediary, for services rendered at the Facility.</u>

DOCS_LA:279581.12 73538/001

DOCS_LA:279581.17 73538-001

4.4    ~~4.3~~New Operator shall have the right to open one or more bank accounts for the Facility in the name of Licensee (the "**Management Account**"), the authorized signatories of which shall consist solely of persons designated by New Operator.  Licensee agrees that it will not take any actions that ~~interferes~~ interfere with the transfer of funds for services rendered by New Operator after the Operations Transfer Date into the Management Account, nor will Licensee remove, withdraw or authorize the removal or withdrawal of any such funds from the Management Account.  Any amounts relating to operations of the Facility after the Operations Transfer Date that are deposited into any of Licensee's bank accounts over which New Operator does not have control shall promptly, but in no event in more than two (2) business days after such deposit, be transferred by Licensee into the Management Account.  Licensee authorizes New Operator to endorse checks made payable to Licensee and to deposit the same into the Management Account.

4.5    *4.4*All cash revenue received during the Operating Periods related to operating revenues for services rendered by the Facility shall be under the control of New Operator, shall be disbursed to New Operator, and shall be owned by New Operator, subject to Section 3h of the Bid Term Sheet, specifying the identification, collection, disbursement and ownership of operating revenues for services rendered by the Licensee prior to the Operating Transfer Date.  A copy of Section 3h of the Bid Term Sheet is set forth below and is incorporated herein:

"h.        Collection of Purchased Receivables and Accounts Receivable Adjustment.

1.        Collection of Purchased Receivables. Notwithstanding any contrary provisions hereof, regardless of whether there first occurs a Sale Effective Date, Plan Effective Date or Interim Management Agreement Effective Date~~, or~~ [which is the Operations Transfer Date ~~(, whether as an IME or a MOTA)~~ that first occurs before or upon the Sale Effective Date] during the first one hundred eighty (180) days following the earliest to occur of the Sale Effective Date, the Plan Effective Date and the Interim Management Agreement Effective Date (the "Relevant Collection Period"), the Debtors shall collect for the Plan Funders or their applicable designees the Purchased Receivables with up to four of the Debtors' employees (the "Collection Team") and turn over such collections, and provide a written report with respect thereto, to the Plan Funders or their applicable designees daily (excluding weekends and holidays).  Reductions to the amount of any of the Purchased Receivables or other decisions or agreements relating to the Purchased Receivables that would otherwise affect the Assets or the business of the Plan Funders or their designees only may be made by the Collection Team with the approval of the Plan Funders or any of their applicable designees.  The Plan Funders shall reimburse the Debtors monthly in arrears for the costs of the services of the Collection Team and shall endeavor in good faith not to encourage, suggest to, or influence any account debtor as to a Facility to pay another receivable owing with respect to such Facility in lieu of paying a Purchased Receivable so owing.  The number (up to four), identity and remuneration of the Collection Team members shall be mutually and reasonably agreed by the Debtors and the Plan Funders, provided

9

that any disagreement or dispute with respect thereto shall be resolved solely by the Bankruptcy Court with no right of appeal. Absent the applicable Debtor's consent, the Plan Funders or their designees may hire members of the Collection Team only for periods beginning after the end of the Relevant Collection Period. The Parties agree that all funds received from collections of the Purchased Receivables shall be applied as the payor indicates. Absent such indication by the payor, (i) funds received from collections during the first ninety (90) days of the Relevant Collection Period shall be applied to the oldest outstanding account receivable owing by the applicable account debtor (*i.e.,* applied to such accounts receivable on a first in, first out (FIFO) basis) and (ii) funds received from collections during the next ninety (90) days (days ninety-one to day one-hundred eighty (91 – 180)) of the Relevant Collection Period shall be applied to the most recent outstanding account receivable owing by the applicable account debtor (*i.e.,* applied to such accounts receivable on a last in, first out (LIFO) basis).

        2.    <u>Accounts Receivable Adjustment</u>. If the actual collections received by the Plan Funders or their applicable designees from the Purchased Receivables during the Relevant Collection Period are less than twenty-seven million dollars ($27,000,000.00), the difference shall be paid to the Plan Funders as a downward adjustment to the Cash Component. The total sum of seven million dollars ($7,000,000.00) shall be retained by LNBYB in a segregated trust account (the <u>"Receivables Trust Account"</u>) until the end of the Relevant Collection Period to provide a source of payment to the Plan Funders in the event of such a downward adjustment to the Cash Component. If the actual collections received by the Plan Funders or their applicable designees from the Purchased Receivables during the Relevant Collection Period are more than twenty-seven million dollars ($27,000,000.00) the difference shall be paid by the Plan Funders to the Debtors as an upward adjustment to the Cash Component, with such payment to be made by the Plan Funders to the Debtors no later than three (3) business days following the Debtors' delivery to the Plan Funders and their applicable designees of the Final Receivables Accounting (defined below in this paragraph). This contingent upward adjustment liability shall be a joint and several liability for all of the Plan Funders and shall be personally guaranteed by the principals of each of the Plan Funders. The downward and upward adjustment to the Cash Component described in this <u>paragraph 3.h2</u>) shall be referred to and defined herein as the "<u>Accounts Receivable Adjustment</u>". Any funds remaining in the Receivables Trust Account after the Accounts Receivable Adjustment shall be added to and become part of the Plan Cash. The Debtors shall provide the Plan Funders and the Creditors Committee with a detailed report of the collections received by the Plan Funders from the Purchased Receivables by the 10th day of each month covering the prior calendar month together with a written status report outlining any disputes the Collection Team is having with any account debtors. No later than ten (10) days following the end of the Relevant Collection Period, the Debtors shall provide the Plan Funders and the Creditors Committee with a

10

detailed report and final accounting of all of the collections received by the Plan Funders from the Purchased Receivables together with a final written status report outlining any disputes the Collection Team is having with any remaining account debtors (the "Final Receivables Accounting")."

4.6 ~~4.5~~If the Early Cancellation Date occurs, as of such date all of the Licensee's ~~amounts~~ accounts receivable collected by New Operator (as determined in accordance with Section 3h of the Bid Term Sheet) shall be due and immediately paid to Licensee, New Operator's name shall be removed by Licensee as a signer on all of the Licensee's ~~Bank Accounts~~bank accounts, and the Parties shall work cooperatively to unwind the transfer to New Operator of management and liability for matters with respect to the Facility.

## 5.    MANAGEMENT FEE

5.1  Reference is made to the provisions in the Bid Term Sheet, which Bid Term Sheet is incorporated herein by reference.  For its services under Sections **3** and **4**, New Operator shall be entitled to a fee from Licensee (the "**Management Fee**") equal to the Facility's operating revenues during the Management Period, as determined under this Agreement, less all operating expenses, including the rent and related expenses due under the terms of the Lease, resulting from operation of the Facility during the Management Period, calculated in accordance with New Operator's standard bookkeeping practices and this Agreement, including Section 11.

5.2  Subject to the provisions of this Agreement, including Section 11, (a) if the Facility incurs losses during the Management Period, New Operator shall be responsible for such losses and shall indemnify Licensee from all claims, demands, liability, and losses related thereto, and (b) New Operator shall pay all of the New Operator's obligations under the Lease and any license renewal fees arising during the Management Period.  Any expense that relates to operation of the Facility for the period prior to the Operations Transfer Date shall be borne and paid by Licensee.

5.3  The Management Fee is based upon revenues earned and expenses incurred during the Management Period, as determined in accordance with New Operator's standard bookkeeping practices, this Agreement and Section 3h of the Bid Term Sheet. ~~Except as specifically set forth in Section 5.2,~~ New Operator has no responsibility to pay for expenses during the Management Period that were incurred prior to the Operations Transfer Date.

## 6.    CHANGE OF OWNERSHIP

6.1  As soon as possible, but no longer than fifteen (15) business days after the Sale Closing, New Operator shall file all licensing applications and other documents required by CDPH for the issuance of the New License to operate the Facility and thereafter New Operator shall diligently proceed with securing the New License and shall, (a) upon request of Licensee, advise Licensee of the status of New Operator's efforts to secure the New License

11

and (b) promptly advise Licensee once the anticipated date of issuance of the New License is known to New Operator. New Operator shall be solely responsible for any and all costs associated with the change of ownership process. Licensee agrees to execute all documentation required by the CDPH in connection with its review and approval of New Operator's license application, including, but not limited to, completing portions of CMS Form 855-A requiring information about Licensee and Licensee's signature, and any letter stating Licensee's intention to relinquish its license upon issuance of the New License to New Operator. Licensee shall cooperate with New Operator in its efforts to obtain any such New Licenses and provider agreements and numbers.

6.2  Promptly upon receipt of a request therefore from Licensee, New Operator will provide Licensee with copies of its licensure applications, and any further documents submitted by New Operator to CDPH in response to any requests from such governmental authority, and with copies of its New License.

6.3  In connection with the transfer of the Facility pursuant to the terms of this Agreement, Licensee shall, in a timely manner, furnish a letter to CDPH stating that Licensee's License will be relinquished to CDPH contingent upon the issuance of the New License to the New Operator. Licensee shall otherwise cooperate with New Operator, to the extent reasonably necessary, in order to facilitate the issuance of the New License. Licensee shall not voluntarily surrender its License or Provider Agreements or provider number, acknowledges that breach of this promise may deny the New Operator and Plan Funders under the Bid Term Sheet all or a substantial part of the value of the consideration for its or their agreement hereto and under the Bid Term Sheet, and agree that such a voluntary surrender of the License, a Provider Agreement or a provider number will be a material breach of this Agreement, and that, in such event, the New Operator may terminate its purchase of this Facility and the Bid Term Sheet.

6.4  Subject to Section 3h of the Bid Term Sheet, Licensee shall cooperate with New Operator to establish a weekly transfer of all remittances received from third party payors, including Medicare and Medi-Cal, or the applicable fiscal intermediary, for services rendered at the Facility.

6.4   *[Section moved to become Section 4.3, without other change.]*

6.5  On or before the Sale Closing, Licensee and New Operator shall execute, as applicable, the (a) the Interim Sublease and Interim Sub-Sublease, a form of which is attached hereto as **Exhibit "2"**, (b) a bill of sale, as may be required and provided in connection with a Sale Transaction (the "**Bill of Sale**"), (c) an assignment of agreements, as may be required and provided in connection with a Sale Transaction (the "**Assignment of Agreements**") and (d) such other documentation as is required for processing of the New Operator's skilled nursing facility application with CDPH, and in connection with the assignment of the Provider Agreements to New Operator.

6.6  On or as of the Sale Closing, Licensee shall assign to New Operator the Provider Agreements, subject to Section **3**.

12

7.     **ADMISSION AGREEMENTS.**    On the Sale Closing, Licensee and New Operator will enter into an assignment and assumption of admission agreements, as required or provided in connection with a Sale Transaction, pursuant to which Licensee will assign to New Operator and New Operator will assume all of Licensee's right, title and interest in and to and obligations accruing on and after the Sale Closing under the admissions agreements with the persons who are residing at the Facility on the Sale Closing (the "**Assigned Admission Agreements**"); provided, however, that the Assigned Admission Agreements shall specifically provide that nothing therein shall be construed as imposing any liability on New Operator for the acts or omissions of Licensee under the Assigned Admission Agreements prior to the Operations Transfer Date.

8.     **TRANSFER OF RESIDENT TRUST FUNDS**

8.1 On the Operations Transfer Date, or within five (5) days thereafter, Licensee shall prepare and deliver to New Operator a true, correct, and complete accounting and inventory (properly reconciled) of any resident trust funds and residents' property held by Licensee as of the Operations Transfer Date in trust for residents at the Facility (collectively the "**Resident Trust Funds**").

8.2 On the Operations Transfer Date, Licensee hereby agrees to transfer to New Operator the Resident Trust Funds and New Operator hereby agrees that it will accept such Resident Trust Funds in trust for the residents/responsible parties and be solely accountable to the residents/responsible parties for such Resident Trust Funds in accordance with the terms of this Agreement and applicable statutory and regulatory requirements.

8.3 Within fifteen (15) days after the Operations Transfer Date, Licensee shall prepare a final reconciliation comparing the actual Resident Trust Fund balance on the Operations Transfer Date to the amount of the Resident Trust Funds transferred to New Operator on the Operations Transfer Date, and, to the extent the former exceeds the latter, Licensee shall remit such excess to New Operator or to the extent the latter exceeds the former, New Operator shall remit such excess to Licensee.

8.4 Licensee shall remain responsible for and New Operator shall have no responsibility (a) as to the applicable resident/responsible party and regulatory authorities in the event the Resident Trust Funds delivered by Licensee to New Operator pursuant to Section 8.2 are demonstrated to be less than the full amount of the Resident Trust Funds for such residents as of the Operations Transfer Date, (b) for inaccuracies in the accounting and inventory provided by Licensee, or (c) for claims which arise from actions or omissions of Licensee prior to the Operations Transfer Date with respect to the Resident Trust Funds. Licensee shall indemnify, defend and hold harmless New Operator for any and all of the foregoing.

8.5 Except as set forth in Sections 8.4 and 16, Licensee shall have no responsibility to the applicable resident/responsible party and regulatory authorities with respect to any Resident Trust Funds delivered to New Operator.

13

9.    **COST REPORTS.**  At the end of the Operating Periods, Licensee shall timely prepare and file with the appropriate Medicare and Medi-Cal agencies any final cost reports with respect to its operation of the Facility that are required to be filed by law under the terms of the Medicare or Medi-Cal programs.   New Operator shall cooperate fully with Licensee by providing to Licensee any and all necessary financial or accounting information reasonably required by Licensee to enable Licensee to timely submit the foregoing described final cost reports.  Within five (5) business days of request by New Operator, Licensee shall provide New Operator with copies of such cost reports, together with copies of any amendments thereto and correspondence related to such final cost reports.

10.    **EMPLOYEES** *[Section 10.1 and certain of the bracketed language in this Section 10 only are applicable to, and to be included for, those facilities that have a Union Contract.]*

10.1 [New Operator acknowledges and agrees that it has been advised that the employees of the Facility are the members of a labor union and that the terms and conditions of their employment with Licensee are governed, in part, by a Collective Bargaining Agreement (the "**CBA**") between the [*Insert name of any applicable union*] (the "**Union**") and Licensee (the "**Employer**"), which commenced on [_____] and terminates on [_____].  The CBA applies to [_____ (__)] other facilities operated by an affiliate of the Licensee and nothing herein shall be construed as imposing any liability on New Operator under the CBA with respect to such other facilities.  In the event of a Closing, the Parties agree that the Debtor shall assume the CBA as it pertains to the Facility and, in the event of a Sale Closing, as of the Sale Closing, the Debtor also shall assign the CBA to the New Operator.  Prior to a Closing and during the Management Period, the costs under the CBA attributable to the Management Period in accordance herewith shall be paid by New Operator and, as between Licensee and New Operator, New Operator shall be liable for such costs.]

10.2 Any unpaid wages and benefits that have accrued as of the Operations Transfer Date by law or by the terms of Licensee's standard policies and procedures for employees of the Facility as of 11:59 p.m. on the day immediately prior to the Operations Transfer Date shall be paid by and/or the responsibility of Licensee directly.  From the Operations Transfer Date and until a Closing, Early Cancellation Date or date selected by the Parties, New Operator shall pay and be responsible for wages and benefits of new and continuing employees of the Facility.  In the event of a Sale Closing, (a) the Parties agree that Licensee shall terminate all of the Facility employees as of 11:59 p.m. on the day immediately prior to the Sale Closing; and (b) any unpaid wages and benefits that Licensee is required by law or by the terms of Licensee's standard policies and procedures to pay to the employees of the Facility as of a Sale Closing shall be paid by New Operator if the Operations Transfer Date is prior to a Sale Closing and shall be paid by Licensee if the Operations Transfer Date is not prior to a Sale Closing.

10.3 Subject to [Section 10.1 and] applicable law, as of the Operations Transfer Date, the terms of employment, benefits and rate of pay of employees of the Facility shall be determined by the New Operator. Prior to the Operations Transfer Date, on a date and

14

at a time to be agreed upon by Licensee and New Operator, Licensee shall permit New Operator, in cooperation and coordination with Licensee, to meet with the [non-union] employees of the Facility and to advise them of New Operator's proposed plans with respect to their continued employment, the terms thereof, and any applicable benefits, or their termination.

10.4 It is the understanding and belief of Licensee and New Operator that Licensee currently employs approximately [_____] employees at the Facility, and that, at least in the event of a Sale Closing, Licensee would be required to give notice to the employees of the Facility of the "closure" thereof as of the Sale Closing under the Worker Adjustment and Retraining Notification Act (the "**WARN Act**") or under any comparable State law. New Operator, however, has advised the Licensee that (a) it does not want Licensee to deliver any such notices to the employees, and (b) it presently intends as of a Sale Closing to offer employment on an "at-will" basis to at least two-thirds of the employees of the Facility who, as of the Sale Closing, [are not employed pursuant to the CBA,] work at the Facility and have been employed for twenty (20) hours or more per week on average on terms and conditions substantially similar to those being received by such employee. In reliance on such statements, Licensee has agreed that a closure notice will not be provided to the employees of the Facility.  New Operator acknowledges and agrees that the provisions of this Section 10.4 are designed, in part, to ensure that Licensee is not required to give notice to employees of the Facility of the "closure" thereof as of the Sale Closing under the WARN Act or any comparable state law.  Accordingly, New Operator agrees to indemnify, defend and hold harmless Licensee and its affiliates from and against any damages, loss, costs or expenses, including, but not limited to, reasonable attorneys' fees, which such party may incur under the WARN Act or any comparable state law in the event of the violation by New Operator of its obligations under this Section 10.4, including without limitation any violation which results from an allegation that the employees of the Facility were constructively terminated as a result of the terms and conditions of employment offered by New Operator for the period following the Sale Closing.

10.5 New Operator agrees to cooperate with Licensee to provide information concerning which employees are to be retained by New Operator as of the Operations Transfer Date (the "**Retained Employees**"), as well as the service descriptions and salary levels for any such retained employees.  Licensee, or any of its affiliates, shall have the right to employ or offer to employ, other than at the Facility or at any facility being managed by New Operator or its affiliates, any employee that is not a Retained Employee and any employee who declines to continue employment at the Facility after the Operations Transfer Date.

10.6 Licensee acknowledges and agrees that New Operator is not assuming any of Licensee's obligations to its employees under Section 601, et seq., of ERISA and Section 4980B of the Internal Revenue Code ("**COBRA**") or otherwise.  New Operator agrees to cooperate with Licensee in providing information concerning the nature of the benefits offered to each Retained Employee.  In the event of, and as of, a Sale Closing, the Retained Employees still employed as of such date shall be eligible for participation in a group health plan (as defined for purposes of Internal Revenue Code Section 4980B) established and

15

maintained by New Operator for the general benefit of its employees and their dependents in accordance with the terms of New Operator's plan. Notwithstanding the foregoing, after a Sale Closing, New Operator shall not make any deduction related to any group health or other employee benefit plan from the salary of any Retained Employee unless and until such Retained Employee is actually and effectively covered by such group health or other employee benefit plan, as any such plan is administered by or for the benefit of New Operator.

11.    **COSTS, NO PRORATIONS, AND LICENSEE'S CONTINUED LIABILITY TO THIRD PARTIES**

11.1 Consistent with <u>Section 13</u> of the Bid Term Sheet, Licensee shall pay and be responsible for all Facility operating expenses that first come due prior to the Operating Transfer Date (subject to the Bankruptcy Code) and New Operator shall pay and be responsible for all Facility operating expenses that first come due during the Operating Periods. This provision shall be implemented by New Operator remitting to Licensee any invoices that first came due before the Operations Transfer Date and by New Operator assuming responsibility for the payment of any invoices that first come due on and after the Operations Transfer Date. There shall be no proration's, including of any prepaid license fees or license fees that come due during the Operating Periods.

11.2 New Operator shall obtain its own insurance coverage covering all periods commencing on and after the Operations Transfer Date and for the duration of the Operating Periods[. To the extent reasonably available as to each policy and each coverage period, New Operator shall] [1][or] [and] and, as to policies other than property insurance and worker's compensation, name Licensee as an "Additional [Named] Insured" to said insurance coverage policies until an Equity Closing or, in the event of a Sale Transaction, until (a) for "occurrence" type policies, the Licensure Date and (b) for "claims-made" type policies, two years after the Licensure Date as to claims arising prior to the Licensure Date.

11.3 On the Operations Transfer Date, Licensee shall not remove from the Facility any petty cash or any other funds maintained at or for the Facility immediately prior to the Operations Transfer Date other than as set forth in <u>Section 4.2</u>.

11.4 In addition to any costs for which New Operator is responsible under <u>Section 3</u> hereof, and subject to <u>Section 3h</u> of the Bid Term Sheet as to the "Collection Team," New Operator shall be solely responsible for all costs, fees and expenses incurred by it in connection with the transfer of operations of the Facility as contemplated hereunder, including but not limited to the cost of any training of the Facility's employees that it may elect to undertake with the approval of Licensee, which approval shall not be unreasonably withheld, conditioned or delayed, provided such training is conducted in a manner that does not disrupt the operation of the Facility prior to the Operations Transfer Date, and the cost of any due diligence that New Operator undertakes in furtherance of such transfer of operations,

---

[1] [The Debtors and Plan Funders have not yet reached agreement as to the bracketed language / alternatives in this section . Insurance availability and cost is being determined. If they do not reach a consensual resolution of these issues, as provided in the Bid Term Sheet, the Debtors and Plan Funders will seek to have the matter of the alternative language resolved by the Court.]

16

DOCS_LA:279581.12 73538/001

DOCS_LA:279581.17 73538/001

including but not limited to, the costs of any examination or copying by New Operator or its agents of any books, records, patient files or other operational or fiscal information and data of any kind of Licensee or the Facility.  In furtherance and not in limitation of the foregoing, in the event that in the process of any such employee training and/or due diligence examinations Licensee shall incur any out-of-pocket costs or expenses related to the use of its employees, equipment and/or the provision of any such information, New Operator shall, within seven (7) days after a written demand therefor accompanied by reasonably detailed supporting documentation, reimburse Licensee for all of such out of pocket costs and expenses.

11.5 The Parties acknowledge and agree that, at all times until a̶ the Licensure Date, Licensee is and shall remain the responsible Licensee of the Facility, fully liable and legally accountable at all times to all residents and governmental organizations for all patient care funds, and all other aspects of the operation and maintenance of the Facility, with ultimate authority and responsibility for the operation of the Facility.

## 12.    ACCESS TO RECORDS

12.1 On the Operations Transfer Date, Licensee shall deliver to New Operator all records necessary to the efficient, continued operation of the Facility.  Nothing herein shall be construed as precluding Licensee from removing from the Facility (a) the originals of the financial records which relate to its operations at the Facility, including all accounts payable and accounts receivable records, provided, however, Licensee shall leave copies of such records at the Facility in order to facilitate the provisions of this Agreement, (b) the originals of any proprietary materials related to its overall corporate operations, (c) the originals of all performance improvement records, (d) originals of employee records for all former employees not employed by New Operator, (e) copies of Retained Employees' records, (f) copies of patient records for all former patients no longer residing at the Facility, (g) copies of records for all current patients residing at the f̶a̶c̶i̶l̶i̶t̶y̶ Facility and (h) legacy records stored either on-site or off-site.  Notwithstanding anything to the contrary in this Agreement, Licensee and New Operator agree that all information, records and data collected or maintained regarding Facility residents shall be confidential.   Licensee, New Operator, and their respective employees and agents shall maintain the confidentiality of all Facility resident information received in accordance with applicable California and federal laws, including the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-91) ("**HIPAA**") and the regulations issued in connection therewith.  No employee or agent of Licensee or New Operator shall discuss, transmit or narrate in any manner any Facility resident information of a personal, medical, or other nature except as a necessary part of providing services to the resident, effectuating a transfer of the Facility operations, or otherwise fulfilling its obligations under this Agreement or under law.  The obligations under this Section 12 shall survive the termination of this Agreement, whether by rescission or otherwise.

12.2 From and after the Operations Transfer Date, New Operator shall allow Licensee and its agents and representatives to have reasonable access to (upon reasonable prior notice and during normal business hours), and to make copies of, the books and records and supporting material of the Facility relating to the period prior to and including the

17

Operations Transfer Date, to the extent reasonably necessary to enable Licensee to among other things investigate and defend malpractice, employee or other claims, to file or defend cost reports and tax returns, to complete/revise, as needed, any patient assessments which may be required for Licensee to seek reimbursement for services rendered prior to the Operations Transfer Date, to verify accounts receivable collections due Licensee and to file exceptions to the Medicare routine cost limits for the cost reporting periods prior to and including the Operations Transfer Date.

12.3 Licensee shall have the right, at Licensee's sole cost and expense, after five (5) days of the delivery of a reasonable request therefore to New Operator to enter the Facility and remove originals or copies of any such records formerly owned by Licensee and delivered to New Operator; provided, however, that if directed by Licensee in its request to New Operator, New Operator shall within such five (5) day period, forward such records to Licensee, at Licensee's sole cost and expense, to the address designated by Licensee; and provided, further, that if, for purposes of litigation involving a patient or employee to whom such record relates, an officer of or counsel for Licensee certifies that an original of such record must be produced in order to comply with applicable law or the order of a court of competent jurisdiction in connection with such litigation then the records so delivered or removed shall be an original. Licensee's request to New Operator to enter the Facility shall be made in writing and state the date upon which the entry to the Facility is required. Any record so removed shall promptly be returned to New Operator following its use, and nothing herein shall be interpreted to prohibit New Operator from retaining copies of any such documents. Nothing hereinabove shall limit, reduce or restrict the Licensee's access to the Facility during the term of the Management Period in connection with any of the Licensee's rights, duties or obligations under this Agreement or that are required by applicable laws, statures, rules or regulations imposed upon the Licensee of the Facility.

12.4 New Operator agrees to maintain such books, records and other material comprising records of the Facility's operations, including, but not limited to, patient records and records of patient funds, to the extent required by law, that relate to the period preceding the Operations Transfer Date and that have been delivered to New Operator by Licensee in conjunction herewith. If upon the expiration of any legislatively mandated retention period for such books and records, New Operator decides to dispose of or destroy such books and records, New Operator shall, upon receipt of a written request from Licensee, allow Licensee a reasonable opportunity to remove such books and records, at Licensee's sole cost and expense, from the Facility.

12.5 New Operator acknowledges and agrees that the books, records and other materials described in this <u>Section 12</u> are unique, that in the event of a breach by New Operator of its obligations under this <u>Section 12</u>, Licensee would suffer injury for which it would not be fully compensated with monetary damages and accordingly that in the event of a breach by New Operator of its obligations under this <u>Section 12</u>, Licensee shall be entitled to seek to enjoin a breach by New Operator of its obligations under this <u>Section 12</u> and/or to specifically enforce the obligations of New Operator hereunder.

13.    **OPERATING CONTRACTS.**

18

13.1 The Parties acknowledge that New Operator is not assuming any obligations under any existing contracts of Licensee with respect to the Facility, except as and when otherwise provided in the Bid Term Sheet or this Agreement.

13.2 New Operator shall procure for Licensee and maintain during the Management Period comprehensive general liability, property, and other insurance in amounts and with coverage as mandated by the Lease to protect against applicable risks and losses relating to the activities of New Operator relating to the Facility, subject to the following. ~~The~~ As to policies other than property insurance and worker's compensation, the Licensee shall be ~~[a Certtificate~~ a Certificate Holder and ~~]~~ named as "Additional ~~[Named~~ ~~]~~ Insured" on all liability policies~~[, to the extent reasonably available,]~~ covering claims arising from and after the Operations Transfer Date, and shall be afforded such status until (a) for "occurrence" type policies, the Licensure Date and (b) for "claims-made" type policies (including any successor policies), two years following the Licensure Date.  Such insurance shall include professional, general comprehensive and employment practices liability insurance with an insurance company authorized to do business in the State of California and with an A.M. Best rating of "A-" or better, with coverage limits of not less than the amounts required under the terms of the Lease but in any event, for professional and general comprehensive coverage, no less than $ 1,000,000 per incident or $ 3,000,000 aggregate.   The cost of such insurance shall be deemed an "operating expense" of the Facility.  If the insurance policy is a "claims-made" type policy, it and any successor policy or policies in place on or before two years following the Licensure Date shall have a retroactive date to the Operations Transfer Date (or the purchase of any successor policy or policies shall be accompanied by other arrangements that have essentially the same effect, *e.g.*, by virtue of an extended report period or tail coverage for the additional ~~[named~~ ~~]~~ insureds).

13.3 ~~Pending~~ Section 3.12 addresses the Lease and Section 6.5 and Section 22 address the Interim Sublease and Interim Sub-Sublease. For other contracts or leases, pending a Closing, New Operator shall continue to perform under any contract or lease as to the Facility for which Licensee has incurred or is incurring as of the Operations Transfer Date, and itself has paid, obligations with an administrative priority in the Bankruptcy Case (each, an "**Administrative Liability Contract**") to the extent and only to the extent that all of the following are applicable:

13.3.1. ~~On the next business day following the Court's announcement of the winning "Plan Funders", but no  later than August 4, 2014, Licensee will have  provided New Operator a copy of such potential Administrative Liability Contract and a list of all such potential Administrative Liability Contracts for the Facility with at~~ At least the name, address and amount or rate owing or payable to the applicable non-debtor contract or lease party ~~(to facilitate New Operator's ability to ensure continued payment of such vendor or service provider)~~ appear on the list of potential Administrative Liability Contracts for the Facility delivered by the Licensee to Shlomo Rechnitz by August 4, 2014;

---

[2] ~~[The Debtors and Plan Funders have not yet reached agreement as to the bracketed language / alternatives  in this section . Insurance availability and cost is being determined. If they do not reach a consensual resolution of these issues, as provided in the Bid Term Sheet, the Debtors and Plan Funders will seek to have the matter of the alternative language resolved by the Court.]~~

13.3.2. New Operator has not provided Licensee 7 days prior written notice that it intends not to perform under, or to discontinue performance of, such potential Administrative Liability Contract (a "**Discontinuation Notice**") (with Licensee hereby acknowledging that once New Operator does provide such Discontinuation Notice, as of 7 days thereafter, New Operator need not perform under, or may discontinue performance under, such potential Administrative Liability Contract);

13.3.3. The amount sought by the non-debtor party to the subject potential Administrative Liability Contract and to be paid to such party does not include penalties, damages or accelerated performance relating to the termination thereof or relating to the non-performance thereof in accordance herewith; and

13.3.4. Licensee  has not consented or does not consent to New Operator discontinuing performance of such potential Administrative Liability Contract.

13.4 To the extent that New Operator has provided Licensee a Discontinuation Notice as to an Administrative Liability Contract or Licensee has consented, at New Operator's request, to New Operator's non-performance of such contract, Licensee may elect, *inter alia*, to reject such contract, itself perform thereunder at its cost, or seek to assume and assign such contract to another person or entity, so long as in each case, absent New Operator's consent, such potential Administrative Liability Contract will have no  effect on the Facility.

13.5 Although nothing in this Agreement alters or affects a third party's setoff or recoupment rights as against the Licensee, absent a Closing and assumption, or assumption and assignment, of the Provider Agreements, nothing herein does or is intended to impose upon New Operator any obligation to pay amounts that may be owing to Medicare or Medi-Cal for prior overpayments to the Licensee.

13.6 The Parties do not intend that any third party shall have any rights under this Section.

14.    **PROPRIETARY INFORMATION AND MATERIALS.**    New Operator acknowledges and agrees that (a) any and all policies and procedures manuals, (b) proprietary and confidential materials, and (c) information located at and used in connection with the operation of the Facility (collectively, the "**Proprietary Information and Materials**"), unless expressly transferred to New Operator pursuant to this Agreement, shall be and remain the property of Licensee and are not transferred to the New Operator.  However, New Operator shall be permitted to use the Proprietary Information and Materials during the period in which it manages the Facility under the Provider Agreements and License of the Licensee.  Accordingly, the Licensee shall not remove the Proprietary Information and Materials from the Facility on the Operations Transfer Date, but may only do so in the event of a Sale Transaction and when the Manager Approvals has occurred.  Licensee makes no representations or warranties regarding the accuracy or compliance with applicable law or regulations of the Proprietary Information and Materials.  New Operator uses the Proprietary Information and Materials at its own risk.

20

15.    **COMPUTER SOFTWARE AND HARDWARE.**  Licensee shall transfer its accounts receivable data and patient care data in electronic form to New Operator on or before the Operations Transfer Date.  Licensee agrees to cooperate with New Operator in transferring such information, and if requested by New Operator, shall allow New Operator to use its computer systems and software for a period up to ninety (90) days after the Sale Closing for accounts receivable collections and patient care matters.

16.    **INDEMNIFICATION**

16.1  The Licensee acknowledges that it is currently obligated to the State of California for unpaid Quality Assurance Fees and that those fees are presently being collected through offset of payments to the Facility under the Medi-Cal Provider Agreement.  Those unpaid Quality Assurance Fees remain liabilities of the Licensee, may be addressed in connection with a Sale Transaction, and are subject to the terms of the Bid Term Sheet.

16.2  New Operator hereby agrees to indemnify, protect, defend, and hold harmless Licensee and its directors, officers, employees, agents, successors and assigns from and against any and all demands, claims, causes of action, fines, penalties, damages (but specifically excluding lost profits and consequential damages), losses, liabilities (including strict liability), judgments, and expenses (including without limitation, reasonable ~~attorneys~~ attorney's fees and other professional fees and court costs) (collectively a "**Loss**" or "**Losses**") incurred in connection with or arising from: (a) a breach by New Operator of its representations, warranties and obligations under this Agreement that is not cured within thirty (30) days after receipt of written notice from Licensee setting forth in reasonable detail the nature of such breach; (b) the occupancy or operation of the Facility by New Operator from and after the Operations Transfer Date; (c) any acts, omissions, elder abuse or negligence of New Operator or any person claiming under New Operator, or the contractors, agents, employees, invitees or visitors of New Operator with respect to the Facility and its patients and residents from and after the Operations Transfer Date; or (d) any failure by New Operator to pay in accordance with this Agreement any liabilities in connection with the Facility attributable to the period from and after the Operations Transfer Date (including, without limitation, reasonable attorneys' and other professionals' fees and court costs).

16.3  The foregoing indemnification obligations shall survive the expiration or other termination of this Agreement.  All matters arising from an indemnified party's gross negligence or willful misconduct are excluded from the scope of the indemnification owing to such party set forth in Section 16.2.

17.    **FURTHER ASSURANCES**.  Each of the Parties hereto agrees to execute and deliver any and all further agreements, documents or instruments reasonably necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder.

18.    **NOTICES**.  All notices to be given by either party to this Agreement to the other party hereto shall be in writing, and shall be (a) given in person, (b) deposited in the United States mail, certified or registered, postage prepaid, return receipt requested, or (c) sent by national overnight courier service with confirmed receipt, each addressed as follows:

21

If to New Operator:          [_____]
                             [_____]
                             [_____]

with copies to:              [_____]
                             [_____]
                             [_____]

If to Licensee:              [_____]
                             Attn: Mark S. Beckel, General Counsel
                             5120 W. Goldleaf Circle, Ste. 400
                             Los Angeles, CA  90056
                             Tel: (310) 574-3733
                             Email: markb@countryvillahealth.com

with copies to:              Gary W. Sanders
                             Sanders Rehaste Sternshein & Harvey, LLP
                             5316 E. Chapman Ave.
                             Orange, CA  92869
                             Tel: (714) 289-7070
                             Email: Gary@srshhealthlaw.com

       Any such notice shall be deemed delivered when actually received or when delivery is first refused regardless of the method of delivery used.  Any party to whom notices are to be sent pursuant to this Agreement may from time to time change its address for further communications thereunder by giving notice in the manner prescribed herein to all other Parties hereto.  Although either party shall have the right to change its address for notice purposes from time to time, any notice delivered pursuant to this Section 18 to the address set forth in this Section 18, or to such other address as may be hereafter specified in writing in accordance with this Section 18, shall be effective even if actual delivery cannot be made as a result of a change in the address of the recipient of such notice and the party delivering the notice has not received actual written notice in accordance with the provisions of this Section 18 of the current address to which notices are to be sent.

       19.    **PAYMENT OF EXPENSES**.  Each party hereto shall bear its own legal, accounting and other expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transaction contemplated hereby, whether or not the transaction is consummated.

       20.    **ENTIRE AGREEMENT; AMENDMENT; WAIVER**.  This Agreement, together with the other agreements referred to herein, constitutes the entire understanding between the Parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.  This Agreement may not be modified or amended except in writing signed by the Parties hereto.  No waiver of any term, provision or condition of

22

this Agreement in any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder. Subject to Section 1.2 as to a document's definitions, any conflict between the Bid Term Sheet and this Agreement and the other agreements referred to herein shall be controlled by the Bid Term Sheet.

21.    **ASSIGNMENT.**    Licensee may not assign its rights nor delegate its duties hereunder to anyone without the prior written consent of New Operator. New Operator may assign its rights and/or delegate its duties hereunder to any entity owned, managed, or controlled directly or indirectly by the Plan Funders. Any other assignment or delegation by New Operator hereunder shall require the prior written consent of Licensee, which consent shall not be unreasonably withheld or delayed.

22.    ~~ADDITONAL~~ **ADDITIONAL DOCUMENTS.**    In connection with and no later than the date of a Sale Closing, Licensee agrees to execute and deliver two (2) copies of the Interim Sublease, Bill of Sale, the Assignment and Assumption of Admission Agreements, and the Assignment of Agreements to New Operator or its counsel, and further agrees to execute such additional documents as may be required to implement the terms of this Agreement.

23.    **NO JOINT VENTURE; THIRD PARTY BENEFICIARIES.**    Nothing contained herein shall be construed as forming a joint venture or partnership between the Parties with respect to the subject matter hereof. The Parties do not intend that any third party shall have any rights under this Agreement except as expressly provided herein.

24.    **CAPTIONS.**    The section headings contained herein are for convenience only and shall not be considered or referred to in resolving questions of interpretation.

25.    **COUNTERPARTS.**    This Agreement may be executed and delivered via facsimile and in one or more counterparts and all such counterparts taken together shall constitute a single original agreement.

26.    **GOVERNING LAW.**    This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to principles of conflicts of law.

27.    **CONSTRUCTION.**    Both Parties acknowledge and agree that they have participated in the drafting and negotiation of this Agreement. Accordingly, in the event of a dispute between the Parties hereto with respect to the interpretation or enforcement of the terms hereof no provision shall be construed so as to favor or disfavor either Party hereto.

28.    **OPENING MAIL**.    From and after the Operations Transfer Date, New Operator shall be authorized to open mail addressed to Licensee received at the Facility. Subject to Section 3h of the Bid Term Sheet and Sections 4.1.4 and 4.3, all mail received at the Facility relating to Licensee's operation of the Facility prior to the Operations Transfer Date shall be promptly delivered to Licensee by New Operator at the address set forth in Section 18, with all

~~DOCS_LA:279581.12 73538/001~~

DOCS_LA:279581.17 73538/001

such mail to be deposited in the United States mail, certified or registered, postage prepaid, return receipt requested within four (4) days of receipt.

29.     **PROTECTED HEALTH INFORMATION**. The Parties acknowledge that in performing its obligations under Sections 3 and 4 of this Agreement, New Operator will be a business associate of Licensee, as that term is defined in 45 CFR § 160.130.  Accordingly, the Parties adopt and incorporate by reference the provisions of the Business Associate Addendum attached to this Agreement as **Exhibit "3"**.

30.     **INCORPORATION OF RECITALS.**     The Recitals set forth above are incorporated into and made a part of this Agreement.

[SIGNATURE PAGES FOLLOW]

24

DOCS_LA:279581.12 73538/001

DOCS_LA:279581.17 73538/001

044

IN WITNESS WHEREOF, the Parties hereby execute this Agreement as of the day and year first set forth above.

**LICENSEE:**

_____

a California _____

By:_____

Name: _____

Its: _____

**NEW OPERATOR:**

_____

a California _____

By:_____

Name: _____

Its: _____

## LIST OF ATTACHMENTS

| | | |
|---|---|---|
| Addendum A | - | MOTA Provisions |
| Exhibit 1 | - | Bid Term Sheet |
| Exhibit 2 | - | Interim Sub-Sub Lease |
| Exhibit 3 | - | Business Associate Addendum |

**ADDENDUM A**

**MOTA Provisions**

Upon the Sale Closing:

     (i)     Licensee acknowledges that, in connection with a Sale Transaction, it will be transferring its Medicare and Medi-Cal provider agreements and the Medicare and Medi-Cal provider numbers (collectively, the Provider Agreements) to New Operator. New Operator will assume sole and complete liability pursuant to applicable law for assignment and assumption of the Provider Agreements, provided that that Licensee will remain liable for any obligations arising prior to the Operations Transfer Date under the Provider Agreements.

     (ii)     In connection with a Sale Transaction, the New Operator shall purchase the Licensee's accounts receivable pursuant to <u>Section 3h</u> of the Bid Term Sheet.

EXHIBIT "1"

**BID TERM SHEET**

EXHIBIT "2"

## FORM OF INTERIM SUB-SUBLEASE AGREEMENT

This INTERIM SUB SUBLEASE AGREEMENT (this "**Sub-Sublease**") is made and entered into as of [_____ ____[, 2014 (the "**Effective Date**") by and between [*Insert legal name of Shlomo Rechnitz or his assignee, as applicable*] _____, a _____ _____ ("**Landlord**"), and [Debtor Entity]_____, a _____ ("**Tenant**").

## RECITALS

**WHEREAS,** Landlord is the lessee under a sublease ("**Sublease**") from the tenant ("**Sublessor**") under a lease (the "**Prime Lease**") with the owner ("**Prime Landlord**") of the _____-bed skilled nursing facility known as _____, located at _____ (collectively with all improvements located thereat, and the fixtures, furnishings, equipment and other personal property used in the management and operation thereof, the "**Facility**").

**WHEREAS,** Tenant is the current licensee of the Facility pursuant to a license issued to Tenant by the California Department of Public Health ("**CDPH**");

**WHEREAS,** Landlord has applied for a license to operate the Facility as a skilled nursing facility (the "**License**") from the CDPH;

**WHEREAS,** Landlord and Tenant have entered into an Interim Management Agreement and Management and Operations Transfer Agreement (the "**Management Agreement**"), pursuant to which Landlord shall manage the Facility under Tenant's existing license during the term of the Management Agreement;

**WHEREAS,** Landlord desires for Tenant to remain in legal possession of the Facility until the License is issued to Landlord by CDPH so that Tenant's license to operate the Facility will remain in effect; and

**WHEREAS,** Landlord desires to sub-sublease the Facility to Tenant and Tenant desires to sublease the Facility from Landlord on the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the covenants and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. **DESCRIPTION OF THE PREMISES:**

    Landlord hereby sub-subleases to Tenant and Tenant sub-subleases from Landlord the Facility.  The Facility shall be hereinafter referred to as the "**Leased Premises**."

2.    **TERM; TERMINATION:**

2.1  Term.  The term of this Sub-Sublease shall commence on the Effective Date and shall continue for a term coterminous with the remainder of the "Operating Periods" under the Management Agreement unless Landlord terminates this Sublease on account of a default by Tenant.

2.2 Termination.    This Sub-Sublease shall terminate concurrently with the termination of the "Operating Periods" under the Management Agreement unless Landlord terminates this Sub-Sublease on account of a default by Tenant.

3.    **PAYMENTS BY TENANT:**

Commencing on the Effective Date, Tenant shall pay to Landlord as rent for the Leased Premises the sum of Twelve Dollars ($12.00) per year, payable in advance.

4.    **PAYMENTS BY LANDLORD:**

4.1    Utilities.  Landlord shall pay all water, gas, heat, light, power, telephone service and all other utility services supplied to the Leased Premises during the term hereof.

4.2    Taxes.  Landlord shall pay all real and personal property taxes, assessments and levies of any kind or nature whatsoever taxed, assessed, levied or imposed upon or against the Leased Premises during the term hereof.

4.3  Insurance.  Landlord shall pay all insurance premiums for all insurance coverage required of (a) the Landlord as lessee under the Sublease and (b) the Sublessor under the ~~Sublease~~Prime Lease.  Landlord covenants and agrees that all of the property constituting the Leased Premises is covered as of the date hereof and will be covered at all times by general liability, fire, theft and property damage insurance.  All such insurance shall name Landlord and Tenant as insureds as their respective interests may appear and shall name the Sublessor and Prime Landlord as the Sublease and Prime Lease, respectively, require.

4.4    Repairs and Maintenance; Alterations.  Landlord shall pay all costs of repairing and maintaining the Leased Premises and every part thereof in good and sanitary order, condition and repair during the term hereof, reasonable wear and tear excepted.  Tenant shall not make any alterations or changes to the Leased Premises without the prior written approval of Landlord in its sole discretion.

5.  **USE:**

Tenant shall use the Leased Premises for the operation of a skilled nursing facility.  Landlord agrees to apply for and devote its reasonable efforts toward obtaining the License.

6.  **COUNTERPARTS**.

This Sub-Sublease may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the

same instrument.

7.  **CONFLICTS WITH OTHER AGREEMENTS.**

   If there is any conflict between the terms of this Sub-Sublease and the Prime Lease, Management Agreement, or Sublease, the Prime Lease, Management Agreement and Sublease, in that order, shall control.

   EVIDENCING their agreement on the above terms and conditions, Landlord and Tenant have executed this Sub-Sublease as of the date first written above.

**"LANDLORD"**

_____

a California _____

By:_____
Name: _____
Its: _____


**"TENANT"**

_____

a California _____

By:_____
Name: _____
Its: _____

Case 8:14-bk-11335-TA    Doc 605    Filed 08/29/14    Entered 08/29/14 01:07:37    Desc
Main Document    Page 52 of 75

EXHIBIT "3"

## BUSINESS ASSOCIATE ADDENDUM

### Business Associate Addendum

1.    Scope and Purpose.  [*Insert legal name of Shlomo Rechnitz or his assignee, as applicable*], a _____ (**Business Associate**) and _____, a [*Insert legal name of applicable Debtor*] (**Covered Entity**) have entered into an Interim Management Agreement and Management and Operations Transfer Agreement dated on or about _____ ____, 2014 (the **MOTA**). Pursuant to the MOTA, Business Associate will create or receive Protected Health Information (defined below) from or on behalf of Covered Entity, which information is subject to protection under the Federal Health Insurance Portability and Accountability Act of 1996 (**HIPAA**), the Health Information Technology for Economic and Clinical Health Act, (the **HITECH Act**) and related regulations (the **HIPAA Regulations**).  The terms of this addendum (the **BA Provisions**) shall govern the access to, use and disclosure of such Protected Health Information.

### Definitions

2.    General.  Terms used, but not otherwise defined, in these BA Provisions shall have the same meaning given to those terms by the MOTA, HIPAA, the HITECH Act and HIPAA Regulations as in effect or as amended from time to time.

3.    Specific.

3.1    **Electronic Protected Health Information**. "Electronic Protected Health Information" shall have the same meaning as the term "electronic protected health information" in 45 CFR § 160.103, limited to the information that Business Associate creates, receives, maintains, or transmits from or on behalf of Covered Entity.

3.2    **Individual.** "Individual" shall have the same meaning as the term "individual" in 45 CFR § 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR § 164.502(g).

3.3    **Protected Health Information**. "Protected Health Information" or "PHI" shall have the same meaning as the term "protected health information" in 45 CFR § 160.103, limited to the information created or received by Business Associate from or on behalf of Covered Entity.

3.4    **Secretary.** "Secretary" shall mean the Secretary of the Department of Health and Human Services or his or her designee.

3.5    **Security Rule.** "Security Rule" shall mean the Security Standards at 45 Part 160 and Part 164.

3.6    **State Law**. "State Law" shall mean the statutes and regulations of the state

of California relating to the privacy and security of Protected Health Information.

## Obligations and Activities of Business Associate

4.1.  **Use and Disclosure**. Business Associate agrees not to use or disclose Protected Health Information other than as permitted or required by the MOTA, these BA Provisions or as Required By Law. Business Associate shall comply with these BA Provisions and all present and future provisions of HIPAA, the HITECH Act, the HIPAA Regulations and State Law that relate to the privacy and security of Protected Health Information and that are applicable to Business Associate. Without limiting the generality of the foregoing, Business Associate shall not directly or indirectly receive remuneration in exchange for disclosing PHI received from or on behalf of Covered Entity except as permitted by HITECH Act § 13405, the HIPAA Regulations and State Law, nor shall Business Associate use PHI for marketing purposes, attempt to re-identify PHI or use or disclose PHI in any manner that would violate State Law, regardless of whether such action is on behalf of or permitted by the Covered Entity.

4.2.  **Appropriate Safeguards**. Business Associate agrees to use appropriate safeguards to prevent the use or disclosure of the Protected Health Information other than as provided for by these BA Provisions. Without limiting the generality of the foregoing sentence, Business Associate will:

(a)  Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of Electronic Protected Health Information as required by the Security Rule;

(b)  Ensure that any agent, including a subcontractor, to whom Business Associate provides Electronic Protected Health Information agrees to implement reasonable and appropriate safeguards to protect Electronic Protected Health Information; and

(c)  Promptly report to Covered Entity any security incident ("**Security Incident**") of which Business Associate becomes aware. In addition, Business Associate agrees to promptly notify Covered Entity following the discovery of a Breach of Unsecured Protected Health Information (as those terms are defined in 45 CFR 164.402). A Breach is considered "discovered" as of the first day on which the Breach is known, or reasonably should have been known, to Business Associate or any employee, officer or agent of Business Associate, other than the individual committing the Breach. Any notice of a Security Incident or Breach of Unsecured Protected Health Information shall include the identification of each Individual whose Protected Health Information has been, or is reasonably believed by Business Associate to have been, accessed, acquired, or disclosed during such Security Incident or Breach as well as any other available information that Covered Entity is required to include in its notification to individuals under the HIPAA Regulations or State Law. In addition, In addition, Business Associate shall comply with applicable State Law regarding notification of data breaches.

4.3.  **Reporting**. Business Associate agrees to promptly report to Covered Entity any use or disclosure of Protected Health Information not permitted by these BA

Provisions of which Business Associate becomes aware.

4.4.   **Mitigation.** Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate or its employees, officers or agents in violation of the requirements of these BA Provisions (including, without limitation, any Security Incident or Breach of Unsecured Protected Health Information). Business Associate agrees to reasonably cooperate and coordinate with Covered Entity in the investigation of any violation of the requirements of these BA Provisions and/or any Security Incident or Breach. Business Associate shall also reasonably cooperate and coordinate with Covered Entity in the preparation of any reports or notices to the Individual, a regulatory body or any third party required to be made under HIPAA, HIPAA Regulations, the HITECH Act, or any other Federal or State laws, rules or regulations, provided that any such reports or notices shall be subject to the prior written approval of Covered Entity.

4.5.   **Agents**. Business Associate shall ensure that any agent, including a subcontractor, to whom it provides Protected Health Information received from, or created or received by, Business Associate on behalf of Covered Entity agrees to the same restrictions and conditions that apply through these BA Provisions to Business Associate with respect to such information.

4.6.   **Access to Designated Record Sets**. To the extent that Business Associate possesses or maintains Protected Health Information in a Designated Record Set, Business Associate agrees to provide access, at the request of Covered Entity, and in the time and manner designated by the Covered Entity, to Protected Health Information in a Designated Record Set, to Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under HIPAA Regulations. If an Individual makes a request for access to Protected Health Information directly to Business Associate, Business Associate shall notify Covered Entity of the request within three (3) business days of such request and will cooperate with Covered Entity and allow Covered Entity to send the response to the Individual.

4.7.   **Amendments to Designated Record Sets**. To the extent that Business Associate possesses or maintains Protected Health Information in a Designated Record Set, Business Associate agrees to make any amendment(s) to Protected Health Information in a Designated Record Set that the Covered Entity directs or agrees to pursuant to HIPAA Regulations at the request of Covered Entity or an Individual, and in the time and manner designated by the Covered Entity. If an Individual makes a request for an amendment to Protected Health Information directly to Business Associate, Business Associate shall notify Covered Entity of the request within three business (3) days of such request and will cooperate with Covered Entity and allow Covered Entity to send the response to the Individual.

4.8.   **Access to Books and Records**. Business Associate agrees to make its internal practices, books, and records, including policies and procedures and Protected Health Information, relating to the use and disclosure of Protected Health Information

received from, or created or received by Business Associate on behalf of, Covered Entity available to the Covered Entity, or to the Secretary, in a time and manner designated by the Covered Entity or designated by the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule.

4.9.    **Accountings**. Business Associate agrees to document such disclosures of Protected Health Information and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with HIPAA, HIPAA Regulations and the HITECH Act.

4.10.    **Requests for Accountings**. Business Associate agrees to provide to Covered Entity or an Individual, in the time and manner designated by the Covered Entity, information collected in accordance with Section 4.9 of these BA Provisions, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with HIPAA, HIPAA Regulations and the HITECH Act. If an Individual makes a request for an accounting directly to Business Associate, Business Associate shall notify Covered Entity of the request within three business (3) days of such request and will cooperate with Covered Entity and allow Covered Entity to send the response to the Individual.

## Permitted Uses and Disclosures by Business Associate

5.1.    **MOTA**. Except as otherwise limited in these BA Provisions, Business Associate may use or disclose Protected Health Information to perform functions, activities, or services for, or on behalf of, Covered Entity as specified in the MOTA, provided that such use or disclosure would not violate HIPAA, HIPAA Regulations, the HITECH Act or State Law if done by Covered Entity or the minimum necessary policies and procedures of the Covered Entity.

5.2.    **Use for Administration of Business Associate**. Except as otherwise limited in these BA Provisions, Business Associate may use Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

5.3.    **Disclosure for Administration of Business Associate**. Except as otherwise limited in these BA Provisions, Business Associate may disclose Protected Health Information for the proper management and administration of the Business Associate, provided that (i) disclosures are Required by Law, or (ii) Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

## Obligations of Covered Entity

6.1.    **Notice of Privacy Practices.** Covered Entity shall provide Business

Associate with a copy of its Notice of Privacy Practices, as well as any amendments to such notice that Covered Entity may adopt from time to time.

6.2.    **Changes in Authorization or Permission.** Covered Entity shall provide Business Associate with any changes in or revocation of any permission by an individual to disclose the individual's PHI, if such changes affect Business Associate's permitted or required uses and or disclosures.

## Term and Termination

7.1.    **Term**. These BA Provisions shall be effective as of the date of the MOTA and shall terminate when all of the Protected Health Information provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this Section.

7.2.    **Termination for Cause**. Upon Covered Entity's knowledge of a material breach by Business Associate of the terms of these BA Provisions, Covered Entity shall either:

(a)    Provide an opportunity for Business Associate to cure the breach or end the violation. If Business Associate does not cure the breach or end the violation within the time specified by Covered Entity, Covered Entity shall terminate: (i) these BA Provisions; (ii) all of the provisions of the MOTA that involve the use or disclosure of Protected Health Information; and (iii) such other provisions, if any, of the MOTA as Covered Entity designates in its sole discretion;

(b)    If Business Associate has breached a material term of these BA Provisions and cure is not possible, immediately terminate: (i) these BA Provisions; (ii) all of the provisions of the MOTA that involve the use or disclosure of Protected Health Information; and (iii) such other provisions, if any, of the MOTA as Covered Entity designates in its sole discretion; or

(c) If neither termination nor cure are is feasible, Covered Entity shall report the violation to the Secretary.

**7.3.    Effect of Termination.**

(a)    Except as provided in this Section, upon termination of these BA Provisions, for any reason, Business Associate shall return or destroy all Protected Health Information received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to Protected Health Information that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the Protected Health Information.

(b)    In the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate shall

provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon mutual agreement of the Parties that return or destruction of Protected Health Information is infeasible, Business Associate shall extend the protections of these BA Provisions to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Health Information.

## Miscellaneous

8.1.    **Regulatory References.** A reference in these BA Provisions to a section in HIPAA, HIPAA Regulations, the HITECH Act or State Law means the section as in effect or as amended or modified from time to time, including any corresponding provisions of subsequent superseding laws or regulations.

8.2.    **Amendment**. The Parties agree to take such action as is necessary to amend the MOTA from time to time as is necessary for Covered Entity to comply with the requirements of HIPAA, the HIPAA Regulations and the HITECH Act.

8.3.    **Interpretation.** Any ambiguity in these BA Provisions shall be resolved to permit Covered Entity and Business Associate to comply with HIPAA, the HIPAA Regulations, the HITECH Act and State Law. If there is any conflict between the HIPAA Regulations and State Law, the most stringent requirements shall control the Parties' obligations under the MOTA and these BA Provisions.

8.4.    **Miscellaneous**. Except as otherwise set forth in Section 8.3 of these BA Provisions, in the event of a conflict between these BA Provisions and the terms of the MOTA, these BA Provisions shall prevail. These BA Provisions supersede and replaces any former business associate agreement or addendum entered into by the parties.

*[Signatures on next page]*

DOCS_LA:279581.8 73538-001
DOCS_LA:279581.17 73538-001

*Business Associate Agreement*
-   *Signature Page*

**COVERED ENTITY:**

_____
a California _____

By:_____
Name: _____
Its: _____

**BUSINESS ASSOCIATE:**

_____
a California _____

By:_____
Name: _____
Its: _____

# PROOF OF SERVICE OF DOCUMENT

1

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

2

3

A true and correct copy of the foregoing document entitled: **STIPULATION RESOLVING CONCERNS OF DHCS AND HHS RE FORM OF INTERIM MANAGEMENT AGREEMENT PROPOSED BY DEBTORS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

4

5

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 19, 2014,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

6

7

8

- Michael A Abramson    maa@abramsonlawgroup.com
- Russell S Balisok    balisok@stopelderabuse.org
- Robert D Bass    rbass@greenbass.com
- Ron Bender    rb@lnbyb.com

9

- Richard S Berger    rberger@lgbfirm.com, marizaga@lgbfirm.com;ncereseto@lgbfirm.com;msutton@lgbfirm.com

10

- Manuel A Boigues    bankruptcycourtnotices@unioncounsel.net
- Matthew Borden    borden@braunhagey.com, fair@braunhagey.com

11

- Michael J Bujold    Michael.J.Bujold@usdoj.gov

12

- Steven Casselberry    scasselberry@mrllp.com, jjacobs@mrllp.com
- Cheryl S Chang    Chang@Blankrome.com, Lalocke@Blankrome.com;RMerten@Blankrome.com

13

- Baruch C Cohen    bcc4929@gmail.com, pjstarr@starrparalegals.com
- Michael T Delaney    mdelaney@bakerlaw.com, sgaeta@bakerlaw.com

14

- Marianne M Dickson    MDickson@seyfarth.com, shobrien@seyfarth.com
- Caroline Djang    cdjang@rutan.com

15

- Joseph A Eisenberg    jae@jmbm.com, vr@jmbm.com;tgeher@jmbm.com;bt@jmbm.com;jae@ecf.inforuptcy.com

16

- Andy J Epstein    taxcpaesq@gmail.com
- Fahim Farivar    lawyercpa@gmail.com

17

- William L Foreman    wforeman@oca-law.com, laiken@oca-law.com
- Eric J Fromme    ejf@jmbm.com, lo2@jmbm.com

18

- Jeffrey K Garfinkle    jgarfinkle@buchalter.com, docket@buchalter.com;dcyrankowski@buchalter.com
- Fredric Glass    fglass@fairharborcapital.com

19

- Christina Goebelsmann    cgoebelsmann@wargofrench.com
- Nancy S Goldenberg    nancy.goldenberg@usdoj.gov

20

- D Edward Hays    ehays@marshackhays.com, ecfmarshackhays@gmail.com
- Mark S Horoupian    mhoroupian@sulmeyerlaw.com, ppenn@sulmeyerlaw.com;mhoroupian@ecf.inforuptcy.com;ppenn@ecf.inforuptcy.com

21

- Ivan L Kallick    ikallick@manatt.com, ihernandez@manatt.com

22

- David I Katzen    katzen@ksfirm.com, schuricht@ksfirm.com
- Gerald P Kennedy    gerald.kennedy@procopio.com, kristina.terlaga@procopio.com;calendaring@procopio.com;efile-bank@procopio.com

23

- Monica Y Kim    myk@lnbrb.com

24

- K Kenneth Kotler    kotler@kenkotler.com, zoe@kenkotler.com
- Ian Landsberg    ilandsberg@landsberg-law.com, bgomelsky@landsberg-law.com;cdonoyan@landsberg-law.com;dzuniga@landsberg-law.com

25

- Mary D Lane    mal@msk.com, mec@msk.com

26

- Leib M Lerner    leib.lerner@alston.com
- Elan S Levey    elan.levey@usdoj.gov, louisa.lin@usdoj.gov

27

- Howard S Levine    howard@cypressllp.com, jennifer@cypressllp.com
- Elizabeth A Lossing    elizabeth.lossing@usdoj.gov

28

- Craig G Margulies    craig@marguliesfaithlaw.com, staci@marguliesfaithlaw.com;mhillel@marguliesfaithlaw.com;fahim@marguliesfaithlaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

059

- Ashley M McDow    amcdow@bakerlaw.com, mdelaney@bakerlaw.com;sgaeta@bakerlaw.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Kenneth Miller    kmiller@ecjlaw.com, kanthony@ecjlaw.com
- Benjamin Nachimson    ben.nachimson@wgfllp.com
- Tara L Newman    tara.newman@doj.ca.gov
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Christopher E Prince    cprince@lesnickprince.com
- Hanna B Raanan    hraanan@marlinsaltzman.com, jhawkes@marlinsaltzman.com;sshepard@marlinsaltzman.com;irvinefileclerk@marlinsaltzman.com
- Hamid R Rafatjoo    hrafatjoo@venable.com, kfox2@venable.com;bclark@venable.com
- Kurt Ramlo    kr@lnbyb.com
- Brett Ramsaur    bramsaur@swlaw.com, kcollins@swlaw.com
- Paul R Shankman    pshankman@jhindslaw.com
- Lindsey L Smith    lls@lnbyb.com
- Adam D Stein-Sapir    info@pfllc.com
- Alan Stomel    alan.stomel@gmail.com, astomel@yahoo.com
- Kelly Sweeney    ksweeney@spiwakandiezza.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Jeanne C Wanlass    jwanlass@loeb.com, karnote@loeb.com;ladocket@loeb.com
- Joshua D Wayser    joshua.wayser@kattenlaw.com, jessica.mickelsen@kattenlaw.com;kim.johnson@kattenlaw.com,ecf.lax.docket@kattenlaw.com,adelle.shafer@kattenlaw.com
- Andrew F Whatnall    awhatnall@daca4.com
- Elisa B Wolfe-Donato    Elisa.Wolfe@doj.ca.gov
- Jennifer C Wong    bknotice@mccarthyholthus.com
- David Wood    dwood@marshackhays.com, ecfmarshackhays@gmail.com
- Benyahou Yeroushalmi    ben@yeroushalmilaw.com
- Kristin A Zilberstein    bknotice@mccarthyholthus.com, kzilberstein@mccarthyholthus.com

**2.  SERVED BY UNITED STATES MAIL**: On **August 19, 2014**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 19, 2014**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Service by Overnight Mail***
The Honorable Catherine E. Bauer
United States Bankruptcy Court
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5165 / Courtroom 5D
Santa Ana, CA 92701-4593

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 19, 2014 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                     **F 9013-3.1.PROOF.SERVICE**

# EXHIBIT 2

1   KAMALA D. HARRIS
    Attorney General of California
2   LESLIE P. MCELROY
    RICHARD T. WALDOW
3   Supervising Deputy Attorneys General
    GREGORY M. CRIBBS, State Bar No. 175642
4   Deputy Attorney General
    CARMEN D. SNUGGS, State Bar No. 221935
5   Deputy Attorney General
     300 South Spring Street, Suite 1702
6    Los Angeles, CA  90013
     Telephone: (213) 897-2441
7    Fax: (213) 897-2805
     E-mail: Gregory.Cribbs@doj.ca.gov
8
    Attorneys for Petitioners
9

EXEMPT FROM FILING FEES
PER GOVERNMENT CODE SECTION 6103

**FILED**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA

**AUG 2 3 2011**

GARY M. BLAIR, Executive Officer
BY _Joseph Garnica_
     JOSEPH GARNICA, Deputy Clerk

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11              COUNTY OF SANTA BARBARA – ANACAPA DIVISION

12

13
    RON CHAPMAN, M.D., MPH, Director of the      Case No.      1382467
14  California Department of Public Health;
    DEPARTMENT OF PUBLIC HEALTH OF               **PETITION FOR ORDER APPOINTING A**
15  THE STATE OF CALIFORNIA,                     **RECEIVER**

16                              Petitioner,       Date:
17                 v.                             Time:
                                                  Dept:
18                                                Judge:
    CARING TEAM INC., dba CENTRAL
19  COAST NURSING CENTER; and DOES 1             [Health & Safety Code, § 1327]
    through 20, inclusive,
20
                                Respondents.
21

22

23          Petitioner Ron Chapman, M.D., MPH, Director of the California Department of Public

24  Health and the California Department of Public Health (hereinafter Department), hereby petitions

25  this Court for an Order Appointing a Receiver, pursuant to California Health and Safety Code

26  section 1327, to temporarily operate Respondent facility, a skilled nursing facility, for a six-

27  month period commencing immediately or no later than September 1, 2011, for the reasons set

28  forth below, and alleges as follows:

                                             1

1.    Petitioner Ron Chapman is the Director of the California Department of Public Health and brings this action in his official capacity and not otherwise.

2.    The California Department of Public Health (Department) is charged with the management of long-term health care facilities, as set forth in California Health and Safety Code sections 1325 *et seq.*, and with the administration and enforcement of the Long-Term Care, Health, Safety, and Security Act of 1973, as set forth in California Health and Safety Code sections 1417 *et seq.*[1]

3.    Petitioner is informed and believes and thereupon alleges that Respondent Caring Team Inc., dba Central Coast Nursing Center (Facility) is a skilled nursing facility. Since September 1, 2010, the Facility has held a provisional license with the State of California to operate a long-term skilled nursing facility located at 3880 Via Lucero, Santa Barbara, California. The Facility's current provisional license is valid from March 1, 2011 to August 31, 2011. (Declaration of Ron Chapman (Chapman Decl.), p. 2, ¶ 6; Declaration of Pamela Dickfoss (Dickfoss Decl.), p. 1, ¶ 4; Exhibit C attached thereto.)

4.    The identities of Does 1 through 20 are presently unknown to Petitioner and this petition will be amended when the identities are ascertained.

5.    Venue of this action is in the County of Santa Barbara as mandated by Health and Safety Code section 1327.

6.    On July 13, 2011, the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services (CMS) terminated Medicare and Medicaid certification of the Facility. (Chapman Decl., p. 1, ¶ 4; Dickfoss Decl., p. 1, ¶ 4; Exhibit D attached thereto.) Previously, CMS also denied payments for new admissions effective May 31,

---

1. Unless otherwise indicated, all statutory references are to the California Health and Safety Code.

Petition for Order Appointing a Receiver

2011. Termination from participation in the Medicare and Medicaid programs was taken after an initial annual recertification survey on January 13, 2011 and three subsequent revisits on March 24, 2011, June 29, 2011, and July 14, 2011 respectively. Termination was due to a failure to achieve substantial compliance with Federal requirements for nursing homes participating in the Medicare and/or Medicaid programs. (Chapman Decl., pp. 1-2, ¶ 4; Dickfoss Decl., p. 1, ¶ 4; Exhibit D attached thereto.)

      7.     The recertification survey on January 13, 2011, identified twenty-two (22) violations, of which the three (3) most serious violations were in the category of quality of care and resulted in actual harm to patients. (Chapman Decl., p. 1, ¶ 4a.) The first follow-up survey on March 24, 2011, identified sixteen (16) violations, of which eight (8) were repeat violations, and the most serious violation posed an immediate jeopardy to patient health and safety. (Chapman Decl., p. 2, ¶ 4b.) The second follow-up survey on June 29, 2011, identified four (4) repeat violations in the category of quality of life, quality of care, and infection control. (Chapman Decl., p. 2, ¶ 4c.) The third follow-up survey, on July 14, 2011, identified three (3) repeat violations again in the category of quality of life, quality of care, and infection control. (Chapman Decl., p. 2, ¶ 4d.)

      8.     From August 2, 2011 through August 12, 2011, the Department began, conducted, and ended a licensing visit survey to determine if the Facility was in full compliance with the licensing requirements of Health and Safety Code section 1427. The Department determined that the Facility was out of compliance with numerous regulations related to administrative services, patient funds held in trust, staff development, patient care policies and procedures, medication storage, pharmaceutical service, dietary service, nursing service, and patient rights. (Dickfoss Decl., pp. 1-2, ¶ 5; Exhibit E attached thereto.)

3

9.    On August 15, 2011, the Department informed the Facility that it was denied a permanent license and that its provisional license would terminate on August 31, 2011. (Chapman Decl., p. 2, ¶ 5; Exhibit A attached thereto.)  The denial was based upon the Facility's failure to meet nurse staffing requirements, failure to report incidences that involved alleged abuse of patients, failure to assess and properly develop a plan of care, and a variety of other violations.  (Chapman Decl., p. 2, ¶ 5; Exhibit A attached thereto.)

10.    On September 1, 2011, the Facility will be unlicensed and therefore cannot continue to operate without a license, pursuant to Health and Safety Code sections 1253 and 1298.  (Chapman Decl., pp. 2-3, ¶ 6; Dickfoss Decl., p. 1, ¶ C; Exhibit C attached thereto.)

11.    Although the Department is aware that the Facility has had inquiries from potential buyers interested in purchasing the facility, no application package from a new potential buyer has been submitted to or received by the Department and there is now little time left to process a change of ownership package for the Facility prior to the expiration of its provisional license. (Chapman Decl., pp. 2-3, ¶ 6.)  In addition, the Facility currently owes approximately two million dollars ($2,000,000.00) in Quality Assurance Fees to the Medi-Cal program, pursuant to Health and Safety Code sections 1324.20 *et seq.*, which would have to be paid by any new owner should the Facility fail to do so.  (Chapman Decl., pp. 2-3, ¶ 6.)

12.    Section 1327 (a) provides that the Department may petition the superior court for the county in which the facility is located for an order appointing a receiver whenever circumstances exist indicating the continued management of a long-term care facility by the current licensee would present a substantial probability or imminent danger of serious physical harm or death to the patients, or there exists in the facility a condition in substantial violation of applicable state statutes and regulations, or the facility exhibits a pattern or practice of habitual violations of applicable state statutes and regulations, or the facility is closing or intends to

4

1   terminate operation as a licensed long-term health care facility and adequate arrangements for

2   relocation of residents have not been made at least 30 days prior to the closing or termination.

3   Although here, all of those factors exist, the latter is the primary reason sought for seeking

4   appointment of a receiver.  As of September 1, 2011, just nine (9) days from the filing of this

5   petition, the Facility's provisional license will terminate and no new license will be issued.  In

6   addition, adequate arrangements were not, and have not, been made for relocation of the residents

7   thirty (30) days prior to September 1, 2011.

8
9          13.      Pursuant to Health and Safety Code sections 1253 and 1298, only a receiver may

10  operate an unlicensed facility.  Section 1325.5 does not permit a temporary manager to operate an

11  unlicensed facility.

12
13         14.      It is essential a receiver be appointed to operate the Facility while the patients are

14  assessed and an orderly transfer is made in accordance with Section 1336.2.  A receivership is

15  essential to protect the health and safety of the patients until the statutorily required notice and

16  relocation services to the Facility's patients are provided.

17         15.      The Department recommends Brius, LLC (Brius), through Shlomo Rechnitz, Chief

18  Executive Officer, be appointed as the receiver.  Brius has an excellent background and

19  reputation.  Brius is willing to be appointed as the receiver for the Facility. (Chapman Decl., p. 3,

20  ¶ 10; Exhibit B attached thereto.)  The receiver is to temporarily operate the long-term health care

21  facility for a period of not more than six months, and the Facility should be enjoined from

22  interfering with the receiver in the conduct of his duties.  (Health & Saf. Code, §§1327 subd. (a),

23
24  subd. 1331(a).)

25         16.      The appointment of a receiver to operate the Facility is the only reasonable,

26  prudent and available means to protect the lives, health, safety and dignity of the patients at the

27  Facility.

28

5

WHEREFORE, Petitioner prays that the Court:

A.      Appoint a receiver to take temporary control of, operate and manage the Facility for a period of not more than six months.

B.      Appoint Brius, LLC (Brius), through Shlomo Rechnitz, Chief Executive Officer, as the receiver of the Facility.  Mr. Rechnitz is a highly qualified individual and has an excellent background and reputation.  Mr. Rechnitz is willing and available to accept the appointment as the receiver in this case.

C.      Set an appropriate bond as specified in Health and Safety Code section 1327;

D.      Enjoin Respondent, its agents, employees, assigns, or representatives of any kind, from any interference with the receiver whatsoever;

E.      Issue an order divesting Respondent, its agents, assigns, and anyone acting by or through them, of possession and control of the Facility;

F.      Issue an order requiring Respondent to turn over the keys of the Facility on or before September 1, 2011, or at an earlier time and date set by the Court.  It is further requested Respondent, its agents, assigns, and anyone acting by or through it, be enjoined from removing any property from the Facility, including, but not limited to, fixtures, funds, furnishings, goods and records;

G.      Issue an order requiring Respondent to turn over all financial information, books, bills, records, journals, accounts receivable, monies, all patient funds and property in its possession, all Facility accounts, or other data to the receiver, and to fully cooperate with the receiver in collecting receivables and making payments as they become due;

H.      Issue an order requiring the receiver to make a monthly accounting to the Department commencing on or before the 15th day of the month following the commencement of the receivership;

6

I.     Approve the compensation to be paid the receiver in the amount of $20,000 per month, plus expenses consistent with normal business practices;

J.     Authorize the receiver to hire attorneys to represent him in the handling of complicated matters which require specialized expertise if any arise;

K.     Issue an order requiring the receiver to operate the Facility in accordance with all of the laws and regulations of California governing the operation of a skilled nursing facility;

L.     Pursuant to section 1333, the licensee shall be required by the Court to reimburse the State for expenses in connection with the receivership and the State granted a lien on the assets of the licensee to recover costs to the State;

M.     Permit the receiver to exercise all powers and duties as set forth in Health and Safety Code section 1329;

N.     Provide for the protection of patients' medical records and free access of the receiver to these medical records;

O.     Permit the receiver to request funding from the State Health Facilities Citation Penalties Account if the funds available from the licensee are inadequate for the receiver to pay outstanding bills to vendors;

P.     For costs of suit; and

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

7

1      Q.    For such other and further relief that the Court deems just and proper.

2

3    Dated: August _2V_, 2011              Respectfully Submitted,

4

5                            KAMALA D. HARRIS
                            Attorney General of California

6                            LESLIE P. MCELROY
                            RICHARD T. WALDOW
                            Supervising Deputy Attorneys General

7

8                            GREGORY M. CRIBBS

9                            CARMEN D. SNUGGS
                            Deputy Attorneys General

10                           *Attorneys for Petitioners*

11    LA2011601254

12    60670061.doc

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 3

State of California—Health and Human Services Agency

# California Department of Public Health



**RON CHAPMAN, MD, MPH**
*Director*

**EDMUND G. BROWN JR.**
*Governor*

August 15, 2011

Mr. Shlomo Rechnitz:
CEO
Brius, LLC
5967 West Third Street, Suite 200
Los Angeles, CA 90036

Dear Mr. Rechnitz:

The purpose of this letter is to notify and congratulate Brius, LLC regarding your successful application for placement on the list maintained by the California Department of Public Health, Licensing and Certification Program (L&C), for potential appointment as a Temporary Manager (TM) pursuant to the Health and Safety Code (HSC) Section 1325.5.

A TM is defined in statute as the person, corporation, or other entity appointed temporarily by the Department as a substitute facility manager or administrator with authority to hire, terminate, or reassign staff, obligate facility funds, alter facility procedures, and manage the facility to correct deficiencies identified in a facility's operation. HSC Section 1325.5(j) specifically requires that a TM meet all of the following qualifications:

1. Be qualified to oversee correction of deficiencies on the basis of experience and education.
2. Not have been found guilty of misconduct by any licensing board.
3. Have no financial ownership interest in the facility and have no member of his or her immediate family who has a financial ownership interest in the facility.
4. Not currently serve, or within the past two years have served, as a member of the staff of the facility.
5. Be acceptable to the facility.

Based on L&C's evaluation of your application, your company has been added to the list of eligible and qualified applicants as meeting the requirements and qualifications for appointment as a TM. In the event that L&C needs to appoint a Temporary Manager when specific serious quality of care and/or financial difficulties exist and it determines the current facility ownership does not have the ability to correct deficiencies, L&C may contact your organization to discuss the nature of the problems and determine if Brius, LLC can provide the services needed for the specific situation.

1615 Capitol Avenue, Suite 73.481, MS 3202 ● P.O. Box 997377 ● Sacramento, CA 95899-7377
(916) 319-9670 ● (916) 552-8693 FAX ● Internet address: www.cdph.ca.gov

071

Shlomo Rechnitz
Page 2

Thank you for your interest and assistance in meeting the Department's commitment to
providing quality health care to California's vulnerable citizens and ensuring patient
safety. If you have any questions regarding the TM solicitation and evaluation process,
or L&C's overall TM Program, please do not hesitate to call me at (916) 319-9670.

Sincerely,

Chase Pierson
L&C Budgets and Fiscal Services Manager

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California  90067**

A true and correct copy of the foregoing document entitled **OPPOSITION OF SHLOMO RECHNITZ TO EMERGENCY MOTION TO DISQUALIFY STALKING HORSE PARTIES FROM (1) INTERIM MANAGEMENT OF DEBTORS' FACILITIES, AND (2) PURCHASING DEBTORS' FACILITIES OR ASSETS; DECLARATION OF MARK JOHNSON**: will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **August 29, 2014**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒    Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On (*date*) **_____**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐    Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **August 29, 2014**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**By Personal Delivery**
Honorable Erithe S. Smith
United States Bankruptcy Court
Santa Ana Division
411 W 4th St Ste 5041
Santa Ana, CA 92701-4500

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 29, 2014 | Megan Wertz | /s/ Megan Wertz |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                      **F 9013-3.1.PROOF.SERVICE**
DOCS_LA:281023.1 73538/001

1. __TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)__:

- Michael A Abramson     maa@abramsonlawgroup.com
- Russell S Balisok     balisok@stopelderabuse.org
- Robert D Bass     rbass@greenbass.com
- Ron Bender     rb@lnbyb.com
- Richard S Berger     rberger@lgbfirm.com,
  marizaga@lgbfirm.com;ncereseto@lgbfirm.com;msutton@lgbfirm.com
- Manuel A Boigues     bankruptcycourtnotices@unioncounsel.net
- Matthew Borden     borden@braunhagey.com, fair@braunhagey.com
- Michael J Bujold     Michael.J.Bujold@usdoj.gov
- Steven Casselberry     scasselberry@mrllp.com, jjacobs@mrllp.com
- Cheryl S Chang     Chang@Blankrome.com, Lalocke@Blankrome.com;RMerten@Blankrome.com
- Baruch C Cohen     bcc4929@gmail.com, pjstarr@starrparalegals.com
- Michael T Delaney     mdelaney@bakerlaw.com, sgaeta@bakerlaw.com
- Marianne M Dickson     MDickson@seyfarth.com, shobrien@seyfarth.com
- Caroline Djang     cdjang@rutan.com
- Joseph A Eisenberg     jae@jmbm.com,
  vr@jmbm.com;tgeher@jmbm.com;bt@jmbm.com;jae@ecf.inforuptcy.com
- Andy J Epstein     taxcpaesq@gmail.com
- Fahim Farivar     lawyercpa@gmail.com
- William L Foreman     wforeman@oca-law.com, laiken@oca-law.com
- Eric J Fromme     ejf@jmbm.com, lo2@jmbm.com
- Jeffrey K Garfinkle     jgarfinkle@buchalter.com, docket@buchalter.com;dcyrankowski@buchalter.com
- Fredric Glass     fglass@fairharborcapital.com
- Christina Goebelsmann     cgoebelsmann@wargofrench.com
- Matthew A Gold     courts@argopartners.net
- Nancy S Goldenberg     nancy.goldenberg@usdoj.gov
- D Edward Hays     ehays@marshackhays.com, ecfmarshackhays@gmail.com
- Mark S Horoupian     mhoroupian@sulmeyerlaw.com,
  ppenn@sulmeyerlaw.com;mhoroupian@ecf.inforuptcy.com;ppenn@ecf.inforuptcy.com
- Ivan L Kallick     ikallick@manatt.com, ihernandez@manatt.com
- David I Katzen     katzen@ksfirm.com, schuricht@ksfirm.com
- Gerald P Kennedy     gerald.kennedy@procopio.com,
  kristina.terlaga@procopio.com;calendaring@procopio.com;efile-bank@procopio.com
- Monica Y Kim     myk@lnbrb.com
- K Kenneth Kotler     kotler@kenkotler.com, zoe@kenkotler.com
- Ian Landsberg     ilandsberg@landsberg-law.com, bgomelsky@landsberg-
  law.com;cdonoyan@landsberg-law.com;dzuniga@landsberg-law.com
- Mary D Lane     mal@msk.com, mec@msk.com
- Leib M Lerner     leib.lerner@alston.com
- Elan S Levey     elan.levey@usdoj.gov, louisa.lin@usdoj.gov
- Howard S Levine     howard@cypressllp.com, jennifer@cypressllp.com
- Elizabeth A Lossing     elizabeth.lossing@usdoj.gov
- Samuel R Maizel     smaizel@pszjlaw.com, smaizel@pszjlaw.com
- Craig G Margulies     craig@marguliesfaithlaw.com,
  staci@marguliesfaithlaw.com;mhillel@marguliesfaithlaw.com;fahim@marguliesfaithlaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_June 2012_

DOCS_LA:281023.1 73538/001

**F 9013-3.1.PROOF.SERVICE**

- Ashley M McDow    amcdow@bakerlaw.com,
  mdelaney@bakerlaw.com;sgaeta@bakerlaw.com;rojeda@bakerlaw.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Kenneth Miller    kmiller@ecjlaw.com, kanthony@ecjlaw.com
- Benjamin Nachimson    ben.nachimson@wgfllp.com
- Tara L Newman    tara.newman@doj.ca.gov
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Christopher E Prince    cprince@lesnickprince.com
- Hanna B Raanan    hraanan@marlinsaltzman.com,
  jhawkes@marlinsaltzman.com;sshepard@marlinsaltzman.com;irvinefileclerk@marlinsaltzman.com
- Hamid R Rafatjoo    hrafatjoo@venable.com, kfox2@venable.com;bclark@venable.com
- Kurt Ramlo    kr@lnbyb.com
- Brett Ramsaur    bramsaur@swlaw.com, kcollins@swlaw.com
- Paul R Shankman    pshankman@jhindslaw.com
- Lindsey L Smith    lls@lnbyb.com
- Adam D Stein-Sapir    info@pfllc.com
- Alan Stomel    alan.stomel@gmail.com, astomel@yahoo.com
- Kelly Sweeney    ksweeney@spiwakandiezza.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Jeanne C Wanlass    jwanlass@loeb.com, karnote@loeb.com;ladocket@loeb.com
- Joshua D Wayser    joshua.wayser@kattenlaw.com,
  jessica.mickelsen@kattenlaw.com;kim.johnson@kattenlaw.com,ecf.lax.docket@kattenlaw.com,adelle.shafer@kattenlaw.com
- Andrew F Whatnall    awhatnall@daca4.com
- Elisa B Wolfe-Donato    Elisa.Wolfe@doj.ca.gov
- Jennifer C Wong    bknotice@mccarthyholthus.com
- David Wood    dwood@marshackhays.com, ecfmarshackhays@gmail.com
- Benyahou Yeroushalmi    ben@yeroushalmilaw.com
- Kristin A Zilberstein    bknotice@mccarthyholthus.com, kzilberstein@mccarthyholthus.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
DOCS_LA:281023.1 73538/001

**F 9013-3.1.PROOF.SERVICE**